# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                        No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants Christopher Garcia, Edward

Troup, Joe Gallegos, Arturo Arnulfo Garcia, Andrew Gallegos, Chris Chavez, Mario Rodriguez,

Rudy Perez, Carlos Herrera, Anthony Ray Baca, Daniel Sanchez, and Mauricio Varela's Sealed Opposed Motion to Compel Disclosure of Discoverable Materials Pursuant to Rule 16, filed September 22, 2017 (Doc. 1270)("Motion"). The Court held a hearing on November 9, 2017. The primary issue is whether the Court should compel Plaintiff United States of America to produce the following evidence requested by the Defendants: (i) all documents and records supporting DNA results obtained in the case, including bench notes and Federal Bureau of Investigation ("FBI") procedures and policies pertaining to DNA testing; (ii) all documentation related to Syndicato de Nuevo Mexico ("SNM") members charged in separate cases; (iii) all call records, texts, memoranda, 302s,[1] recordings, debrief notes, and documents pertaining to financial payments or benefits relating to Eric Duran, Grace Duran No. 1, Grace Duran No. 2, Felicia Cordova, and Caroline Buena; (iv) all law enforcement cooperation agreements regarding any individual providing information to any law enforcement agency in the investigation; (v) documents pertaining to the United States' witness Mario Montoya's criminal history record and the benefits Montoya received for his cooperation with law enforcement; (vi) subpoenas served upon all sources of investigative information; and (vii) law enforcement agents' notes from debriefs of all defendants and confidential human sources in the case. The Court grants the Motion in part and denies it in part. The Court concludes that: (i) Plaintiff United States of America must produce bench notes describing the observations of technicians conducting DNA analysis, but does not need to produce DNA testing procedures and protocols; (ii) the United States does not need to produce documentation related to SNM members charged in separate cases; (iii) the United States must produce all requested documentation pertaining to the United States' witness Eric Duran for

---

[1]302s, also known as FD-302s, are FBI forms that agents prepare to summarize the interviews they conduct.

which disclosure is required by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)("<u>Brady</u>"), and <u>Giglio v. United States</u>, 405 U.S. 150 (1972)("<u>Giglio</u>"); (iv) the United States must produce all law enforcement cooperation agreements within the United States' possession and relating to the individuals listed in paragraph 5.f of the Motion; (v) the United States must produce all documentation pertaining to the United States' witness Montoya's criminal history record and the benefits Montoya received for his cooperation with law enforcement to the extent that such documentation exists; (vi) the United States must produce all unsealed subpoenas served upon all sources of investigative information; and (vii) the United States must produce all law enforcement agents' notes from debriefs for which <u>Brady</u> and <u>Giglio</u> require disclosure, and the United States must preserve all other documents pertaining to agents' notes as required by the Jencks Act, 18 U.S.C. § 3500. In addition, the United States and Christopher Garcia must meet and confer to come to a mutual agreement about C. Garcia's remaining discovery requests.

### **FACTUAL BACKGROUND**

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment"). The background facts are largely unchanged from those facts that the Court provided in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events.

This case deals with crimes that SNM allegedly committed through its members. <u>See</u> Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18,

United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a prison gang that formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates assaulted and raped twelve correctional officers after taking them hostage. Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 inmates were injured. See Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, including "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders to members outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals: primarily the control and profit of narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its power. See Indictment at 4. If another gang does not follow SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any

suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM generates income by having its members and associates traffic drugs and extort narcotic traffickers. See Indictment at 8. SNM members' recent conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections Department") Officials motivated the FBI's present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

In March, 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina. See Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO"). Molina was J. Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). See MOO at 6, 2016 WL 7242579, at *3. The New Mexico Third Judicial District Attorney's Office accused J. Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. See MOO at 6, 2016 WL 7242579, at *3. That New Mexico indictment charged J. Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. See MOO at 6-7, 2016 WL 7242579, at *3. In November, 2015, the state District Attorney dismissed the charges against J. Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy. See MOO at 7, 2016 WL 7242579, at *3. "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level." MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts. See Indictment at 1, 9-18. All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Indictment at 9-18. Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta,[2] Defendant Benjamin Clark, M. Rodriguez, Defendant

---

[2]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2003, I was an active member of the SNM. The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM. J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM. The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting. The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico. This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R. This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[3] and D. Sanchez are the enterprise's alleged leaders. See Indictment at 6. The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders. See Indictment at 6. The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) define that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Indictment at 9.

---

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[3]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM. On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S. Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State. Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S. As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S. I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C." Indictment at 9 (Count 1). On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G." Indictment at 10 (Count 2). On June 17, 2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez allegedly murdered "F.S." Indictment at 10-11 (Count 3). On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B." Indictment at 11 (Count 4). On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B. See Indictment at 11-12 (Count 5). In March 2014, Armenta, Montoya, M. Rodriguez, Defendant Timothy Martinez, Baca, Defendant Mauricio Varela, D. Sanchez, Defendant Carlos Herrera, and Defendant Rudy Perez allegedly conspired to murder "J.M." Indictment at 12 (Count 6). On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, D. Sanchez, Herrera, and R. Perez allegedly murdered J.M. See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R." Indictment at 13-14 (Count 8). Starting "on a date uncertain, but no later than 2013," and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S." Indictment at 14 (Count 9). During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M." Indictment at 15 (Count 10). On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Indictment at 15-16 (Count 11). On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a conspiracy to murder charge. See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Indictment at 16 (Count 13). From February 1, 2016, until February 27, 2016, J. Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez allegedly conspired to murder "J.G." Indictment at 17 (Count 14). Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Indictment at 17-18 (Count 15). The same Defendants also allegedly tampered with a witness, J.G. See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)[4] -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C.

_____

[4]The Court granted a conditional severance to one Defendant in that case. See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.). The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his rights under the Speedy Trial Act, 18 U.S.C. §§ 3161-74. The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping. Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . . If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32. Ultimately, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor. See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld). On March 22, 2017, R. Gallegos pled guilty in his severed case. See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

§ 1962(d).[5]  The United States is separately prosecuting C. Garcia for drug crimes, see United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

**PROCEDURAL BACKGROUND**

On October 4, 2016, in a pretrial hearing, the Court outlined its general approach regarding this case's discovery.  See Transcript of Hearing (held October 4, 2016), filed October 18, 2016 (Doc. 743)("Oct. 2016 Tr.").  The United States agreed to produce material under the Jencks Act, fourteen days before trial even though the Jencks Act does not require the United States to produce a witness' statements until after the witness testifies, see Oct. 2016 Tr. at 19:2-12 (Beck), and the Court indicated that it was "not going to require any Jencks material to be produced before the 14 days," Oct. 2016 Tr. at 23:10-12 (Court).  On the other hand, the Court indicated that the United States "needs to go in and look at these files and do a Brady review," and "produce the Brady material promptly, immediately."  Oct. 2016 Tr. at 23:16-19 (Court).  The Court later memorialized its discovery determinations in its Sealed Memorandum Opinion and Order at 106-11, 2017 WL 2271430, at *50-52, filed January 3, 2017 (Doc. 809).

1.      **The Motion.**

On September 22, 2017, C. Garcia filed the Motion, making thirty-five discovery requests. See Motion at 7-24.  Troup, J. Gallegos, Garcia, A. Gallegos, Chavez, Rodriguez, Perez, Herrera, Baca, Sanchez, and Varela join the Motion.  See Motion at 1.  The Motion specifically requests:

_____

[5]The Court has also declared that case complex under the Speedy Trial Act.  See United States v. Baca, No. CR 16-1613, Memorandum Opinion and Order, filed October 20, 2016 (Doc. 238).

(i) the identification, investigatory documents, and Confidential Human Source ("CHS") documents of all 114 suspected SNM members arrested; (ii) the identification and documentation of all thirty SNM members who are cooperating with law enforcement; (iii) all law enforcement notes from debriefs of all Defendants and CHS; (iv) law enforcement agents' notes regarding all Defendants; (v) telephone records of Duran's use of the NM Corrections Department's telephone lines from December 1, 2014, to the present; (vi) Montoya's entire criminal history and his motivation to cooperate with law enforcement; (vii) all cellular telephone and electronic devices, recordings, and digital reports obtained in the case regarding C. Garcia, Duran, Montoya, Sammy Griego, Baca, Angelina Hito, and Tomas Clark, as well as the electronic surveillance ("ELSUR") recording of Billy Cordova's cell or person while in custody; (viii) all documents and records supporting DNA results obtained in the case; (ix) all telephones, tablets, and computers seized from C. Garcia, as well as all cellular telephones issued to CHSs; (x) a mirror image of all electronic files obtained during a search warrant executed December 2, 2017, at C. Garcia's residence; (xi) all chains of custody for firearm evidence related to Counts 11 and 12; (xii) all law enforcement agents' notes of an alleged gun deal on November, 29, 2015, involving C. Garcia; (xiii) a list of all law enforcement witnesses, lay witnesses, and expert witnesses whom the United States intends to call at the trial; (xiv) law enforcement reports regarding the allegations in the case; (xv) all judicial orders regarding all NM Corrections Department inmates' use of cellular telephones; (xvi) all subpoenas served on any source of investigative information; (xvii) all documents related to the allegations in the case; (xviii) all forensic laboratory reports obtained in the case; (xix) all criminal history documents related to all CHSs, witnesses, and informants testifying against C. Garcia; (xx) all of C. Garcia's state and federal prison records; (xxi) all prior statements made by any witness whom the United States intends to call at trial; (xxii) all law

enforcement communications, notes, and reports related to the case's allegations; (xxiii) all electronic communications between the United States Attorney's Office for the District of New Mexico and any law enforcement agents involved in the case; (xxiv) all electronic communications between law enforcement agents and any of the United States' witnesses; (xxv) a copy of all tapes produced by law enforcement body recorders or dashboard cameras; (xxvi) notice of all evidence that the United States will use against C. Garcia; and (xxvi) recordings and transcripts of all law enforcement interviews conducted between 2004 and the date of sentencing with any witnesses whom the United States intends to call; (xxvii) viewing of all laboratories where DNA analysis was conducted in the case; (xxviii) an immediate, independent testing of all DNA evidence; (xxix) a complete, unredacted set of all discovery that the United States produced in the case; (xxx) a complete, unredacted set of discovery of all CHSs, informants, cooperating Defendants, and witnesses in the case; (xxxi) all NM Corrections Department polices and procedures in effect when C. Garcia was housed at NM Corrections Department facilities; (xxxii) all NM Corrections Department documents regarding SNM; (xxxiii) all evidence of drug distributions to SNM and Defendants in the case; (xxxiv) all prior law enforcement contacts since January 1, 2003, with C. Garcia; and (xxxv) transcripts of audio recordings that the United States intends to use at trial.  See Motion at 7-24.

> **2.    The Hearing.**

The Court held a hearing on the Motion on November 9, 2017.  See Transcript of Motion Proceedings on November 9, 2017 at 1 (taken November 9, 2017), filed November 20, 2017 (Doc. 1457)("Tr.").  C. Garcia noted that the United States "chose not to file a response."  Tr. at 184:17-18 (Sirignano).  C. Garcia said that the FBI conducted DNA analyses, but that he had received only the examiner's report.  See Tr. at 185:7-11 (Sirignano).  C. Garcia said that the FBI

had recently "changed its DNA procedures," and C. Garcia argued that the United States should disclose collection, storage, and other DNA records so that the "defense DNA expert [can] do what it needs to do based on the subjectivity of the [FBI's new DNA procedures]." Tr. at 185:13-17 (Sirignano).

The Court stated its concern that, "if there is no problem with the DNA that you know of, it just seems to me that this is a fishing expedition." Tr. at 186:2-4 (Court). The Court further noted that there is no "reason to think that there is a problem with the DNA or the lab or the testing. And so it seems to me this is probably something you're not entitled to under the criminal rules." Tr. at 186:6-10 (Court). C. Garcia argued that the FBI's new DNA procedures are "a problem," because the FBI's new system changed the "likelihood ratios."[6] Tr. at 186:15-21 (Sirignano). C. Garcia argued that he is entitled to discovery "[b]ased on the subjectivity of the new standards [and] the way that the examiner is now looking at different electropherograms." Tr. at 187:1-3 (Sirignano). The Court responded that it interpreted C. Garcia's argument as saying: "Any criminal defendant that has DNA tested by the FBI is entitled to all this information. That just can't be the law, can it?" Tr. at 187:8-10 (Court). The Court added that C. Garcia had not shown "any evidence of unreliability" in the FBI's testing methods. Tr. at 187:15-16 (Court). C. Garcia stated that all he has is "a piece of paper with an opinion" from the FBI, and therefore he does not "know how [the] examiner from the FBI got to the conclusion that it made." Tr. at 188:24-25 (Sirignano). According to C. Garcia, he cannot "challenge what [the FBI] did without having a record of each step that every DNA examiner must take now with this new science, and to make

---

[6]"Likelihood ratio" refers to the probability that two DNA samples share the same source. National Research Council Committee on DNA Forensic Science: An Update, The Evaluation of Forensic DNA Evidence, Washington, D.C.: National Academies Press (1996), available at https://www.ncbi.nlm.nih.gov/books/NBK232615/ (last visited November 4, 2019).

sure that it was done properly." Tr. at 189:10-13 (Sirignano). C. Garcia summarized that "all [he is] asking for is what [the FBI] did, their standard operating procedures[,] if they followed the standard operating procedures, [and] why the FBI changed their likelihood ratios in June 2017 to a different standard of likelihood ratios in July." Tr. at 189:21-25 (Sirignano).

C. Garcia conceded that the new likelihood ratios "got better for the defense," but that he still believed the FBI's DNA testing procedures are problematic. Tr. at 190:2-3 (Sirignano). C. Garcia argued that there may be additional people's DNA on the firearm that the FBI tested. See Tr. at 190:15-18 (Sirignano). C. Garcia asserted that the DNA evidence is "relevant" and may contain Brady material. Tr. at 190:19-20 (Sirignano). C. Garcia further argued that the FBI regularly turns over its DNA testing procedures and that the "Court can't really do its gatekeeping function without really knowing if what they did is generally acceptable." Tr. at 191:3-5 (Sirignano). The Court asked whether there are any court opinions "saying you get this discovery to decide whether you're going to file a Daubert motion?" Tr. at 191:21-23 (Court). C. Garcia responded that he "can find out for the Court." Tr. at 191:24-25 (Sirignano). C. Garcia stated that the United States has produced the "underlying data" for Counts 1, 2, 3, 4, and 5, but that he is seeking "the training records and the way that the DNA is collected." Tr. at 193:2-3 (Sirignano). J. Gallegos stated that most of the requested materials are normally produced, and argued that the United States should also produce the DNA testing procedures and the FBI's revisions to the testing procedures that occurred during the time period of the alleged offenses. See Tr. at 194:12-195:5 (Benjamin). J. Gallegos argued that, because there were offenses that occurred as early as 2001 and as late as 2012, the FBI likely used different procedures at different times to test DNA, and therefore the United States should produce procedures for the "multiple different time frames that apply." Tr. at 195:17 (Benjamin).

- 14 -

The United States maintained that it could provide the "bench notes from the [DNA] testing," but that it would "have to talk to the FBI about [producing the] policies." Tr. at 196:10-13 (Beck). The United States argued that, under rule 16 of the Federal Rules of Criminal Procedure, it should not have to produce the policies "unless there is some reason to question the credibility" of the DNA reports. Tr. at 196:14-15 (Beck). C. Garcia clarified that bench notes refer to a technician's notes when testing a DNA sample that is "specific to a specific defendant." Tr. at 197:7-9 (Court, Sirignano). The United States said that it is willing to turn over the bench notes, and it suggested that the Defendants "can come back to us with questions or request more documents based on what [they have] found" in the bench notes. Tr. at 198:17-19 (Beck). The United States confirmed that, in turning over bench notes, it is not turning over "relevant training records for field evidence collection personnel," which C. Garcia also requested. Tr. at 199:17-20 (Court, Beck). The United States said that, although it is not willing to turn over statements of "qualifications for each analyst or technician involved in preparation, testing, or interpretation of the subject case," "the laboratory's quality manual," or "internal and external proficiency results during the relevant accreditation period for each analyst," if the defendants find something in the bench notes that leads them to question the DNA evidence's reliability, "that's fine to ask for . . . [and] explore on cross-examination during a Daubert hearing." Tr. at 200:4-201:17 (Court, Beck). The United States then confirmed that it is willing to disclose reports or specific information relevant to individual Defendants, but that it is not willing to produce "general polic[ies], accreditation reports, [and] CVs." Tr. at 201:19-24 (Court, Beck). The United States noted, however, that it may be willing to turn over additional materials if the Defendants have issues with the bench notes. See Tr. at 202:1-8 (Beck).

The United States verified that, when it introduces DNA evidence at trial, it will have an expert present the evidence, and it will "file a notice of that person being an expert." Tr. at 204:6-8 (Court, Beck). The Court then referenced guidelines that former Attorney General for the United States of America Loretta Lynch issued for the Department of Justice ("DOJ") in January, 2017, which states that, "[i]n meeting obligations under Rule 16(a)(1)(E)[,] (F) and (G), the Jencks Act, Brady, and Giglio, and to comply with the department's policies of broad disclosure, the prosecutor should be attuned to the following four steps." Tr. 205:4-8 (Court). The Court summarized the four steps:

> [T]he first step is: In most cases the best practice is to turn over the forensic expert's report to the defense if requested. That seems to be what . . . you're willing to give. Then it also says, number two: The prosecutor should disclose to the defense a written summary -- I'm not sure that's really important, but -- sufficient to explain the basis and reasons for the expert's expected report. And then it says, third: If requested by the defense, the prosecutor should provide the defense with a copy of or access to the laboratory or forensic expert's case file, either electronic or copy. Normally, this will describe the facts or data considered by the forensic expert, including the underlying documentation of examination or analysis performed, and contain the material necessary for another examiner, the defendant's expert, to understand the expert's report. The exact material contained in the case file varies depending upon the type of forensic analysis performed. It may include such items as chain of custody, photographs, analysis, worksheets, bench notes, scope of work, and examination plan data. It then says: In some circumstances the defense may seek laboratory policies and protocols. To the extent that a laboratory provides this information online, the prosecutor may simply share the website address with the defense. Otherwise, determination regarding disclosure of this information should be made on a case-by-case basis in consultation with the forensic analysis involved, taking into account the particularity of the defendant's request and how relevant the request appears to be to the anticipated offenses. And then fourth: The qualifications of the expert. I'm wondering if we can use this somewhat as a guideline to work backwards; that they're entitled to what your expert and proffering witness at the time -- if they're entitled to it at the time -- get a little closer to trial -- use it now to get them the information they need to challenge any of the DNA expert report. What would you think about using your department's guidelines as a guideline for what should be produced in this case?

Tr. at 205:12-207:8 (Court). The United States agreed that the DOJ's guidelines provide a "good framework for all of us to work in." Tr. 207:24-25 (Beck).

C. Garcia responded that he "can't live with that right now, because [he's] just going to come back again and ask for more." Tr. at 208:6-8 (Sirignano). C. Garcia stated that the National Institute of Standards and Technology ("NIST") published a paper in October, 2017, concluding that the "use of the likelihood ratio . . . is not consistently supported by scientific reasoning approach." Tr. at 208:20-22 (Sirignano). The Court explained that the NIST is primarily taking rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, and "kind of slicing and dicing it slightly for use as a criminal rule," which is less relevant than the DOJ's "rendition." Tr. at 209:5-15 (Court). The Court also stated that the NIST is "being cautionary because it's trying to provide some basis for . . . the defense experts to challenge the Government's experts. But it doesn't seem to be that it's requiring protocols and those sort[s] of things." Tr. at 210:3-8 (Court). The Court suggested to C. Garcia that his expert can look at the case files that the United States provides and determine if the DNA test was conducted properly. See Tr. at 210:24-211:6 (Court). C. Garcia identified several ways in which the FBI's DNA testing could have been erroneously conducted, and argued that, "without the proper manuals, . . . the written procedures, [and] when the tests were performed[,] . . . my expert and I are unable to really do the right job in cross-examining the Government's DNA expert." Tr. at 213:16-22 (Sirignano). C. Garcia noted that the state lab had produced the evidence specific to Troup when Troup requested it and that, "[i]f the state lab is producing it, and it's needed in order to do a proper evaluation, then there is no reason why the FBI shouldn't produce it." Tr. at 214:18-21 (Sirignano). C. Garcia concluded that using the likelihood ratio method on "more than one source of DNA is not supported by the current scientific reasoning" and that he needs the evidence he requests "to make a proper Daubert challenge." Tr. at 215:7-10 (Sirignano).

Troup noted that the evidence that the state produced for him is the "same [evidence and] . . . underlying data" that C. Garcia now requests. Tr. at 217:4-5 (Harbour-Valdez). Troup argued that "this is the underlying data that you should get in order to make sense of the [FBI's] one- or two-page report that you get." Tr. at 217:10-13 (Harbour-Valdez). Troup said that the state produced "standard operating procedures related to biology, standard operating procedures related to serology, and the New Mexico Department of Public Safety Northern Forensics Lab standard operating procedures." Tr. at 218:2-5 (Harbour-Valdez). Troup also identified a variety of reports pertaining to the underlying data that he received from the state. See Tr. at 218:7-219:9 (Harbour-Valdez). C. Garcia then identified which of his requests in his Motion he had received and which he had not received. See Tr. at 219:13-23 (Sirignano).

The Court then ruled that it woul "draw the line about where the Government is agreeing to draw it, where the Department of Justice is drawing it, where NIST seems to be drawing it, where National Commission on Forensic Science seem to be drawing it." Tr. at 220:3-7 (Court). The Court stated that it will not grant C. Garcia's requests for laboratory policies and protocols "at the present time." Tr. at 220:24 (Court). The Court further instructed C. Garcia and the United States to reference paragraphs 1, 2, 3, and 4 of the DOJ's recommendations. See Tr. at 220:7-22 (Court)(citing Memorandum for Heads of Department Components ¶¶ 1-4, at 2-3, Office of the Attorney General (dated January 6, 2017)("Lynch Memo"), available at https://www.justice.gov/archives/ncfs/doj-responses-ncfs-recommendations (last visited November 18, 2019); Recommendations to the Attorney General on Pretrial Discovery, National Commission on Forensic Science (dated May, 8, 2016), available at https://www.justice.gov/archives/ncfs/work-products-adopted-commission (last visited November 18, 2019)). The Court advised that, after C. Garcia's expert receives the "hard data,"

"if for some reason [his expert] can't give an opinion," then C. Garcia should discuss this issue with the United States. Tr. at 220:25-221:2 (Court). The Court further advised that, if the United States and C. Garcia "can't reach a reconciliation," then C. Garcia may come back to the Court with "expert testimony telling [the Court that C. Garcia] cannot criticize the Government's expert without protocols and procedures." Tr. at 221:3-7 (Court).

J. Gallegos stated that his expert's position is that experts must have access to protocols and procedures to examine the FBI's testing methods. See Tr. at 221:16-24 (Benjamin). The Court stated that it would need "expert testimony" on the need for procedures and protocols. Tr. at 222:7 (Court). The Court also noted that, while it is "interesting" that the state laboratories have produced the requested material for Troup, "it's a different issue as to whether [the Court] order[s] it out of the federal labs." Tr. at 222:12-13 (Court). The Court said that many experts "opine in front of [the Court] without protocols and procedures." Tr. at 222:18-19 (Court). The Court concluded that C. Garcia's request for DNA materials is thus "granted in part and denied in part." Tr. at 222:1-2 (Court).

Turning to the other requests in his Motion, C. Garcia suggested that, "instead of wasting the Court's time[,] . . . [he and the United States] agreed to sit down after this hearing . . . and go through all of these . . . and try to come to a compromise." Tr. at 223:6-10 (Sirignano). The United States agreed with C. Garcia's suggestion. See Tr. at 223:16-17 (Beck). The Court reminded the parties that they must "meet and confer before [they] file a motion in federal court. That's required by local rules. That's required by the federal rules." Tr. at 223:24-224:2 (Court). The Court stated that it does not like to "bring everybody down [to the courthouse], [] schedule two days [for hearings], and then [] break in the middle of it . . . to meet and confer." Tr. at 224:2-6 (Court). The Court warned that "[t]his can't happen again. . . . We've got a very tight schedule here."

Tr. at 224:16-21 (Court).  C. Garcia stated that he had anticipated the United States responding to his Motion.  See Tr. at 224:22-24 (Sirignano).

The Court then instructed that it will not go through all of the requests in the Motion, and it asked C. Garcia: "[I]f we just absolutely know that there is something you want, and we know that the Government is not going to give it to you, can we tackle that issue and get after it this afternoon?"  Tr. at 225:5-8 (Court).  C. Garcia responded affirmatively.  See Tr. at 225:9 (Sirignano).  C. Garcia then stated that he was aware of 114 arrestees and over eighty SNM members who had been charged in the case, and he requested "information that is relevant to our case based on the 114 arrestees and more than 80 members [who] have been charged."  Tr. at 226:1-3 (Sirignano)(citing Motion ¶¶ 1-5, at 7-11).  C. Garcia expressed his concern that the United States had opened other cases that "either were dropped or prosecuted separately," that he learned this information on his own, and that the United States has not produced any "information regarding these separate criminal complaints [and] possible related confidential sources."  Tr. at 226:14-19 (Sirignano).  C. Garcia stated that he requests all "investigatory documents, audio and video, related to Agent [Bryan] Acee's statements" in the criminal complaints of the other cases that were opened.  Tr. at 226:22-24 (Sirignano).

C. Garcia stated that he is entitled to his request, because "Acee believes these [separate cases] are all related."  Tr. at 228:6-7 (Sirignano).  The United States noted that there are separate cases related to SNM, but it argued that these cases are not related to this case.  See Tr. at 229:11-19 (Beck).  The United States said that "anything that's really of interest, to which the defendants are entitled under Rule 16, Brady, [and] Giglio, has been turned over from . . . the investigation."  Tr. at 229:20-23 (Beck).  According to the United States, evidence in other cases involving other SNM members is inadmissible.  See Tr. at 229:24-25 (Beck).  The United States said: "[I]t's our

position that all of this information is not relevant, and that's why it hasn't been produced." Tr. at 230:3-5 (Beck). The United States also stated that it does not intend to use evidence from separate cases in its "case-in-chief at trial. We don't intend to introduce evidence of these folks [charged in separate cases] or these [separate] crimes." Tr. at 231:7-9 (Beck).

C. Garcia then argued that the evidence in the other cases is relevant, because, for example, Guadalupe Urquizo's complaint has "the identical language of the first 14 paragraphs of our indictment." Tr. at 231:19-21 (Sirignano). C. Garcia argued that, because "part of what [the United States has] to prove here is that the SNM Gang is an enterprise, we are entitled to this information" from separate cases involving SNM members. Tr. at 232:10-12 (Sirignano). The United States clarified that "Urquizo is related to this case . . . . So that is relevant. And [the United States has] already produced his gang file, his STIU file [and will be producing] his inmate misconduct reports [and] his pen pack." Tr. at 232:20-25 (Beck). The United States argued, however, that the "majority of the rest of [the separate cases] are simply not relevant." Tr. at 233:4-5 (Court).

Baca argued that the evidence in the separate cases is relevant, because

[t]he Government has the burden of proving the enterprise. And they've taken this very large macro perspective that the SNM is this huge organization, with all of these members. And if the Government is correct in that interpretation, then every single SNM member is responsible for every criminal act of the SNM organization.

Tr. at 233:19-234:1 (Lowry). Baca maintained that the evidence in the separate cases would be helpful for impeachment purposes and to argue that "there is no one big enterprise; that this is a small collection of . . . isolated events charged to different collectives." Tr. at 234:15-18 (Lowry). J. Gallegos also requested that the United States produce documents pertaining to Jose Antonio Gomez, who is the "victim in Counts 13 through 16," and for whom the United States has not produced documents. Tr. at 235:7-8 (Benjamin). The United States responded that it has not

heard how these items would be material to preparing the defense. These cases are unrelated, other than that these targets, these convicts, or suspects, or however you want to refer to them as, Rule 16 requires that it be material to preparing the defense, or that we're going to use in our case-in-chief at trial. We're not going to use in our case-in-chief in trial; they're not indicted acts in the RICO. To the extent that they are, they have evidence of all this stuff. And so I hear that they're saying we're casting the net broad, and you know, we've got this wide brush on what the SNM is, and they have over 40,000 pages of discovery of what they think is material to their defense in preparation. And they have everything that we think is material and everything that we think we'll use at trial to prove that element of the case.

Tr. at 235:20-236:11 (Beck). The United States added that the evidence in the separate cases is "not within [the] realm of possibly material documents." Tr. at 236:12-13 (Beck). Baca then reiterated that documents pertaining to the separate cases are "material for us to dissect and understand the breadth, the extent, and the true structure of this organization, which will be a material part of the defendants' defense on the enterprise element." Tr. at 237:7-11 (Lowry). C. Garcia agreed with Baca, and he added that "the materiality would be that [the defendants in the separate cases] are alleged SNM Gang members," "one is allegedly the victim in this case," and another "one is a material witness." Tr. at 237:16-20 (Sirignano).

The Court stated that it is no "secret" that there are additional SNM members, so there is no "need to engage in a lot of discovery to establish that point." Tr. at 238:4-7 (Court). The Court also concluded that the request is not "going to produce material information, Brady information, [or] Giglio information." Tr. at 238:8-11 (Court). The Court noted, however, that "[t]here may be some particular files that the defendants can make a greater showing that this [request] is going to lead to Rule 16 evidence." Tr. at 238:11-13 (Court). The Court then denied the request without prejudice to the Defendants. See Tr. at 238:15 (Court). The Court advised the Defendants that, if they identify "some specific files[] [about] specific defendants and why those might be particularly material to the issues that are going to be tried in this case," they then will have an opportunity to request such files. Tr. at 238:18-20 (Court).

C. Garcia next turned to his request for "all call records, texts, memos, 302s, field notes, or any kind of recordings or debrief notes with Grace Duran No. 1, Grace Duran No. 2, Felicia Cordova, and Caroline Buena," including documents pertaining to financial payments, as well as all documentation related to Duran, one of the United States' witnesses. Tr. at 239:6-10 (Sirignano)(citing Motion ¶ 5.b, at 8). The United States informed the Court that the requested text messages "don't exist." Tr. at 240:4 (Beck). The United States also added that the request for documents signed by Duran "would be encompassed in the Giglio stuff we already said we're going to produce. So if it exists, it will be produced." Tr. at 240:23-25 (Beck). The United States clarified that "all call records, texts, memorandums, 302s, field notes, or any kind of audio or audio-visual recordings, or debrief notes with [Grace Duran No. 1, Grace Duran No. 2, Felicia Cordova, and Caroline Buena] do not exist." Tr. at 241:15-19 (Sirignano, Beck).

C. Garcia then turned to his request for "all law enforcement cooperating agreements regarding any individual providing information to any law enforcement agency that is related to these investigations." Tr. at 242:1-4 (Sirignano)(citing Motion ¶ 5.f, at 8-9). The United States responded that it will produce the Giglio material that encompasses the "cooperation agreements," and that it does not object to the request for cooperation agreements. Tr. at 242:13 (Beck). The United States admitted that it does not understand to whom "'others not specifically mentioned'" refers in the request, so it was not sure that it would produce cooperation agreements related to unidentified individuals, but that it would produce cooperation agreements for the individuals specifically listed in the request. Tr. at 242:20-21 (Beck)(quoting Motion ¶ 5.b, at 9). The United States also clarified that it could produce only documents that were in its possession. See Tr. at 243:7-13 (Beck). C. Garcia argued that rule 16 requires production of documents "not just in [the United States'] custody and control, but upon an exercise of due diligence that they can get

within their custody and control." Tr. at 243:22-25 (Sirignano). The Court stated that the United States does not need to obtain the files for all local police departments, and that the United States need only produce what is in its "possession, custody, and control." Tr. at 244:19 (Court). C. Garcia then agreed that it is satisfied with the United States complying with his request in paragraph 5.f of his Motion, except that the United States provides only documents within its possession and pertaining to the listed individuals. See Tr. at 245:4-7 (Court, Sirignano).

C. Garcia next brought up his request for Montoya's entire criminal history and for evidence of his motivation to cooperate with law enforcement. See Tr. at 245:16-23 (Sirignano)(citing Motion ¶ 6.a-c, at 11-12). The United States responded that it will "produce the [documents] to the extent that [it has] them." Tr. at 246:3-4 (Beck). The United States noted, however, that production of documentation of the benefits that cooperators received must go through a procedure that "may not be done till November 17[, 2017]." Tr. at 246:19-20 (Beck). The United States and C. Garcia agreed that, regarding Montoya, the United States would produce the requested documents to the extent they exist, and complete the procedure for producing documents on the benefits that Montoya receives. See Tr. at 246:23-248:3 (Court, Beck, Sirignano).

Next, C. Garcia turned to his request for all subpoenas served upon sources of investigative information that the United States intends to use in its case-in-chief. See Tr. at 249:5-14 (Sirignano)(citing Motion ¶ 14.c, at 19). The United States said that "all the consensual wire[taps] have already been disclosed," but that it had not thought much about the other requests. Tr. at 249:17-18 (Court). The United States offered that it could produce subpoenas that are not sealed, which C. Garcia agreed would satisfy his request. See Tr. at 249:24-250:5 (Beck, Court, Sirignano).

C. Garcia then stated his request for "all law enforcement agents' notes from all debriefs of all defendants and CHSs in this case, including, but not limited to, all statements made by all defendants, co-defendants, and testifying and nontestifying CHSs." Tr. at 250:9-13 (Sirignano)(citing Motion ¶¶ 3-4, at 7). The United States offered that it would produce the requested evidence that constitutes Brady or Giglio material, and then produce Jencks material when such disclosure is required. See Tr. at 250:23-251:5 (Beck). The Court said that the request for "all law enforcement agents' notes" may not constitute Jencks material, and the United States agreed that it would continue preserving agents' notes, and conducting reviews for Brady and Giglio material. See Tr. at 251:9-24 (Court, Beck). The Court said that notes taken by Acee that are not verbatim written recordings of statements made during debriefs likely would not qualify as Jencks material. See Tr. at 252:6-21: (Court). The United States and C. Garcia then agreed to the United States producing all law enforcement agents' notes that Brady and Giglio require, and preserving all Jencks material. See Tr. at 252:22-253:2 (Court, Sirignano, Beck). Baca asked whether the United States must produce "notes from individual debriefs," which the Court responded would constitute Jencks materials. See Tr. at 253:5-6 (Lowry, Court). C. Garcia then stated that he and the United States can "work out" everything else that he had requested in his Motion. Tr. at 253:14 (Sirignano).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

In Brady, the Supreme Court of the United States of America explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In Giglio, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching

government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request.");  United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").  On the other hand, "[i]t is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.)(internal quotation marks omitted).  "A prosecutor does not have a duty . . . to obtain evidence from third parties."  United States v. Badonie, 2005 WL 2312480, at *2.  See United States v. Padilla, No. CR 09-3598, 2011 WL 1103876, at *6 (D.N.M. Mar. 14, 2011)(Browning, J.).

During a criminal prosecution, the Federal Rules of Criminal Procedure and the Constitution of the United States of America require the United States to disclose certain evidence to a criminal defendant.  Rule 16 of the Federal Rules of Criminal Procedure is one source that imposes such a duty on the United States.  The Due Process Clause of the United States

Constitution is another source imposing a duty to disclose on the United States.

## LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

> **Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> **(i)** the item is material to preparing the defense;
>
> **(ii)** the government intends to use the item it its case-in-chief at trial; or
>
> **(iii)** the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E) (bold in original). Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition." United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)). Rule 16 also does not obligate the United States to "take action to discover information which it does not possess." United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted). Nor is the United States required to secure information from third parties. See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir.

1993))(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor."  United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.  The court may permit a party to show good cause by a written statement that the court will inspect ex parte.  If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1).  In In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information."  In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d at 122.  In United States v. Delia, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]."  United States v. Delia, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16.  United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.**  If a party fails to comply with this rule, the court may:
>
> > **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
> >
> > **(B)** grant a continuance;

**(C)** prohibit that party from introducing the undisclosed evidence; or

**(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2) (bold in original).

In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)). In United States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the United States Court of Appeals for the Tenth Circuit held that "a court should impose the least severe sanction." 455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)). The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies." 455 F.3d at 1131.

### LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

The Due Process Clause of the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Supreme Court of the United States has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See Giglio, 405 U.S. 150; Douglas v. Workman, 560 F.3d at 1172-73 ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. at 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168,

1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined <u>Brady</u> and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government." <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995)(quoting <u>United States v. Bagley</u>, 473 U.S. at 682). <u>See</u> <u>Douglas v. Workman</u>, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); <u>United States v. Summers</u>, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

      1.      <u>**Material Exculpatory Evidence Under**</u> **Brady.**

"The Constitution, as interpreted in <u>Brady</u>, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." <u>Smith v. Sec'y of N.M. Dep't of Corr.</u>, 50 F.3d 801, 823 (10th Cir. 1995). <u>Brady</u> requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." <u>Brady</u>, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. at 682. <u>See</u> <u>United States v. Allen</u>, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." <u>United States v. Bagley</u>, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." <u>United States v. Fleming</u>, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . including whether the defendant should testify."

Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting United States v. Burke, 571 F.3d 1048,

1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under Brady, undisclosed information or evidence acquired through that

information must be admissible."   Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir.

1995)(quoting United States v. Kennedy, 890 F.2d at 1059).  The Supreme Court, in Cone v. Bell,

556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as
> interpreted by Brady, only mandates the disclosure of material evidence, the
> obligation to disclose evidence favorable to the defense may arise more broadly
> under a prosecutor's ethical or statutory obligations.  See Kyles, 514 U.S. at 437
> ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than
> the ABA Standards for Criminal Justice Prosecution Function and Defense
> Function 3-3.11(a) (3d ed. 1993)").  See also ABA Model Rules of Professional
> Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely
> disclosure to the defense of all evidence or information known to the prosecutor
> that tends to negate the guilt of the accused or mitigates the offense, and, in
> connection with sentencing, disclose to the defense and to the tribunal all
> unprivileged mitigating information known to the prosecutor, except when the
> prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; the defendants have

no obligation to first note that such materials exist.  See Kyles v. Whitley, 514 U.S. at 437 (stating

that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which

alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the

likely net effect of all such evidence and make disclosure when the point of 'reasonable

probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a

mistrial for failure to produce personnel files of government witnesses), overruled on other

grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011

WL 1103876, at *6.  This obligation means that the United States must "volunteer exculpatory

evidence never requested, or requested only in a general way." Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant." United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.

### 2.    Timing of the Disclosure Under Brady.

"The obligation of the prosecution to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue." United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), aff'd by 742 F.3d 451 (10th Cir. 2014). As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady v. Maryland." United States v. Burke, 571 F.3d at 1054. The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." United States v. Burke, 571 F.3d at 1054. "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)). The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054. Notably, "not every delay in disclosure of Brady material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056. "To justify

imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they "continue[] throughout the judicial process." Douglas v. Workman, 560 F.3d at 1173. For instance, the prosecutor's obligation to disclose Brady material can arise during trial. See United States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until trial is underway."). The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information." United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not."). The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original). The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632. The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness
> of relevant circumstances, does not require complete knowledge of the relevant

circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice."  United States v. Ruiz, 536 U.S. at 630.  The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence.  The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement.  Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."  Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances – even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[7]

---

[7]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored.  However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that United States v. Johnson, United States v. Ohiri, 133 F. App'x 555 (10th Cir.

The Tenth Circuit has held, however, that <u>United States v. Ruiz</u> does not apply to exculpatory evidence, but rather applies only to impeachment evidence:

> <u>Ruiz</u> is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in <u>Ruiz</u> that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished). The Tenth Circuit qualified its holding in <u>United States v. Ohiri</u>, however, stating that the case presented "unusual circumstances." 133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether <u>Brady v. Maryland</u>'s restrictions apply to suppression hearings." <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151. In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression hearing, rejected a defendant's argument that the prosecution violated <u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material. <u>See</u> <u>United States v. Johnson</u>, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision). Specifically, the Tenth Circuit found that

> disclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression

2005)(unpublished), <u>United States v. Dahl</u>, 597 F. App'x 489 (10th Cir. 2015)(unpublished), and <u>United States v. Dahl</u>, 597 F. App'x 489 (10th Cir. 2015)(unpublished), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

> hearing would have been different. First, we question whether the evidence in question would have been admitted at the suppression hearing. Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined. Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the <u>Brady</u> line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet <u>Brady</u> rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" <u>United States v. Bowie</u>, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation and internal quotation omitted). Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from <u>United States v. Bowie</u>. <u>See</u> <u>United States v. Bullock</u>, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the <u>Brady</u> issues at stake here."). The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "<u>Brady</u> disclosures are required prior to suppression hearings." <u>United States v. Stott</u>, 245 F.3d 890, 902 (7th Cir. 2001). The Second Circuit also noted that <u>Brady</u>'s applicability to suppression hearings was not "obvious" for plain error purposes. <u>United States v. Nelson</u>, 193 F. App'x 47, 50 (2d Cir. 2006).

Before the Supreme Court decided <u>United States v. Ruiz</u>, the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that <u>Brady</u> applies to suppression hearings. <u>See</u> <u>United States v. Barton</u>, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in <u>Brady</u> and its progeny must be applied to a suppression hearing involving

a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "*Brady* rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment." United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(unpublished)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013)(acknowledging that "[w]hether *Brady's* disclosure requirements even apply at the motion to suppress stage is an open question")). Although the United States Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea." United States v. Harmon, 871 F. Supp. 2d at 1151. The Tenth Circuit affirmed United States v. Harmon, in which the Court concluded that the United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of United States v. Ruiz to suppression hearings. The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial. The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing. In United States v. Ruiz, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." United States v. Ruiz, 536 U.S. at 632 . . . (emphasis in original). It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded

> that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632 . . . . Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632 . . . .

United States v. Harmon, 871 F. Supp. 2d at 1169 (emphasis in original). Accordingly, Brady does not require the United States to disclose impeachment evidence before suppression hearings. See United States v. Harmon, 871 F. Supp. 2d at 1165-67.

### 3. Evidence Must Be in the United States' Possession.

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)). Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2. On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984). Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)). "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)). A prosecutor does not have a duty, however, to obtain evidence from third parties. See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

**LAW REGARDING THE JENCKS ACT**

In <u>Jencks v. United States</u>, 353 U.S. at 667, the Supreme Court held that a "criminal action must be dismissed when the government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial." 353 U.S. at 672. In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 670-671. Congress later codified the <u>Jencks v. United States</u> in 18 U.S.C. § 3500. <u>See United States v. Kimoto</u>, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in <u>Jencks v. United States</u>, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

**(a)** In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)** After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b) (bold in original). "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of

- 39 -

the United States' once that witness has testified." United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349 (1959).  The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

The Jencks Act defines statements as:

**(1)**  a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)**  a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)**  a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e)(1)-(3) (bold in original).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993). At least one district court within the Tenth Circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act. United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.).  In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in

any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack held

that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure

and because the potential impeachment value of the notes may not become evident until trial," the

United States must, under 18 U.S.C. § 3500, preserve its rough interview notes "made by law

enforcement agents during interview of potential witnesses." 530 F. Supp. 2d at 1267. See United

States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview

notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09

(finding that interview notes may be producible under the Jencks Act).

        The defendant bears the initial burden of showing that particular materials qualify under

the Jencks Act, but the defendant's burden is not heavy. See United States v. Smaldone, 544 F.2d

at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements'

and that they relate to the subject matter of the testimony of the witness."); United States v. Harry,

No. CR 10–1915, 2013 WL 684671, at *10 (D.N.M. Feb. 6, 2013)(Browning, J.). To satisfy this

burden, the defendant need not prove that particular materials are within the scope of the Jencks

Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the

Court the question of the producibility of the document at a time when it is possible for the Court

to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086

(quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). See United States v. Burton,

81 F. Supp. 3d 1229, 1250-51 (D.N.M. 2015)(Browning, J.). The defendant's demand for

documents under the Jencks Act must be sufficiently precise for a court to identify the requested

statements. See United States v. Smith, 984 F.2d at 1086. For example, in United States v. Smith,

the Tenth Circuit concluded that a defendant had met his burden and made a prima facie showing

that a statement of a witness existed which may be producible under the Jencks Act when a

government witness testified during the United States' case-in-chief that a government agent had interviewed her before she testified, and the defense counsel moved for production of the notes. See 984 F.2d at 1085-86. Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement. See 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, Order, filed November 8, 2006 (Doc. 86)(D.N.M.)(Browning, J.), the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant. No. CR 05-801 JB, Order at 1. The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for cross-examination at trial of the FBI agent who conducted the interview. See No. CR 05-801 JB, Order at 1-2. The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be given to the defendants after the agents testify at trial. See United States v. Goxcon-Chagal, No. CR 11-2002 JB, 2012 WL 3249473, at *2, *6 (D.N.M. Aug. 4, 2012)(Browning, J.). In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial. See 760 F. Supp. 2d at 1164, 1167. See also United States v. Harry, 2013 WL 684671, at *11-12.

## ANALYSIS

The Court will grant in part and deny in part the Motion. C. Garcia and the United States agreed to meet and confer to reach a mutual agreement about many of C. Garcia's requests. See

Tr. at 223:6-10 (Sirignano); id. at 223:16-17 (Beck). The Court ruled, however, on seven disputed requests, which C. Garcia identifies as requests for which he and the United States would likely disagree. See Tr. at 225:5-8 (Court). The seven disputed issues include the following: (i) whether the United States must produce all documents and records supporting DNA results obtained in the case, including bench notes and FBI procedures and policies pertaining to DNA testing; (ii) whether the United States must produce all documentation related to SNM members charged in other cases; (iii) whether the United States must produce all call records, texts, memoranda, 302s, recordings, debrief notes, and documents pertaining to financial payments or benefits relating to Duran, Grace Duran No. 1, Grace Duran No. 2, F. Cordova, and Buena; (iv) whether the United States must produce all law enforcement cooperation agreements regarding any individual providing information to any law enforcement agency in the investigation; (v) whether the United States must produce documents pertaining to Montoya's criminal history record and the benefits Montoya received for his cooperation with law enforcement; (vi) whether the United States must produce subpoenas served upon all sources of investigative information; and (vii) whether the United States must produce law enforcement agents' notes from debriefs of all Defendants and CHSs in the case.

The Court concludes that: (i) the United States must produce bench notes describing the observations of technicians conducting DNA analysis, but does not need to produce DNA testing procedures and protocols; (ii) the United States does not need to produce documentation related to SNM members charged in separate cases; (iii) the United States must produce all requested documentation pertaining to the United States' witness Duran for which Brady and Giglio require disclosure; (iv) the United States must produce all law enforcement cooperation agreements within the United States' possession and relating to the individuals listed in paragraph 5.f of the Motion;

- 43 -

(v) the United States must produce all documentation pertaining to Montoya's criminal history record and the benefits Montoya received for his cooperation with law enforcement to the extent that such documentation exists; (vi) the United States must produce all unsealed subpoenas served upon all sources of investigative information; and (vii) the United States must produce all law enforcement agents' notes from debriefs for which <u>Brady</u> and <u>Giglio</u> require disclosure, and the United States must preserve all other documents pertaining to agents' notes as the Jencks Act requires.

I.     **THE UNITED STATES MUST PRODUCE DNA ANALYSIS BENCH NOTES BUT DOES NOT NEED TO PRODUCE DNA TESTING PROCEDURES AND PROTOCOLS.**

C. Garcia argues that he is entitled to all documents and records supporting DNA results obtained in the case, including bench notes, and FBI procedures and policies pertaining to DNA testing.  <u>See</u> Motion ¶ 8, at 12-16.  According to C. Garcia, he cannot "challenge what [the FBI] did without having a record of each step that every DNA examiner must take now with this new science, and to make sure that it was done properly."  Tr. at 189:10-13 (Sirignano).  Moreover, C. Garcia argued that the FBI's use of the likelihood ratio method on "more than one source of DNA is not supported by the current scientific reasoning," and that he needs the evidence he requests "to make a proper Daubert challenge."  Tr. at 215:7-10 (Sirignano).  The United States responded that it could provide the "bench notes from the [DNA] testing," but that it would "have to talk to the FBI about [producing the] policies."  Tr. at 196:10-13 (Beck).  The United States argued that, under rule 16 of the Federal Rules of Criminal Procedure, it should not have to produce the policies "unless there is some reason to question the credibility" of the DNA reports.  Tr. at 196:14-15 (Beck).

The Court concludes that the United States must produce only the bench notes and reports describing the observations of technicians conducting DNA analysis of C. Garcia's DNA, and the United States does not need to produce DNA testing procedures and protocols. The Tenth Circuit has instructed that "[t]he Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823. Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." 373 U.S. at 87. Moreover, in Giglio, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See 405 U.S. at 153. Here, the Court concludes that the DNA testing procedures and protocols do not constitute exculpatory evidence under Brady or impeachment evidence under Giglio. Under the reasoning that C. Garcia puts forward, any criminal defendant that has DNA tested by the FBI would be entitled to the information that he requests, but the criminal rules do not require such extensive disclosure. In addition, C. Garcia has not identified any specific items of evidence that indicate that the FBI's DNA testing methods are unreliable. See Tr. at 187:15-16 (Court). Furthermore, C. Garcia argues that he is entitled to the FBI's testing procedures and protocols so that he can "make a proper Daubert challenge," Tr. at 215:7-10 (Sirignano), but he does not identify -- and the Court is not aware of -- any cases in which a court "order[s] [discovery] so the defendants can determine whether a Daubert motion is appropriate," Tr. at 192:8-11 (Court, Sirignano). See id. at 191:21-25 (Court, Sirignano). Accordingly, the Court orders the United States to produce bench notes and reports specific to C. Garcia's DNA, but the United States does not need to produce laboratory policies and protocols. After the United States produces the DNA analysis bench notes and reports, if C. Garcia's expert determines that

he or she cannot properly criticize the FBI's DNA analysis without additional evidence, then

C. Garcia and the United States should meet and confer about additional requests, using the Lynch

Memo as a guide. <u>See</u> Lynch Memo ¶¶ 1-4, at 2-3. The Lynch Memo provides the following

guidance:

> The Department's policy to provide discovery over and above the minimum legal thresholds applies to cases with forensic evidence. Rule 16's disclosure requirements -- disclosing the results of scientific tests (16(a)(l)F)), the witness' written summary (16(a)(l)(G)), and documents and items material to preparing the defense (16(a)(l)(E)) -- are often jointly satisfied when presenting expert forensic testimony, since disclosure of the test results, the bases for those results, and the expert's qualifications will often provide all the necessary information material to preparation of the defense. But, depending on the complexity of the forensic evidence, or where multiple forensic tests have been performed, the process can be complicated because it may require the prosecutor to work in tandem with various forensic scientists to identify and prepare additional relevant information for disclosure. Although prosecutors generally should consult with forensic experts to understand the tests or experiments conducted, responsibility for disclosure ultimately rests with the prosecutor assigned to the case.
>
> In meeting obligations under Rule 16(a)(1)(E), (F), and (G), the Jencks Act, and *Brady/Giglio*, and to comply with the Department's policies of broad disclosure, the prosecutor should be attuned to the following four steps:

> 1. First, the prosecutor should obtain the <u>forensic expert's laboratory report</u>, which is a document that describes the scope of work assigned, the evidence tested, the method of examination or analysis used, and the conclusions drawn from the analyses conducted. Depending on the laboratory, the report may be in written or electronic format; the laboratory may routinely route the report to the prosecutor, or the prosecutor may need to affirmatively seek the report from the forensic expert or his or her laboratory. In most cases the best practice is to turn over the forensic expert's report to the defense if requested. This is so regardless of whether the government intends to use it at trial or whether the report is perceived to be material to the preparation of the defense. If the report contains personal information about a victim or witness, or other sensitive information, redaction may be appropriate and necessary. This may require court authorization if the forensic expert will testify, as the report likely will be considered a Jencks Act statement. (See the Additional Considerations section below.)

2. Second, the prosecutor should disclose to the defense, if requested, a <u>written summary</u> for any forensic expert the government intends to call as an expert at trial. This statement should summarize the analyses performed by the forensic expert and describe any conclusions reached. Although the written summary will vary in length depending on the number and complexity of the tests conducted, it should be sufficient to explain the basis and reasons for the expert's expected testimony. Oftentimes, an expert will provide this information in an "executive summary" or "synopsis" section at the beginning of a report or a "conclusion" section at the end. Prosecutors should be mindful to ensure that any separate summary provided pursuant to Rule 16(a) should be consistent with these sections of the report. Further, any changes to an expert's opinion that are made subsequent to the initial disclosure to the defense ordinarily should be made in writing and disclosed to the defense.

3. Third, if requested by the defense, the prosecutor should provide the defense with a copy of, or access to, the laboratory or forensic expert's "<u>case file</u>," either in electronic or hard-copy form. This information, which may be kept in an actual file or may be compiled by the forensic expert, normally will describe the facts or data considered by the forensic expert, include the underlying documentation of the examination or analysis performed, and contain the material necessary for another examiner to understand the expert's report. The exact material contained in a case file varies depending on the type of forensic analysis performed. It may include such items as a chain-of-custody log; photographs of physical evidence; analysts' worksheets or bench notes; a scope of work; an examination plan; and data, charts and graphs that illustrate the results of the tests conducted.

    In some circumstances, the defense may seek laboratory policies and protocols. To the extent that a laboratory provides this information online, the prosecutor may simply share the web address with the defense. Otherwise, determinations regarding disclosure of this information should be made on a case-by-case basis in consultation with the forensic analysts involved, taking into account the particularity of the defense's request and how relevant the request appears to be to the anticipated defenses.

4. Fourth, the prosecutor should provide to the defense information on the <u>expert's qualifications</u>. Typically, this material will include such items as the expert's curriculum vitae, highlighting

relevant education, training and publications, and a brief summary that describes the analyst's synopsis of experience in testifying as an expert at trial or by deposition. The prosecutor should gather potential *Giglio* information from the government agency that employs the forensic expert. If using an independent retained forensic expert, the prosecutor should disclose the level of compensation as potential *Giglio* information; the format of this disclosure is left to the discretion of the individual prosecuting office.

Disclosure should be made according to local rules but at least as soon as is reasonably practical and, of course, reasonably in advance of trial. It is important that the prosecutor leave sufficient time to obtain documents and prepare information ahead of disclosure. When requesting supporting documents from a laboratory's file regarding a forensic examination, the prosecutor should consult the guidelines set by the laboratory for the manner in which discovery requests should be made, and for the time required for them to process and deliver the materials to the prosecutor. Further, if multiple forensic teams have worked on a case, the prosecutor should build in sufficient time to consult with, and obtain relevant materials from, each relevant office or forensic expert.

Lynch Memo at 2-3 (emphasis in original). Although the Lynch Memo "does not create . . . any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal," Lynch Memo at 1 n.1, it provides helpful guidance, because "DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations," United States v. Hykes, No. CR 15-4299 JB, 2016 WL 1730125, *15 (D.N.M. Apr. 11, 2016)(Browning, J.). See id. at *15 ("The DOJ [] issued guidelines that federal prosecutors must follow in complying with their discovery obligations in criminal cases.")(internal citations omitted). Finally, if C. Garcia is not satisfied with the process, he is free to return to the Court for redress.

## II.   THE UNITED STATES DOES NOT NEED TO PRODUCE DOCUMENTATION RELATED TO SNM MEMBERS CHARGED IN SEPARATE CASES.

C. Garcia argues that the United States must produce "all related investigatory documents" and "all related Confidential Human Source ('CHS') documents" for all 114 arrestees of suspected

SNM Gang members. Motion at 7. At the hearing, the United States said that "anything that's really of interest, to which the defendants are entitled under Rule 16, Brady, [and] Giglio, has been turned over from . . . the investigation," Tr. at 229:20-23 (Beck), and that "it's our position that all of this information is not relevant, and that's why it hasn't been produced," Tr. at 230:3-5 (Beck). Baca and C. Garcia responded that the information is material, because these other cases concern SNM members, and the requested information would help the Defendants to rebut the United States' allegation that SNM is an enterprise. See Tr. at 237:7-11 (Lowry); Tr. at 237:16-20 (Sirignano).

The Court concludes that the request is not likely to produce relevant Giglio, Brady or rule 16 material. The United States already has agreed to turn over materials related to testifying SNM members who are charged in other cases, see Tr. at 232:20-25 (Beck); Giglio, 405 U.S. at 153, and there is no argument that information regarding other SNM members' prosecution and investigation is material to the guilt or punishment of the Defendants in this case, see Brady, 373 U.S. at 87. Additionally, while rule 16's materiality standard is not a "heavy burden," generally, the United States must "disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor." United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted). Here, the Defendants have received tens of thousands of pages of discovery already, see Tr. at 236:7 (Beck), and they will continue to receive thousands more. The United States has turned over all material evidence and everything that it will use at trial to prove SNM is an enterprise. See Tr. at 236:9-11. The evidence of enterprise is overwhelming and is unlikely to be seriously contested at trial. It is practically a phantom issue. There is also an abundance of evidence of racketeering activity. The Defendants, meanwhile, seek evidence concerning an extraordinary number of unrelated cases and cite no specific evidence they

hope is revealed. The Defendants may not use rule 16 to engage in a "fishing expedition," <u>United States v. Maranzino</u>, 860 F.2d at 985-86 (citing <u>Jencks v. United States</u>, 353 U.S. at 667) and so the Court denies the request. The Court's denial is without prejudice to renewal by the Defendants if something specific in other cases becomes relevant. If the Defendants identify specific files of specific SNM members and identify why these files are particularly material to the case, they will have an opportunity to request them. <u>See</u> Tr. at 238:15-20 (Court).

### III. THE UNITED STATES MUST PRODUCE ALL CALL RECORDS, TEXTS, MEMORANDA, 302S, RECORDINGS, DEBRIEF NOTES, AND DOCUMENTS PERTAINING TO FINANCIAL PAYMENTS OR BENEFITS RELATING TO <u>DURAN</u>.

C. Garcia argues that he is entitled to documents related to "all financial payments and other law enforcement benefits given to Eric Duran, Grace Duran #1, Grace Duran #2, Carolyn or Caroline Buena, and all documents that Eric Duran signed regarding his cooperation with the U.S. Attorneys' Office, the Federal Bureau of Investigation . . . , the NMDOC, and, or any law enforcement agency." Motion ¶ 5.b, at 8. At the hearing, the United States informed the Court that "all call records, texts, memorandums, 302s, field notes, or any kind of audio or audio-visual recordings, or debrief notes with [Grace Duran No. 1, Grace Duran No. 2, Felicia Cordova, and Caroline Buena] do not exist." Tr. at 241:15-19 (Sirignano, Beck). The United States also added that the request for documents that Duran signed regarding his cooperation with law enforcement "would be encompassed in the Giglio stuff we already said we're going to produce. So if it exists, it will be produced." Tr. at 240:23-25 (Beck).

### IV. THE UNITED STATES MUST PRODUCE ALL LAW ENFORCEMENT COOPERATION AGREEMENTS WITHIN ITS POSSESSION RELATING TO <u>INDIVIDUALS LISTED IN PARAGRAPH 5.f OF C. GARCIA'S MOTION</u>.

C. Garcia argues that he is entitled to "all law enforcement cooperating agreements" involving

Eric Duran, Grace Duran #1, Grace Duran #2, Javier Alonso, Gerald Archuleta, Jerry Armenta, Manuel Armijo, Benjamin Clark, Billy Cordova, Richard Gallegos, Santos Gonzales, Ruben Hernandez, Leonard Lujan, Eugene Martinez, Robert Martinez, Roy Paul Martinez, Timothy Martinez, Jerry Montoya, Mario Montoya, Frederico Munoz, Paul Rivera, and others not specifically mentioned.

Motion ¶ 5.b, at 8. At the hearing, the United States responded that it could only produce cooperation agreements within its possession; that the <u>Giglio</u> material that the United States says it will produce encompasses C. Garcia's request; and that it does not object to the request for cooperation agreements. <u>See</u> Tr. at 242:13-16 (Beck); <u>id.</u> at 243:7-13 (Beck). The United States also stated that it would produce cooperation agreements for all of the individuals whom C. Garcia's Motion lists, but not for "'others not specifically mentioned.'" Tr. at 242:20-21 (Beck)(quoting Motion ¶ 5.b, at 9). C. Garcia stated that he is satisfied with production of cooperation agreements only for the individuals whom he lists in his Motion, <u>see</u> Tr. at 243:21 (Sirignano), but C. Garcia argued that rule 16 requires production of documents "not just in [the United States'] custody and control, but upon an exercise of due diligence that they can get within their custody and control," Tr. at 243:22-25 (Sirignano).

The Court concludes that the United States must produce all law enforcement cooperation agreements for the individuals listed in paragraph 5.f of the Motion that are in its possession. Rule 16(a)(1)(E) states that, "[u]pon a defendant's request, the government must permit the defendant to inspect and to copy or photograph . . . items, if the item is within the government's possession, custody, or control." Fed. R. Civ. P. 16(a)(1)(E). Although the United States has agreed to produce all requested items in its possession, the United States declines to produce items not in its control, such as law enforcement cooperation agreements executed at the local and state levels. <u>See</u> Tr. at 243:7-13 (Beck); <u>id.</u> at 244:3-11 (Court). The Court has held previously that "[i]t is well settled that there is no affirmative duty upon the government to take action to discover

information which it does not possess." United States v. Badonie, 2005 WL 2312480, at *2. Rule 16 therefore does not obligate the United States to "take action to discover information which it does not possess." United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d at 864)(internal quotation marks omitted). Accordingly, the Court orders the United States to produce law enforcement cooperation agreements only for the individuals that paragraph 5.f of the Motion lists and that are in its possession. If -- after the United States produces its law enforcement cooperation agreements -- C. Garcia disagrees with what the United States admits is in its possession, custody, and control, then C. Garcia may ask the Court to revisit his request.[8] See Tr. at 244:24-245:1 (Court)("Down the road, if you disagree with what possession, custody, or control is, you can come back and argue about that.").

## V. THE UNITED STATES MUST PRODUCE ALL OF ITS DOCUMENTATION PERTAINING TO MONTOYA'S CRIMINAL HISTORY AND THE BENEFITS THAT MONTOYA HAS RECEIVED FOR HIS COOPERATION WITH LAW ENFORCEMENT.

C. Garcia argues that he is entitled to "[a]ny and all records of payment" between law enforcement officials and Montoya, as well as "any and all corresponding agency files" regarding Montoya's cooperation, payment, meetings, and the like. Motion ¶ 6.a, at 11. At the hearing, the United States informed the Court that it would produce what the Defendants request. See Tr. at 246:1-247:1 (Beck). The United States also reiterated that it would produce all audio recordings of Montoya's cellular telephone from January 1, 2015, until the present -- if the United States possessed any recordings. See Tr. at 247:16-21 (Beck).

---

[8]The Court has ruled that the NM Corrections Department's records are within the United States' possession, custody, and control. See United States v. DeLeon, No. CR 15-4268, 2017 WL 2271430, at *50 (D.N.M. Feb. 8, 2017)(Browning, J.).

## VI.  THE UNITED STATES MUST PRODUCE ALL UNSEALED SUBPOENAS SERVED UPON ALL SOURCES OF INVESTIGATIVE INFORMATION.

C. Garcia argues that he is entitled to "[a] copy of any and all judicial subpoenas *duces tecum*, all administrative subpoenas, and subpoena returns and correspondence from the entity or individual subpoenaed."  Motion ¶ 14.c, at 19.  At the hearing, the United States informed the Court that it would produce all existing unsealed subpoenas.  See Tr. at 249:20-250:2 (Beck).

## VII.  THE UNITED STATES MUST PRODUCE ALL LAW ENFORCEMENT AGENTS' NOTES FROM DEBRIEFS FOR WHICH DISCLOSURE IS REQUIRED BY BRADY AND GIGLIO, AND THE UNITED STATES MUST PRESERVE ALL OTHER DOCUMENTS PERTAINING TO AGENTS' NOTES AS THE JENCKS ACT REQUIRES.

Finally, C. Garcia argues that he is entitled to "all enforcement agents' notes from all debriefs of all defendants, and all CHSs, in this case, including, but not limited to, all statements made by all defendants, co-defendants, testifying and non-testifying CHSs," and "[a]ll law enforcement agents' notes regarding every defendant in this case."  Motion ¶¶ 3-4, at 7.  See Tr. at 250:7-17 (Sirignano).  At the hearing, the United States gave its "recollection" that the Court had previously ordered the notes' preservation for Jencks purposes.  Tr. at 250:24-251:2 (Beck). See Transcript of Motion Proceedings on May 9, 2017 at 235:7-236:17 (Court, Fox-Young, Beck)(taken May 9, 2017), filed May 23, 2017 (Doc. 1160).  The United States stated that it would produce any Brady or Giglio material from law enforcement notes.  See Tr. at 251:3-6 (Beck); id. at 251:21-24 (Beck).

Regarding the "statements of defendants in those notes," Tr. at 252:3-4 (Sirignano); see Motion ¶ 3, at 7, the Court's disclosure decision depends on a note-by-note analysis.  Law enforcement officers' interview notes may be statements that the Jencks Act requires the United States to disclose.  See United States v. Smith, 984 F.2d at 1086 ("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Harry,

2013 WL 684671, at *11–12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses."); <u>United States v. Tarango</u>, 760 F. Supp. 2d at 1164, 1167 (requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial). The Court will not require the disclosure of paraphrased recollections written weeks after an interview, unless they reflect verbatim statements. Notes taken contemporaneously with the statements, however, must be disclosed, as most note takers try to write down -- as much as possible -- verbatim statements and phrases. <u>See</u> Tr. at 252:6-13 (Court). Whether disclosure is required also depends on Acee's ability to recall the statements. <u>See</u> Tr. at 252:14-16 (Court).

**IT IS ORDERED** that Defendants C. Garcia, Troup, J. Gallegos, A. Garcia, A. Gallegos, Chavez, Rodriguez, Perez, Herrera, Baca, Sanchez, and Varela's Sealed Opposed Motion to Compel Disclosure of Discoverable Materials Pursuant to Rule 16, filed September 22, 2017 (Doc. 1270), is granted in part and denied in part. The Court orders that: (i) the United States must produce bench notes describing the observations of technicians conducting DNA analysis, but does not need to produce DNA testing procedures and protocols; (ii) the United States does not need to produce documentation related to SNM members charged in separate cases; (iii) the United States must produce all requested documentation pertaining to the United States' witness Duran for which <u>Brady</u> and <u>Giglio</u> require disclosure; (iv) the United States must produce all law enforcement cooperation agreements within the United States' possession and relating to the individuals listed in paragraph 5.f of the Motion; (v) the United States must produce all documentation pertaining to Montoya's criminal history record and the benefits Montoya received for his cooperation with law enforcement to the extent that such documentation exists; (vi) the United States must produce all unsealed subpoenas served upon all sources of investigative information; and (vii) the United

States must produce all law enforcement agents' notes from debriefs for which <u>Brady</u> and <u>Giglio</u>

require disclosure, and the United States must preserve all other documents pertaining to agents'

notes as the Jencks Act requires.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
   Attorney for the United States
      Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

        *Attorneys for the Plaintiff*

Susan M. Porter
Albuquerque, New Mexico

--and--

Sarah M. Gorman
Albuquerque, New Mexico

        *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

> *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

> *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

> *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

> *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

> *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

 *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

 *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

 *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

--and--

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

     *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

     *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

*Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

*Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

*Attorneys for Defendant Mauricio Varela*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

    *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

    *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

    *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

    *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

    *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

     *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

     *Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

     *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

     *Attorneys for Defendant Brandy Rodriguez*