# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                             No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

     Defendants.

<u>**MEMORANDUM OPINION AND ORDER**</u>

**THIS MATTER** comes before the Court on the Defendants' Omnibus Motion for Timely Discovery of Giglio Materials, filed May 24, 2017 (Doc. 1163)("Motion"). held a hearing on November 8, 2017. The primary issue is whether the Defendants' twenty requested categories of evidence fall under <u>Giglio v. United States</u>, 405 U.S. 150 (1972)("<u>Giglio</u>"), and, if so, when the United States must disclose the materials. Specifically, the Court must decide: (i) whether the Defendants are entitled to Plaintiff United States of America's witnesses' competency and mental health records; (ii) whether the Defendants are entitled, under <u>Giglio</u>, to the United States' witnesses' last known addresses; (iii) the United States' deadline to produce its witness list; and (iv) the United States' deadline to produce records of all payments and consideration given to its cooperating witnesses. The Court concludes that: (i) the Defendants' requested records concerning the competency and mental health treatment of each of the United States' witnesses are not in the United States' possession or control; (ii) the United States is not required under <u>Giglio</u> to produce the last known addresses of each of its witnesses; (iii) the United States must produce a good-faith witness list no later than two weeks prior to each trial; and (iv) the United States must disclose all payments issued to its cooperating witnesses no later than two months before each trial.

<u>**FACTUAL BACKGROUND**</u>

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment"). The background facts are largely unchanged from those facts that the Court provided in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events.

This case deals with crimes that the SNM allegedly committed through its members.

Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a prison gang that formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates assaulted and raped twelve correctional officers after taking them hostage. Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 inmates were injured. See Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, including "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders to members outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals: primarily the control and profit of narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its power. See Indictment at 4. If another gang does not follow SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings

within the prison system.  See Indictment at 4.  SNM engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment at 4.  To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Indictment at 5.  To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Indictment at 7.  SNM generates income by having its members and associates traffic drugs and extort narcotic traffickers.  See Indictment at 8.  SNM members' recent conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections Department") Officials inspired the Federal Bureau of Investigation's ("FBI") present investigation.  See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133).  The other relevant facts giving rise to this case are as follows.

In March, 2014, a Doña Ana County, New Mexico grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina.  See Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO").  Molina was J. Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico").  See MOO at 6, 2016 WL 7242579, at *3.  The New Mexico Third Judicial District Attorney's Office accused J. Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack.  See MOO at 6, 2016 WL 7242579, at *3.  That New Mexico indictment charged J. Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See MOO at 6-7, 2016 WL

7242579, at *3. In November, 2015, the state District Attorney dismissed the charges against J.

Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant

Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner,

tampering, and conspiracy. See MOO at 7, 2016 WL 7242579, at *3. "A spokesperson for the

District Attorney's Office indicated the charges were dismissed because the cases were going to

be prosecuted at the federal court level." MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico,

against thirty-one Defendants, charging them with a total of sixteen counts. See Indictment at 1,

9-18. All Defendants are accused of participating in the SNM enterprise's operation and

management, and of committing unlawful activities "as a consideration for the receipt of, and as

consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and

for the purpose of gaining entrance to and maintaining and increasing position in SNM, an

enterprise engaged in racketeering activity." Indictment at 9-18. Defendant Arturo Arnulfo

Garcia, Defendant Gerald Archuleta,[1] Defendant Benjamin Clark, M. Rodriguez, Defendant

_____

[1]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2003, I was an active member of the SNM. The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM. J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM. The

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[2] and D. Sanchez

are the enterprise's alleged leaders.  See Indictment at 6.  The other Defendants are allegedly

---

"green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting.  The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico.  This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca.  As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R.  This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[2]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State.  Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

members or associates who acted under the direction of the enterprise's leaders.  See Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846.  Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon, Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9 (Count 1).  On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen Patterson, and Christopher Chavez allegedly murdered "R.G."  Indictment at 10 (Count 2).  On June 17, 2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez allegedly murdered "F.S."  Indictment at 10-11 (Count 3).  On November 12, 2012, J. Gallegos and Defendant Andrew Gallegos allegedly conspired to murder "A.B."  Indictment at 11 (Count 4).  On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B.  See Indictment at 11-12 (Count 5).  In March 2014, Armenta, Montoya, M. Rodriguez, Martinez, Baca, Defendant Mauricio Varela, D. Sanchez, Defendant Carlos Herrera, and Defendant Rudy Perez allegedly conspired to murder "J.M."  Indictment at 12 (Count 6).  On March 7, 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, D. Sanchez, Herrera, and R. Perez allegedly murdered J.M.  See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury to "J.R."  Indictment at 13-14 (Count 8).  Starting "on a date uncertain, but no later than 2013,"

and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S." Indictment at 14 (Count 9). During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M." Indictment at 15 (Count 10). On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm. See Indictment at 15-16 (Count 11). On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a conspiracy to murder charge. See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G." Indictment at 16 (Count 13). From February 1, 2016, until February 27, 2016, J. Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez allegedly conspired to murder "J.G." Indictment at 17 (Count 14). Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G. See Indictment at 17-18 (Count 15). The same Defendants also allegedly tampered with a witness, J.G. See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)[3] -- the United States names twelve defendants, all alleged SNM members

---

[3]The Court granted a conditional severance to one Defendant in that case. See United States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.). The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his Speedy Trial Act, 18 U.S.C. §§ 3161-74, rights. The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the joint-trial grouping. Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[4] There is also a separate prosecution of C. Garcia for drug crimes, see United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

## PROCEDURAL HISTORY

Defendant Billy Garcia filed the Motion, and Defendants Joe Gallegos, Edward Troup, Allen Patterson, Christopher Chavez, Javier Alonso, Arturo Arnulfo Garcia, Mario Rodriguez, Mauricio Varela, Daniel Sanchez, Conrad Villegas, Anthony Ray Baca, Christopher Garcia, Carlos Herrera, Rudy Perez, Andrew Gallegos, Shauna Gutierrez, and Brandy Rodriguez ("Defendants") all joined.[5] See Motion at 1-2. The United States filed a Response. See Response to Defendants' Motion for Timely Discovery of *Giglio* Materials, filed June 7, 2017 (Doc. 1185)("Response"). The Court held a hearing on November 8, 2017, at which several of

---

Gallegos is ready for trial, because his counsel prepared his state court defense and he "[is] basically being tried for the same thing here. . . ." in federal court. . . . If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32. Ultimately, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor. See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld). On March 22, 2017, R. Gallegos pled guilty in his severed case. See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

[4]The Court has also declared that case complex under the Speedy Trial Act. See United States v. Baca, 2016 WL 6404772, at *30-32.

[5]The Court notes that it severed the case into two trial groups: (i) Counts 6–12; and (ii) Counts 1-5 and 13-16. See Memorandum Opinion and Order, 2017 WL 3054511 at *103, filed June 30, 2017 (Doc. 1204).

Defendants' requests were resolved.  <u>See</u> Transcript of Hearing (held November 8, 2017), filed November 20, 2017 (Doc. 1456)("Tr.").

1.       **The Motion**.

The Defendants, "pursuant to Fed. R. Crim. P. 16, *Brady v. Maryland*, 373 U.S. 83 (1963)[("<u>Brady</u>")], and *Giglio v. United States*, 405 U.S. 150 (1972)," make a general request for twenty different categories of files and information.  Motion at 2.  The Defendants request: (i) the "last known address of any witness," Motion at 6; (ii) "guilty verdicts, juvenile and adjudication or other bad acts" of all witnesses, Motion at 7; (iii) all "consideration" that the United States' witnesses received, Motion at 8; (iv) all "sources of [the United States' witnesses'] bias, motive or interest," Motion at 10; (v) "any threats expressed or implied, direct or indirect, whether coercively made or directed against any witness in the form of criminal prosecutions, investigations, or potential prosecutions pending," Motion at 12; (vi) "the existence and identification of each occasion on which a witness has testified before any court, grand jury, or other tribunal body or other statements," Motion at 14; (vii) "any and all impeaching information contained in any federal and local Government files (or computer information) maintained concerning the witness," Motion at 14-15; (viii) "information which impeaches a witness' competency and his capacity and opportunity to observe, remember, recall and narrate as well as his character for veracity, partiality and evidence of 'basic mental trouble,'" Motion at 15 (quoting <u>Wiman v. Powell</u>, 293 F.2d 605, 606 (5th Cir. 1961)); (ix) "false or erroneous statements, whether under oath or penalty of perjury, or evidence that any witness does not have a good reputation in the community for honesty," Motion at 16; (x) "oral and written results of any polygraph test administered to any prosecution witness," Motion at 17; (xi) "evidence that a government informant had acted as an informant on prior occasion," Motion at 18; (xii) "prior placement records for all inmate informants that either

indicate they were a percipient witness or overheard admissions by any defendant," Motion at 19; (xiii) "all records of complaints lodged by or on behalf of the witness while incarcerated and records indicating any disciplinary action," Motion at 19; (xiv) all information relating to any witness' "acceptance into any witness protection program," Motion at 19; (xv) "any sentence, reduction or modification of sentence which does not conform to the law in existence at the time of the sentence reduction," Motion at 19; (xvi) "any and all correspondence or other communication between the sentencing, modifying or reducing judge and the Government and or witness regarding the sentence, modification or reduction," Motion at 20; (xvii) "information regarding instances of use of controlled substances," Motion at 20; (xviii) "any and all information that the witness has recanted their statement," Motion at 20; (xix) "any indication that a witness, after cooperating with the government, went back and cooperated with any defendant or target of the criminal investigation," Motion at 20; and (xx) "any individual whose statements the government intends on offering as an exception or exclusion to the hearsay rule," Motion at 3.

For the last known addresses of the United States' witnesses, the Defendants note that failure to interview government witnesses may amount to ineffective assistance of counsel, and the witnesses' addresses are necessary to locate and interview them. See Motion at 6 (citing United States v. Napue, 834 F.2d 1311 (7th Cir. 1987)). The Defendants assert that, "[j]ust as the government interviewed inmates that lived with the defendants to obtain information, the defendants wish to interview the inmates who live with the government's witnesses." Motion at 7.

Turning to information on the cooperating witnesses' competency, the Defendants argue that "information which impeaches a witness' competency . . . cannot be suppressed and must be disclosed." Motion at 15 (citing Wiman v. Powell, 293 F.2d 605). Accordingly, the Defendants

seek "any medical, psychological or psychiatric evidence tending to show that any informant's ability to perceive, remember, communicate, or tell the truth is impaired." Motion at 16 (citing United States v. Lindstrom, 698 F.2d 1154, 1163-68 (11th Cir. 1983)). Finally, for "prior placement records," the Defendants seek any such records "so that the defense can determine whether or not the inmate informant was in a position to have perceived or overheard what they claim to have witnessed." Motion at 19.

The Defendants conclude by requesting "consultation with the Court" on any matters which the United States opposes, but note that they would reluctantly acquiesce in the United States' ex parte consultation with the Court on the discoverability of contested information. Motion at 21-22.

## 2. The Response.

The United States has filed a response. See Response at 1. The United States begins by noting that "the Court concluded that timing of disclosure under *Giglio* is identical to that for" Brady. Response at 1. The United States also notes the Court's oral ruling at the May 19, 2017, motions hearing, at which "the Court noted the distinction between *Giglio* materials and statements under Jencks, of which [the Court] did not order early production." Response at 1. Accordingly, "the United States does not oppose many of the Defendants' requests, as they request information that the United States concedes may be properly considered *Giglio* materials." Response at 1. The United States opposes, however, the "Defendants' request for confidential competency and mental illness records, as those materials are protected from the United States' access and it, thus, cannot produce them." Response at 1. The United States also opposes the Defendants' request for the last known address of each of its witnesses, "as that information does not come within *Giglio*

materials." Response at 1. Finally, to the extent the United States has materials responsive to the Defendants' requests, "the United States doesn't oppose" the Motion. Response at 1.

As to its witnesses' last known addresses, the United States concedes that failure to interview government witnesses can, in certain circumstances, amount to ineffective assistance of counsel. See Response at 5 (citing United States v. Tucker, 716 F.2d 576 (9th Cir. 1983)). The United States asserts, however, that "witnesses' addresses are not *Giglio* materials, and Defendants do not cite to a case that so holds." Response at 5.

As to competency information, the United States asserts that such information is beyond its awareness and possession. See Response at 7. The United States acknowledges that such information could be impeachment evidence, but asserts that it is aware of such information for only "one witness who is a former co-Defendant and who underwent a competency hearing in this matter." Response at 7. Accordingly, the United States requests that the Court deny the Defendants' motion for these materials. See Response at 7.

The United States then argues that its witnesses' prior placement records are not Giglio materials. See Response at 8. "If the record reflects information inconsistent with a witness' anticipated testimony, it may be. But the Defendants have not provided any basis on which such a determination may be made presently." Response at 8.

The United States then agrees to produce: (i) "summaries of its witnesses' NCIC[6] reports," Response at 5; (ii) all "consideration paid to its witnesses to the extent that they're in the United

---

[6]"NCIC" is the National Crime Information Center, "an electronic clearinghouse of crime data that can be tapped into by virtually every criminal justice agency. . . . NCIC has operated under a shared management concept between the FBI and federal, state, local, and tribal criminal justice users since its inception." NCIC, https://www.fbi.gov/services/cjis/ncic (last visited November 5, 2019).

States' possession," Response at 6; (iii) all "*Giglio* materials that reflect its witnesses' bias, interest, or motive, to the extent that they're in the United States' possession," Response at 6; (iv) "the existence and location of its witnesses' prior testimony," with the exception of grand jury transcripts, Response at 6; (v) its agents' notes "that constitute *Giglio* materials," and all impeaching information contained within those files as that information comes to its attention, Response at 6; (vi) all of its witnesses' "false or inconsistent statements, or reputation for dishonesty, to the extent that they're in the United States' possession," Response at 7; (vii) all its witnesses' prior informant activities, Response at 8; (viii) "all records of complaints lodged by or on behalf" of its witnesses during incarceration which indicate "any disciplinary action" or "belief that the witness might be a security risk," Response at 8; and (ix) all information in its possession regarding its witnesses' use of illegal substances, see Response at 8.

The United States asserts that it does not have any records pertaining to threats made against any of its witnesses.  See Response at 6.  The United States also asserts that it does not have any polygraph information for any of its witnesses.  See Response at 7.  The United States also says that it does not have any information relating to its witnesses' applications into any witness protection program, or any information about any reduction or modification in its witnesses' sentences in exchange for their cooperation.  See Response at 8.  Finally, the United States responds that it does not have any correspondence between any sentencing judges and the United States regarding its witnesses' sentencing.  See Response at 8.

Accordingly, of the Defendants' twenty requests, the United States disputes only three.  It disputes the Defendants' entitlement to each of the United States' witnesses' last known addresses. See Response at 6.  It disputes the Defendants' entitlement to its witnesses' competency

information.  See Response at 7.  Last, it disputes the Defendants' entitlement to its witnesses' prior placement records.  See Response at 8.

### 3.  The November 8, 2017, Hearing.

At the hearing, B. Garcia first argued that he is entitled to all the government's information on "any individual whose statements the Government intends on offering as an exception or exclusion to the hearsay rule."  Tr. at 49:8-11 (Castle).  B. Garcia argued that he is entitled, under Giglio and rule 806 of the Federal Rules of Evidence, to impeachment evidence for any declarant whose statement the United States introduces as a co-conspirator's statement.  See Tr. at 50:21-51:2 (Castle).  B. Garcia acknowledged, however, that, if the United States does not introduce that declarant's statement, the Defendants would not be entitled to impeachment evidence for that declarant under Giglio.  See Tr. at 51:24-52:5 (Court, Castle).  The United States then agreed to provide Giglio evidence on all witnesses it would call to testify and on all declarants whose statements it would introduce.  See Tr. at 52:5-10 (Beck).  The United States also agreed to disclose impeachment evidence on any co-Defendants whose statements would be introduced under hearsay exceptions.  See Tr. at 52:20-22 (Court, Beck).  Baca added, however, that this rule would enable the United States to disclose Giglio materials belatedly on those who remain only potential witnesses until well into trial.  See Tr. at 54:23-55:8 (Lowry).  Accordingly, Baca requested "overdisclosing" Giglio evidence.  Tr. at 55:1 (Lowry).  The Court responded that it would not order the United States to do something it was not obligated to do, preferring to encourage the United States' cooperation.  See Tr. at 55:20-56:8 (Court, Lowry).  Baca countered that certain individuals are almost certainly necessary to prove the United States' case, and so it would be "a little disingenuous" for the United States to "sit on the Brady and Giglio information that's relevant" to those witnesses.  Tr. at 56:14-18 (Lowry).

B. Garcia next argued "the extent" of the United States' disclosure obligations regarding evidence held by various state entities like "the two New Mexico Joint Task Forces," which "were involved in the investigation into at least the 2001 murders," although B. Garcia acknowledged that this argument derives from separate briefing not slated for argument at this hearing. Tr. at 58:10-16 (Castle). The United States agreed to disclose information relating to federal-state cooperation in the federal prosecution, and stated that it would make good-faith efforts to obtain information from prior cooperation unrelated to the instant prosecution, and reported that the United States would be transparent about those efforts' scope and results. See Tr. at 61:5-21 (Court, Beck).

B. Garcia turned to his request for information relating to all United States' witnesses' "competency or mental illness." Tr. at 68:25-69:1 (Castle). The United States responded that, at least with regard to some witnesses, the United States considered such information as "the Court's documents, because there was a competency evaluation," and so it asked the Court to "make a determination about what should or shouldn't be disclosed from those documents." Tr. at 69:17-21 (Castellano). B. Garcia asserted that he wanted both the competency evaluations and the underlying and supporting documents for those evaluations. See Tr. at 72:16-23 (Court, Castle). B. Garcia acknowledged that such information is not in the United States' control and that disclosure may require each witness' consent. See Tr. at 74:3-13 (Castle, Court).

B. Garcia next argued his request for all information concerning the drug use of the United States' witnesses. See Tr. at 91:2-3 (Castle). The United States responded that any such information would "be in the defendants' disciplinary reports, which have been produced and will be produced in the next disclosure." Tr. at 91:8-10 (Beck). The United States accordingly

acknowledged it was "treating illegal drug use as a <u>Giglio</u> issue," which B. Garcia accepted. Tr. at 91:11-13 (Court, Beck). <u>See</u> <u>id.</u> at 91:17-18 (Castle).

B. Garcia turned to disclosure timing, which he described as "the final issue . . . that's most concerning." Tr. at 91:21-25 (Castle). B. Garcia complained that the United States promised to immediately disclose all impeachment evidence in June, 2017, but had not yet done so as of the November 8, 2017, hearing. <u>See</u> Tr. at 91:23:92:3 (Castle). B. Garcia argued: "What we've gotten on all the people that we know are going to be witnesses is their criminal history and their plea agreements, with some minor exceptions. We haven't gotten <u>Giglio</u> material." Tr. at 92:3-6 (Castle). B. Garcia requested some assurances from the United States, and potentially a Court order, because "the history of this case is this Court has ordered productions of things, and they don't get produced many times, when they have been ordered to have been produced." Tr. at 96:13-18 (Castle). The United States responded that it was "abiding" by the Court's discovery orders, and noted that "there has been numerous productions of jail calls, disciplinary history, classification records, pen packs, STIU files, [and] jail calls," the last of which, for a single witness, "are at 5.6 gigabytes." Tr. at 6-10 (Beck). The United States posited that "what the defendants are really latching onto here is . . . the payments to these cooperating defendants, and these haven't been turned over." Tr. at 14-17 (Beck). The United States asserted that it did not yet know who it would call as witnesses, and argued that, until it made such a decision, "certain information is not <u>Giglio</u>." Tr. at 99:1-5 (Beck). The Court proposed setting a deadline for blanket disclosure of all payments and consideration given to the United States' cooperating witnesses, to which the United States reluctantly agreed. <u>See</u> Tr. at 104:8-10 (Court); <u>id.</u> at 108:4-8 (Beck). The Court proposed a deadline of two months before each trial. <u>See</u> Tr. at 108:10-14 (Court, Beck).

B. Garcia was skeptical of this arrangement, mistrusting that the United States would meet the deadline. <u>See</u> Tr. at 108:5-10 (Castle).

Having heard the parties' arguments about the timing of <u>Giglio</u> and other evidentiary disclosure, the Court proposed that the United States give "a good faith best statement of their witnesses for the first trial, with the inclination of being overinclusive, rather than underinclusive," Tr. at 113:5-8 (Court,) by January 29, 2018, and also full disclosure, two months before each trial, of all cash payments to cooperating witnesses and their spouses, <u>see</u> Tr. at 113:18-22 (Court); <u>id.</u> at 120:1-7 (Court, Beck); <u>id.</u> at 142:17-22 (Court). The Defendants will provide their witness list within a week of receiving the United States' witness list. <u>See</u> Tr. at 142:23-24 (Court). For the second trial, the United States would produce its witness list no later than two weeks before trial, and the second trial defendants would produce a witness list within seven days of that disclosure. <u>See</u> Tr. at 142:24-143:3 (Court). The United States acknowledged that <u>Giglio</u> would require disclosure beyond cash payments and committed to working to expedite such disclosure, although this information might not be disclosed by November 17, 2017. <u>See</u> Tr. at 120:1-6 (Court, Beck). The United States also agreed that cooperating witnesses' statements which contradict those of other cooperating witnesses would fall under <u>Giglio</u>. <u>See</u> Tr. at 133:9-24 (Court, Beck).

The Court noted that it was resolving -- and would continue resolving -- the substance of multiple discovery motions at hearings and asked the Defendants to withdraw motions as the Court resolves them. <u>See</u> Tr. at 14-22 (Court, Sirignano). In response, Baca acknowledged that he had a "stand-alone motion," the Motion to Compel Immediate Production of *Brady* and *Giglio* Materials, filed October 13, 2017 (Doc. 1332), which the Court's "ruling just neutralized completely." Tr. at 118:19-20 (Lowry). Baca accordingly withdrew his Motion to Compel Immediate Production of *Brady* and *Giglio* Materials. <u>See</u> Unopposed Notice Withdrawing

Motion to Compel Immediate Production of Brady and Giglio Materials at 1, filed November 20, 2017 (Doc. 1463).

**LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE
IN CRIMINAL CASES**

In Brady, the Supreme Court of the United States of America explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In Giglio, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See 405 U.S. at 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request."). On the other hand, "[i]t is well settled that there is no affirmative duty upon

the government to take action to discover information which it does not possess." United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. 2005)(Browning, J.)(internal quotation marks omitted). "A prosecutor does not have a duty . . . to obtain evidence from third parties." United States v. Badonie, 2005 WL 2312480, at *2.

During a criminal prosecution, the Federal Rules of Criminal Procedure and the Constitution of the United States of America require the United States to disclose certain evidence to a criminal defendant. Rule 16 of the Federal Rules of Criminal Procedure is one source that imposes such a duty on the United States. The Due Process Clause of the United States Constitution is another source imposing a duty to disclose on the United States.

## LAW REGARDING RULE 16

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

    **(i)**      the item is material to preparing the defense;

    **(ii)**      the government intends to use the item it its case-in-chief at trial; or

    **(iii)**      the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition." United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)). Rule 16 also does not obligate the United States to "take action to discover information which it does not possess." United States v. Badonie,

2005 WL 2312480, at *2 (quoting <u>United States v. Tierney</u>, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure information from third parties. <u>See</u> <u>United States v. Gatto</u>, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." <u>United States v. Graham</u>, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting <u>United States v. Lloyd</u>, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor." <u>United States v. Graham</u>, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1).  In <u>In re Terrorist Bombings of United States Embassies in East Africa</u>, 552 F.3d 93 (2d Cir. 2008), the United States Court of Appeals for the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information." <u>In re Terrorist Bombings of United States Embassies in East Africa</u>, 552 F.3d at 122.  In <u>United States v. Delia</u>, 944 F.2d 1010 (2d Cir. 1991),

the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." United States v. Delia, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16. United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> > **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
> >
> > **(B)** grant a continuance;
> >
> > **(C)** prohibit that party from introducing the undisclosed evidence; or
> >
> > **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)). In United States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the United States Court of Appeals for the Tenth Circuit held that "a court should impose the least severe sanction." 455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)). The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies." 455 F.3d at 1131.

**LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE**

The Due Process Clause requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [government's] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); Bowen v. Maynard, 799 F.2d 593, 610 (10th Cir. 1986)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d at 1304 ("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

**1.      Material Exculpatory Evidence Under Brady.**

"The Constitution, as interpreted in *Brady*, does not require the prosecution to divulge

every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, "is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994)(Seymour, C.J.). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . [including] whether the defendant should testify." Case v. Hatch, 731 F.3d 1015, 1041 (10th Cir. 2013)(Tymkovich, J.)(alteration in Case v. Hatch)(internal quotation marks omitted)(quoting United States v. Burke, 571 F.3d at 1054).

"To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(internal quotation marks omitted)(quoting United States v. Kennedy, 890 F.2d 1056, 1059 (9th Cir. 1989)). The Supreme Court in Cone v. Bell, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. See Kyles, 514 U.S. at 437 . . . ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993)"). See also ABA Model Rule of Professional

Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; defendants have no obligation to first point out that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *6 (D.N.M. Mar. 14, 2011)(Browning, J.). This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way." Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted). Additionally, "[u]nder *Brady*, the good or bad faith of government agents is irrelevant." United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982). "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.

## 2. **Timing of the Disclosure Under Brady.**

"The obligation of the prosecution to disclose evidence under *Brady v. Maryland* can vary depending on the phase of the criminal proceedings and the evidence at issue." United States v.

Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), aff'd, 742 F.3d 451 (10th Cir. 2014). As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in *Brady v. Maryland*." United States v. Burke, 571 F.3d at 1053. The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." United States v. Burke, 571 F.3d at 1054. "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)). The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with *Brady*, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

United States v. Burke, 571 F.3d at 1054. Notably, "not every delay in disclosure of *Brady* material is necessarily prejudicial to the defense." United States v. Burke, 571 F.3d at 1056. "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial." United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they "continue[] throughout the judicial process." Douglas v. Workman, 560 F.3d at 1173. For instance, the prosecutor's obligation to disclose Brady material can arise during trial. See United States v. Headman, 594 F.3d 1179, 1183 (10th Cir. 2010)("Although *Brady* claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until

trial is underway."). The disclosure obligation continues even while a case is on direct appeal. See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir. 1997)(Seymour, C.J.)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of impeachment information." United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide whether the Constitution requires that preguilty plea disclosure of impeachment information. We conclude that it does not."). The Supreme Court has recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." United States v. Ruiz, 536 U.S. at 629 (emphasis in original). The Supreme Court has acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 629. The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630. The Supreme Court has explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 631. The Tenth Circuit has reiterated these principles from United States v. Ruiz:

Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in *United States v. Ruiz*, . . . by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. *Ruiz* emphasized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances -- even though the defendant may not know the *specific detailed* consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(per curiam)(unpublished)(alteration in United States v. Johnson, emphasis in United States v. Ruiz)(quoting United States v. Ruiz, 546 U.S. at 630).[7]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence but rather applies only to impeachment evidence:

*Ruiz* is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in *Ruiz* that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a

---

[7]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. McIntosh, 573 F. App'x 760 (10th Cir. 2014), United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005)(unpublished), Ortlieb v. Howery, 74 F. App'x 853 (10th Cir. 2003)(unpublished), United States v. Johnson, 117 F.3d 1429, 1997 WL 381926 (10th Cir. 1997)(unpublished table decision), United States v. Bullock, 130 F. App'x 706 (6th Cir. 2005)(unpublished), and United States v. Dahl, 597 F. App'x 489 (10th Cir. 2015)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a *Brady* violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished).  The Tenth Circuit qualified its holding in United States v. Ohiri, however, stating that the case presented "unusual circumstances."  133 F. App'x at 562.

The Courts of Appeals "have split on the issue whether *Brady v. Maryland*'s restrictions apply to suppression hearings."  United States v. Harmon, 871 F. Supp. 2d at 1151.  In an unpublished opinion, the Tenth Circuit, without discussing whether Brady applies to a suppression hearing, rejected a defendant's argument that the prosecution violated Brady by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material.  See United States v. Johnson, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different.  First, we question whether the evidence in question would have been admitted at the suppression hearing.  Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined.  Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a *Brady* violation.

United States v. Johnson, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the *Brady* line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet *Brady* rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'"  United States v. Bowie, 198 F.3d 905, 912 (D.C. Cir. 1999)(quoting Brady,

373 U.S. at 87).  Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie. See United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the *Brady* issues at stake here.").  The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "*Brady* disclosures are required prior to suppression hearings."  United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).

Before the Supreme Court issued its United States v. Ruiz decision, the United States Courts of Appeals for the Fifth Circuit and the Ninth Circuit held that Brady applies to suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in *Brady* and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965 (5th Cir. 1990)("Timing is critical to proper *Brady* disclosure, and objections may be made under *Brady* to the state's failure to disclose material evidence prior to a suppression hearing."  (citations omitted)), vacated on other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "*Brady* rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment."  United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(unpublished)(Tymkovich, J.)(internal quotation marks omitted)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013)(acknowledging that "[w]hether *Brady's* disclosure requirements even apply at the motion to suppress stage is an open question")).

Although the Courts of Appeals have split on whether <u>Brady</u> applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in *United States v. Ruiz* that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea."  <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151.  The Tenth Circuit affirmed <u>United States v. Harmon</u>, in which the Court concluded that the United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of *United States v. Ruiz* to suppression hearings.  The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial.  The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing.  In *United States v. Ruiz*, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*."  *United States v. Ruiz*, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant."  *United States v. Ruiz*, 536 U.S. at 632 . . . .  Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant."  *United States v. Ruiz*, 536 U.S. at 632 . . . .

<u>United States v. Harmon</u>, 871 F. Supp. 2d at 1169.  Accordingly, <u>Brady</u> does not require the United States to disclose impeachment evidence before suppression hearings.  <u>See United States v. Harmon</u>, 871 F. Supp. 2d at 1165-67.

### <u>LAW REGARDING THE RIGHT TO PRIVACY IN MEDICAL RECORDS</u>

The Due Process Clause of the Fourteenth Amendment protects the right of privacy.  <u>See</u> <u>Flanagan v. Munger</u>, 890 F.2d 1557, 1570 n .15 (10th Cir. 1989); <u>Mangels v. Pena</u>, 789 F.2d 836,

839 (10th Cir. 1986).  The Tenth Circuit has recognized that the right to privacy protects government employees from their employers improperly attempting to obtain the private medical history or records.  See Lankford v. City of Hobart, 27 F.3d 477, 479 (10th Cir. 1994).  Although the Tenth Circuit in Lankford v. City of Hobart found a violation of the right of privacy under the facts in that case, it did not discuss how a court should determine when a violation of the privacy right occurs.  See 27 F.3d at 479-80.  Flanagan v. Munger provides some instruction on this point. In Flanagan v. Munger, the Tenth Circuit employed a balancing test to determine when disclosure by the government of private information amounts to violation of the right to privacy.  See 890 F.2d at 1570.  Specifically, a court must inquire: "(1) if the party asserting the right has a legitimate expectation of privacy; (2) if disclosure serves a compelling state interest; and (3) if disclosure can be made in the least intrusive manner."  Flanagan v. Munger, 890 F.2d at 1570.  The Tenth Circuit held that the plaintiffs, police officers who owned an adult video store, did not suffer a violation of their privacy rights when their ownership was disclosed, noting that "only highly personal information is protected."  Flanagan v. Munger, 890 F.2d at 1570.  See Mangels v. Pena, 789 F.2d at 839 ("The legitimacy of an individual's expectations depends, at least in part, upon the intimate or otherwise personal nature of the material. . . .").  In Ortlieb v. Howery, 74 F. App'x 853 (10th Cir. 2003)(unpublished), the Tenth Circuit applied the balancing test set forth in Flanagan v. Munger and held that the plaintiff did not have a reasonable expectation of confidentiality in her x-ray.  See 74 F. App'x at 857.  In reaching its conclusion, the Tenth Circuit in Ortlieb v. Howery noted that the plaintiff's broken leg was not confidential information, because the plaintiff had contacted her employer seeking extended medical leave given the severity of her injury, and the injury was "well-known and publicized with no intrusion into her personal affairs."  74 F. App'x at 857.  The Tenth Circuit also observed that, because the plaintiff had "supported her request for

an indefinite extension of medical benefits with her doctor's report stating that his opinion of continuing disability was corroborated with her x-rays, she had no reasonable expectation that the x-rays themselves would be confidential or protected from her supervisor's reach or purview." 74 F. App'x at 857. Finally, the Tenth Circuit noted that "the x-rays, unlike written medical records, contained no facts or information of an intimate or personal nature about which Ms. Ortlieb could form a legitimate or reasonable expectation of confidentiality notwithstanding her claim for benefits." 74 F. App'x at 857.

In Kerns v. Board of Commissioners, 707 F. Supp. 2d 1190 (D.N.M. 2010)(Browning, J.), rev'd in part, vacated in part sub nom. Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the Court used the Tenth Circuit's balancing test from Flanagan v. Munger to determine whether a sheriff who obtained the plaintiff's medical records violated the plaintiff's privacy right under the Fourteenth Amendment, and concluded that (i) the plaintiff had a legitimate expectation of privacy in his medical and psychiatric records, because he believed that the medical and mental health records were confidential and private; (ii) the sheriff's department had a compelling state interest in the records, because of its interest in enforcing 18 U.S.C. § 922(g)(4), which makes it unlawful for a person who has been "adjudicated as a mental defective" or who has been "committed to a mental institution" to possess firearms; and (iii) the state could have achieved its objectives in a less intrusive manner by making a more particularized request for records, rather than requesting to "review all records." 707 F. Supp. 2d at 1256-57. Balancing these factors, the Court concluded that the plaintiff met its burden on summary judgment to demonstrate that the sheriff violated his constitutionally protected right to privacy. See 707 F. Supp. 2d at 1257. The Court noted that the sheriff had not relied on the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104–191, 110 Stat.1936 ("HIPAA") when he requested the records; the law-enforcement exception

in HIPAA allows HIPAA-covered entities to disclose protected healthcare information in six circumstances:

> (i) as required by law-court orders, subpoenas, warrants; (ii) to identify or locate a suspect, fugitive, material witness, or missing person; (iii) in response to a law-enforcement official's request for information about a victim or suspected victim of a crime; (iv) to alert law enforcement of a person's death, if the covered entity suspects that criminal activity caused the death; (v) when a covered entity believes that protected health information is evidence of a crime that occurred on its premises; and (vi) by a covered health-care provider in a medical emergency not occurring on its premises, when necessary to inform law enforcement about the commission and nature of a crime, the location of the crime or crime victims, and the perpetrator of the crime.

707 F. Supp. 2d at 1259 (citing 45 C.F.R. § 164.512).  The Court said that "HIPAA restrains the 'health plan, health care clearinghouse, or healthcare provider' from disclosing protected medical information, and does not restrain law-enforcement directly."  707 F. Supp. 2d at 1259 (quoting 45 C.F.R. § 164.104).  The Court also concluded that the plaintiff established that his right to privacy in his medical records was clearly established at the time, precluding the sheriff from qualified immunity.  See 707 F. Supp. 2d at 1259-61.

The majority of the panel in the Tenth Circuit did not agree with the Court that the plaintiff's Fourteenth Amendment rights were clearly established and reversed the Court without analyzing whether the sheriff had violated the plaintiff's constitutional rights.  See Kerns v. Bader, 663 F.3d at 1183-84.  Although the plaintiff cited several cases in which the Tenth Circuit "held that government officials violated plaintiffs' substantive due process privacy rights by accessing their records without public disclosure," the Tenth Circuit explained that those cases "involved another element not present here: the government officials involved accessed the plaintiffs' confidential information as part of an unlawful campaign of sexual harassment."  663 F.3d at 1186. The Tenth Circuit ordered the Court to enter summary judgment in favor of the sheriff, "only

because [the plaintiff] has failed to identify clearly established law rendering beyond debate that the Sheriff's conduct was unlawful as of 2005." 663 F.3d at 1187. Judge Holloway dissented, agreeing instead with the Court that the officer violated the plaintiff's "clearly established right to have his highly personal medical information protected from a law enforcement officer whose access to that information was supported only by a generalized interest in whether a crime might have occurred." 663 F.3d at 1197-98 (Holloway, J., dissenting)(emphasis in original).

## LAW REGARDING THE PSYCHOTHERAPIST-PATIENT PRIVILEGE

The Supreme Court established the federal psychotherapist-patient privilege in Jaffee v. Redmond, 518 U.S. 1, 15 (1996). In that case, a police officer had roughly fifty counseling sessions with a licensed clinical social worker to cope with psychological problems resulting from a police shooting. See 518 U.S. at 5. The shooting victim's relatives brought a civil suit against the officer and her employer, and sought access to the social worker's notes to cross-examine the police officer. See 518 U.S. at 5. Both the police officer and the social worker refused to discuss their conversations' contents, and the district court allowed the jury to draw a negative inference from their refusals. See 518 U.S. at 5-6. The United States Court of Appeals for the Seventh Circuit reversed, recognizing a psychotherapist-patient privilege, but allowing for exceptions when, "in the interests of justice, the evidentiary need for the disclosure of the contents of a patient's counseling sessions outweighs that patient's privacy interests." 518 U.S. at 7. The Supreme Court granted certiorari to resolve a split among the Courts of Appeals. See 518 U.S. at 8.

The Supreme Court held that "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." 518 U.S. at 15. It

determined that "a privilege protecting confidential communications between a psychotherapist and her patient 'promotes sufficiently important interests to outweigh the need for probative evidence.'" 518 U.S. at 9-10 (quoting <u>Trammel v. United States</u>, 445 U.S. 40, 51 (1980)).  The Supreme Court then explained the purpose of the privilege:

> Treatment by a physician for physical ailments can often proceed successfully on the basis of a physical examination, objective information supplied by the patient, and the results of diagnostic tests.  Effective psychotherapy, by contrast, depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears.

518 U.S. at 10.[8]  It reasoned that the privilege served the public interest "by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem," promoting "a public good of transcendent importance."[9]  518 U.S. at 11.  It also noted

---

[8]These are empirical assertions.  Some courts and commentators have questioned the basis for the distinction between medical and psychological records.  Some contend that because Freudian techniques are increasingly rare, patients make embarrassing disclosures about their childhoods or deeply personal matters.  <u>See</u> § 5522 <u>Policy of the Privilege</u>, 25 Fed. Prac. & Proc. Evid. § 5522 (1st ed.).  Others doubt whether psychological patients are more likely to be dissuaded from seeking treatment by the threat of disclosure.  <u>See</u> § 5522 <u>Policy of the Privilege</u>, 25 Fed. Prac. & Proc. Evid. § 5522 (1st ed.)("It seems to be assumed that the paranoid mind will be satisfied by a few words added to the statute books."); <u>Lora v. Bd. of Ed. of City of New York</u>, 74 F.R.D. 565, 575 (E.D.N.Y. 1977)(Weinstein, J.)(" In the case before us, those persons in charge of gathering the data agreed that students and their families may be reluctant to give personal information to guidance counselors, psychologists, social workers, psychiatrists or their associates for many reasons, but that fear of use in any possible court proceeding is not a factor of any substantial importance.")(ultimately approving the privilege).  <u>But</u> <u>see</u> Stephen A. Saltzburg, <u>Privileges and Professionals: Lawyers and Psychiatrists</u>, 66 Va. L. Rev. 597, 620 (1980)("Psychiatric communications are uniquely sensitive, and successful treatment requires a degree of self-revelation by the patient which can only be accomplished in an atmosphere of inviolate privacy.").

[9]The privilege was originally grounded in the fear of stigma surrounding mental health treatment.  <u>See</u> John G. Fleming & Bruce Maimov, <u>The Patient or His Victim: The Therapist's Dilemma</u>, 62 Calif. L. Rev. 1025, 1050, 1974 (describing the experience of Thomas Eagleton, a Democratic candidate for Vice-President of the United States who was forced off the ticket after the public learned that he had once seen a psychiatrist).  Some commentators have suggested that

that the privilege would not greatly interfere with the pursuit of truth, as "[w]ithout a privilege, much of the desirable evidence to which litigants such as petitioner seek access -- for example, admissions against interest by a party -- is unlikely to come into being." 518 U.S. at 12. The Supreme Court concurred, however, with "the judgment of the state legislatures and the Advisory Committee that a psychotherapist-patient privilege will serve a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." 518 U.S. at 15. The Supreme Court further expressly declined to prescribe a balancing test for lower courts evaluating the psychotherapist privilege:

> [m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege. As we explained in *Upjohn*[ v. United States, 449 U.S. 383, 393 (1981),] if the purpose of the privilege is to be served, the participants in the confidential conversation "must be able to predict with some degree of certainty whether particular discussions will be protected." An uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all.

518 U.S. at 17-18. Subsequent cases have described the case as a "notable exception" to the Supreme Court's general trend of refusing to create new privileges.[10] In re Qwest Commc'ns Int'l Inc., 450 F.3d 1179, 1197 (10th Cir. 2006).

The Supreme Court did not delineate the privilege's other boundaries, explaining that,

---

the stigma resulting from mental health treatment is not as great as courts originally assumed. See § 5522 Policy of the Privilege, 25 Fed. Prac. & Proc. Evid. § 5522 (1st ed.).

[10]The psychotherapist-patient privilege is an exception to general rules disfavoring evidentiary privileges. See United States v. Nixon, 418 U.S. 683, 710 (1974)("[E]xceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."); Mason v. Stock, 869 F. Supp. 828, 833 (D. Kan. 1994)(Belot, J.)("It is a venerable legal axiom that privileges are to be narrowly, not expansively, construed.")(internal quotations omitted).

"[b]ecause this is the first case in which we have recognized a psychotherapist privilege, it is neither necessary nor feasible to delineate its full contours in a way that would govern all conceivable future questions in this area." 518 U.S. at 18 (internal quotations omitted). "The lower federal courts have just begun to flesh out the dimensions of the privilege." 1 McCormick On Evid. § 98 (7th ed. 2013).

### 1. <u>When the Privilege Applies</u>.

The Supreme Court provided basic guidelines on the privilege's application. The communications must be made in the course of diagnosis and treatment. See Jaffee v. Redmond, 518 U.S. at 15. The Supreme Court rejected the Seventh Circuit's balancing component, stating that "[m]aking the promise of confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." 518 U.S. at 17. It allowed for an exception when "a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist." 518 U.S. at 18 n.19.

The lower courts have further defined when this dangerous patient exception applies. See United States v. Auster, 517 F.3d 312, 315-16 (5th Cir. 2008)(declining to apply privilege when patient knew that therapist would convey his threats to his targets); United States v. Glass, 133 F.3d 1356, 1360 (10th Cir. 1998)(requiring evidentiary hearing to determine whether threat could be averted only by disclosure). But see United States v. Chase, 340 F.3d 978, 985 (9th Cir. 2003)(holding that privilege prevented discovery after threat had passed). Courts have also allowed for a crime-fraud exception. See In re Grand Jury Proceedings (Gregory P. Violette), 183 F.3d 71, 78 (1st Cir. 1999).

## 2. **What the Privilege Covers.**

The privilege extends to confidential communications made to licensed psychiatrists, psychologists, and social workers in the course of psychotherapy.  See Jaffee v. Redmond, 518 U.S. at 15.  The privilege also protects notes made during the course of treatment.  See Jacobs v. Conn. Cmty. Tech. Colleges, 258 F.R.D. 192, 195 (D. Conn. 2009)(Smith, J.).  Its scope is not unlimited, however:

> Facts regarding the very occurrence of psychotherapy, such as the dates of treatment, are not privileged. And so, for example, if Plaintiff was seeing a psychotherapist before any actionable emotional injury allegedly occurred, the dates of such pre-existing treatment would be available to Defendants.  The substance of the psychotherapist-patient communication is privileged. The fact that such communication took place is not.

Vanderbilt v. Town of Chilmark, 174 F.R.D. 225, 230 (D. Mass. 1997)(Tauro, J.).  See Langenfeld v. Armstrong World Indus., Inc., 299 F.R.D. 547, 551 (S.D. Ohio 2014)(Frost, J.)("The privilege does not, however, cover the patient/psychotherapist's identity, the time of treatment, and/or the fact that any such treatment took place.").

## 3. **When a Party Waives the Privilege.**

The Supreme Court explained that, "[l]ike other testimonial privileges, the patient may of course waive the protection," but did not specify precisely when that waiver would occur.  Jaffee v. Redmond, 518 U.S. at 15 n.14.  See 1 McCormick On Evid. § 103 (7th ed. 2013)("The physician-patient privilege, like most other privileges, may also be waived in advance of trial by a disclosure of the privileged information either made or acquiesced in by the privilege holder.").

In Speaker ex rel. Speaker v. County of San Bernardino, 82 F. Supp. 2d 1105 (C.D. Cal. 2000)(Timlin, J.), San Bernardino County required a police officer to speak with a mental health counselor after he shot a man.  See 82 F. Supp. 2d at 1107.  San Bernardino County informed the

officer that the sessions would be confidential.  See 82 F. Supp. 2d at 1107.  The victim's family later sued the officer and San Bernardino County, and sought to question the counselor on the content of her conversations with the officer at trial.  See 82 F. Supp. 2d at 1107.

The district court rejected two of the plaintiff's arguments that the psychotherapist-patient privilege did not apply.  First, the court determined that a "'quasi-therapist'/patient privilege" protected the communications, despite the counselor's lack of a license, because the officer "reasonably, but mistakenly" believed that she was a psychotherapist.  82 F. Supp. 2d at 1115.  Second, the court rejected the plaintiff's argument that the privilege could not attach to counseling sessions that an employer required.  See 82 F. Supp. 2d at 1115.  It explained that the waiver inquiry "turn[s] on the fact that the officer knew that the counselor's report would go to his employer."  82 F. Supp. 2d at 1115.  See Kamper v. Gray, 182 F.R.D. 597, 599 (E.D. Mo. 1998)(Sippel, J.)(holding that a police officer waived the privilege, "[s]ince he was aware that his evaluations would be reported to his employer").  See also Stephen A. Saltzburg, Michael M. Martin, & Daniel J. Capra, Federal Rules of Evidence Manual 501.02 (8th ed. 2002).

The United States District Court for the Western District of Pennsylvania confronted a similar issue in Barrett v. Vojtas, 182 F.R.D. 177 (W.D. Pa. 1998)(Cindrich, J.).  In that case, a police officer defendant sought a protective order covering conversations and notes from employer-mandated counseling sessions with a psychiatrist and a psychologist.  See 182 F.R.D. at 178.  The district court denied the defendant's motion, explaining that "[a] police officer who is ordered to therapy, knowing that the therapist will report back to his or her superior, would have no expectation that his or her conversation was confidential."  182 F.R.D. at 181.  Although the court allowed that "there could be situations giving rise to the privilege when an officer has been ordered to undergo therapy," it refused to apply the privilege "when it is expected that the therapist

will produce a report or an evaluation from the ordered sessions for review by third parties."  182

F.R.D. at 181.  See Boudreau ex rel. Boudreau v. Ryan, No. 00 C 5392, 2001 WL 1001156, at *4

(N.D. Ill. Aug. 24, 2001)(Grady, J.)(unpublished)("There is also no showing that the

communications at issue were made with the expectation of confidentiality. If they were not, then

the privilege does not attach.").

The United States District Court for the District of New Jersey confronted similar facts two

years later in Caver v. City of Trenton, 192 F.R.D. 154 (D. N.J. March 10, 2000)(Hughes, M.J.).

The plaintiff in that case argued that the privilege should not apply, because the defendant police

officer was required to undergo a psychological fitness examination.  See 192 F.R.D. at 162.  The

district court rejected this argument:

> The Court finds that whether Defendant Valdora went to a psychologist voluntarily,
> or was ordered to go, is not dispositive of the issue.  What is critical is that
> Defendant Valdora was examined by a psychologist for the purpose of diagnosing
> whether he was suffering from some mental illness or emotional disorder that
> would render him unfit to be a police officer. More importantly, unlike . . . the cases
> relied on by Plaintiffs, Defendant Valdora clearly had an expectation of
> confidentiality.  He was told and reassured that the psychological records and
> reports would be kept strictly confidential, and would not be disclosed to the City
> of Trenton personnel.

192 F.R.D. at 162.  Because the psychologist conducting the examination gave only a pass or fail

recommendation to the police department without disclosing any of the officers' information, the

district court concluded that all of the reports and records were privileged, and should not be

disclosed.  See 192 F.R.D. at 162.  Accord Phelps v. Coy, 194 F.R.D. 606, 608 (S.D. Ohio

2000)(Rice, J.)(holding that all communications disclosed to police officer's employer were non-

confidential and subject to disclosure).

The amount of information disclosed to police departments can be decisive. In James v.

Harris County, 237 F.R.D. 606 (S.D. Tex. 2006)(Atlas, J.), the district court found that a police

officer had a reasonable expectation of privacy in his mandatory post-shooting evaluation.  See 237 F.R.D. at 612.  The district court noted that the officer's employer received only "the fact of the referral and the fact of Wilkinson's attendance," and distinguished the case from cases in which "the officers knew that reports and assessments from post-incident evaluation sessions would be submitted to their employers."  237 F.R.D. at 613.

## ANALYSIS

The Court will grant in part and deny in part the Motion.  Several issues that the Defendants raise in the Motion were resolved in the Response and at the November 8, 2017, hearing, without the need for an Order.  The United States indicated in the Response that it opposes only the Defendants' request for: (i) the United States' witnesses' mental health and competency records, see Response at 7; (ii) the last known addresses of each of the United States' witnesses, see Response at 5; and (iii) the United States' witnesses' placement records, see Response at 8.  At the November 8, 2017, hearing, the United States agreed to provide Giglio evidence on all witnesses it would call to testify, and on all declarants whose statements it would introduce, including on co-defendants whose statements would be introduced under hearsay exceptions.  See Tr. at 52:5-10 (Beck); id. at 52:20-22 (Beck).  The United States also agreed to disclose all its information relating to the federal-state investigation for this matter, and reported that it would make good-faith efforts to obtain information from prior cooperation unrelated to this matter.  See Tr. at 61:5-2 (Beck).  For mental health records, B. Garcia reported that he had reached an agreement with one of the cooperating witnesses' attorneys, so B. Garcia did not seek an order with regards to that witness.  See Tr. at 87:21-24 (Castle).  B. Garcia still seeks the records for two other witnesses: Leonard Lujan and Jimmy Ray Gordon.  For the remaining disputed discovery matters, the Court concludes that: (i) the United States in not required under Giglio to produce its witnesses' last known

addresses and placement records; (ii) the United States is not required to acquire and disclose each of its witnesses' mental health records; (iii) the Defendants are not entitled to blanket disclosure of each of the United States' witnesses' placement records; (iv) the United States must produce good-faith witness lists at least two weeks before each trial; and (v) the United States must disclose all payments issued to its cooperating witnesses no later than two months before each trial.

The Court previously has concluded that this case includes capital offenses and that therefore the United States has disclosure obligations under 18 U.S.C. § 3432. See United States v. DeLeon, No. CR 15-4268 JB, 2019 WL 1780092, at *27 (D.N.M. Apr. 23, 2019)(Browning, J.). Accordingly, the Count 1 Defendants are entitled to the United States' witness list at least three days before trial. See 18 U.S.C. § 3432 ("A person charged with treason or other capital offense shall at least three entire days before commencement of trial . . . be furnished with . . . a list . . . of the witnesses to be produced on the trial for proving the indictment"). The Court also has inherent authority to conduct and manage the discovery in this matter. See, e.g., United States v. W.R. Grace, 526 F.3d 499, 509 (9th Cir. 2008); United States v. Napue, 834 F.2d 1311, 1318 (7th Cir. 1988)("[A] district court has the authority to require the government to provide the defendant with such a list . . . [as] part of the court's inherent power")(internal quotation marks omitted); United States v. Higgs, 713 F.2d 39, 44 n.6 (3d Cir. 1983)("While it is true that the government is not automatically required to make such disclosure, the district court, within its discretion, may order such disclosure to ensure the effective administration of the criminal justice system.")(citation omitted). The Court notes the United States agreed to an earlier disclosure date for its witness list. See Tr. at 140:16-23 (Beck); id. at 142:12-21 (Court). The Court therefore orders the United States to disclose its witness list for each trial no later than two weeks before trial. The Court also orders the United States to disclose all cash payments to cooperating witnesses and their spouses

no later than two months before each trial. The Court reminds the United States that its Giglio duties extend beyond cash payments to all consideration and benefits given to the cooperating witnesses. The Defendants must provide their witness lists within a week of receiving the United States' witness list.

## I. THE UNITED STATES' WITNESSES' LAST KNOWN ADDRESSES ARE NOT GIGLIO MATERIALS.

Defendants seek "the last known address of any witness." Motion at 6. The Defendants define "witness" as "any non-law enforcement individual who [sic] the prosecution intends on calling as a witness at trial or whose statement they are seeking to admit under an exclusion to the hearsay rule." Motion at 6 n.1. The Defendants justify their request by observing that failure to interview prosecution witnesses may amount to ineffective assistance of counsel. See Motion at 6 (citing United States v. Tucker, 716 F.2d 576 (9th Cir. 1983)). The United States acknowledges that such failure may be necessary for effective assistance of counsel, but asserts that "witnesses' addresses are not *Giglio* materials, and Defendants do not cite to a case that so holds." Response at 5.

The Defendants appear to construe Giglio to require disclosure of all information that might be helpful to the Defendants' strategy or convenient to their pretrial investigations. "The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d at 823. "There is no general constitutional right to discovery in a criminal case." Weatherford v. Bursey, 429 U.S. 545, 559 (1977). Giglio and Brady focus on "evidence favorable to an accused . . . where the evidence is material either to guilt or punishment." Brady, 374 U.S. at 87. The Defendants are not entitled to "evidence possibly useful to the defense." Giglio, 405

U.S. at 154 (quoting United States v. Keogh, 391 F.2d 138, 148 (2d Cir. 1968)(internal quotation marks omitted)).  The prosecution violates Brady where, for example, the United States fails to disclose impeachment evidence that defendants could have used to impeach the government's "key witness" whose reliability "may be well be determinative of guilt."  Giglio, 405 U.S. at 154-55.

Nor does rule 16 support the Defendants' argument.  As support for their contention that they are entitled to the United States' witnesses' last known addresses, the Defendants cite United States v. Napue, 834 F.2d at 1317.  In that case, however, the Seventh Circuit noted that Congress expressly rejected a rule 16 requirement that parties exchange the names and addresses of their witnesses.  See 834 F.2d at 1317.  "The conference committee expressed concern that such a requirement would discourage witnesses from testifying and would lead to 'improper contact directed at influencing their testimony'" 834 F.2d at 1317 (quoting H.R. Conf. Rep. No. 94-414, 94th Cong., 1st Sess. 12, reprinted in 1975 U.S. Code Cong. & Admin. News 674, 713, 716).  Accordingly, the Defendants are not entitled to the United States' witnesses' last known addresses absent a more articulable justification.

An address is a neutral piece of evidence.  Without more, it is not exculpatory, inculpatory, or even facially helpful or material, and so cannot be Brady, or Giglio evidence.  It may be helpful in investigating, but on its face, it is not anything but information.  Seeking this information is just a fishing expedition.  Without more, no constitutional provision, statute, or rule requires the United States to disclose the information.  Moreover, in this case, where there are allegations and evidence of SNM members killing and threatening law enforcement cooperators, there is no sound reason to require the United States to turn over the locations of each of its witnesses without a constitutional, statutory, or rule-based requirement that it do so.

## II. THE DEFENDANTS ARE NOT ENTITLED TO THE COMPETENCY AND MENTAL HEALTH RECORDS OF THE UNITED STATES' WITNESSES THAT THE UNITED STATES DOES NOT POSSESS.

The Court agrees with the Defendants that the cooperating witnesses' competency and their "capacity and opportunity to observe, remember, recall and narrate," Motion at 15, are relevant impeachment topics. The United States asserts, however, that its witnesses' relevant records "are protected from the United States' access." Response at 7. See Tr. at 71:2-9 (Castellano). In a previous Memorandum Opinion and Order, the Court concluded that the "New Mexico Corrections Department's records under the unique facts of this case, are under the [United States'] control." Memorandum Opinion and Order at 120, 2017 WL 2271430, at *49, filed February 8, 2017 (Doc. 907)("MOO"). Because the United States effectively controls the NM Correction Department's records, the Court generally has directed those records' disclosure. This analysis does not apply, however, to the inmate health records that the NM Corrections Departments possesses. Under HIPAA, regulations, disclosing those health records requires a court order or patient consent.[11] Consequently, the United States cannot acquire health records that the NM

---

[11]Generally, a healthcare provider cannot use or disclose a patient's health care information without the patient's authorization. See 45 C.F.R. § 164.508(a)(1)("Except as otherwise permitted or required by this subchapter, a covered entity may not use or disclose protected health information without an authorization that is valid under this section."). While HIPAA applies to all health care providers -- including the components of prisons that provide medical care, see 45 C.F.R. § 160.102(a)(3); id. § 164.504(a); id. § 164.512(k)(5)(ii) ("A covered entity that is a correctional institution may use protected health information . . . .") -- inmate health records can be used and disclosed in several circumstances where using or disclosing the records of someone who is not an inmate would not be permissible absent their consent:

(A) The provision of health care to such individuals;

(B) The health and safety of such individual or other inmates;

(C) The health and safety of the officers or employees of or others at the correctional institution;

(D)    The health and safety of such individuals and officers or other persons responsible for the transporting of inmates or their transfer from one institution, facility, or setting to another;

(E)    Law enforcement on the premises of the correctional institution; or

(F)    The administration and maintenance of the safety, security, and good order of the correctional institution.

45 C.F.R. 164.512(k)(5)(i). None of those circumstances apply to the Defendants' request in the Motion. Consequently, the Defendants must rely on a different exception to 45 C.F.R. § 164.508(a)(1). That exception is 45 C.F.R. § 164.512(e):

(e)    Standard: Disclosures for judicial and administrative proceedings.

(1)    Permitted disclosures. A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:

(i)    In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or

(ii)    In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if:

(A)    The covered entity receives satisfactory assurance . . . from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or

> (B)     The covered entity receives
>         satisfactory assurance . . .
>         from the party seeking the
>         information that reasonable
>         efforts have been made by
>         such party to secure a
>         qualified protective order.

45 C.F.R. § 164.512(e).

Psychotherapy notes are "notes recorded (in any medium) by a health care provider who is a mental health professional documenting or analyzing the contents of conversation during a private counseling session . . . that are separated from the rest of the individual's medical record," but not "medication prescription and monitoring," or summaries of "[d]iagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date." 45 C.F.C. § 164.501. Requests for psychotherapy notes are held to a higher standard, so 45 C.F.R. § 164.512(e) does not permit their disclosure. See 45 C.F.R. § 164.508(a)(2). Psychotherapy notes are held to a higher disclosure standard, likely because they contain particularly sensitive information, and are often irrelevant for treatment or payment purposes. See HIPAA Privacy Rule and Sharing Information Related to Mental Health, U.S. Dep't Health & Hum. Serv., at 2 https://www.hhs.gov/sites/default/files/hipaa-privacy-rule-and-sharing-info-related-to-mental-health.pdf (last visited Nov. 18, 2019).

> Psychotherapy notes are treated differently from other mental health information both because they contain particularly sensitive information and because they are the personal notes of the therapist that typically are not required or useful for treatment, payment, or health care operations purposes, other than by the mental health professional who created the notes. Therefore, with few exceptions, the Privacy Rule requires a covered entity to obtain a patient's authorization prior to a disclosure of psychotherapy notes for any reason, including a disclosure for treatment purposes to a health care provider other than the originator of the notes.

HIPAA Privacy Rule and Sharing Information Related to Mental Health, U.S. Dep't Health & Hum. Serv., at 2 (citing 45 C.F.R. 164.508(a)(2)). Healthcare providers can disclose psychotherapy notes without patient consent in very few circumstances, see 45 C.F.R. § 164.508(a)(2), and the only circumstance that potentially applies in this case is provided in 45 C.F.R. § 154.512(a):

> (a)     Standard: Uses and disclosures required by law.
>
>         . . .

(2)      A covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law.

(3)      A covered entity must meet the requirements described in paragraph (c), (e), or (f) of this section for uses or disclosures required by law.

45 C.F.R. § 164.512(a).

Required by law means a mandate contained in law that compels an entity to make a use or disclosure of protected health information and that is enforceable in a court of law. Required by law includes, but is not limited to, court orders and court-ordered warrants; subpoenas or summons issued by a court, grand jury, a governmental or tribal inspector general . . . .

45 C.F.R. § 164.103. Rule 17(c) subpoenas qualify as "issued by a court," 45 C.F.R. § 164.103, even though the clerk or attorneys do the minimal work, see Fed. R. Crim. P. 17(a)("The clerk must issue a blank subpoena -- signed and sealed -- to the party requesting it, and that party must fill in the blanks before the subpoena is served."), but a rule 17(c) subpoena cannot be used to obtain psychotherapy notes -- unless the patient waives the psychotherapist privilege -- because "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence," Jaffee v. Redmond, 518 U.S. at 17.

Confidentiality is an important limitation on the psychotherapist privilege's scope, because it means that the privilege does not apply when a patient "'has no reasonable expectation that the communications will remain private.'" Dorato v. Smith, 163 F. Supp. 3d 837, 886 (D.N.M. 2015)(Browning, J.)(quoting Estate Turnbow v. Ogden City, 254 F.R.D. 434, 437 (D. Utah 2008)(Warner, J.)). For example, to the extent that a patient "is informed that evaluations, tests, therapy session notes, or any other information will be disclosed to his or her employer," that information is not privileged. Dorato v. Smith, 163 F. Supp. 3d at 887. The psychotherapist privilege would apply, however, to documents associated with employer-provided therapy if the patient reasonably believes that the employer would not have access to the information in those documents. See Dorato v. Smith, 163 F. Supp. 3d at 887 ("If, for example, the City of Albuquerque required officers involved in police shootings to visit psychotherapists as an employee benefit, but did not receive the results of the examinations, the results need not be disclosed.").

Carefully applying the psychotherapist privilege to confidential communications only, i.e., to communications where a patient has a reasonable expectation of privacy, resonates with the policy rationale underlying the privilege. The psychotherapist privilege exists, because "the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment," but that ship has sailed once a patient knows that a given communication can be disclosed to third parties. Jaffee v. Redmond, 518 U.S. at 10. Similarly, "much of the desirable evidence to which litigants seek access . . . is unlikely to come into being" without the

Corrections Department possesses by just asking for them, as the NM Corrections Department needs a court order or patient consent, and so this category of NM Corrections Department records are not within the United States' "possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). Accordingly, those records are not discoverable from the United States under rule 16 of the Federal Rules of Criminal Procedure.[12]   The Defendants need to secure these documents from the NM

psychotherapist privilege, because "confidential conversations between psychotherapists and their patients would surely be chilled," Jaffee v. Redmond, 518 U.S. at 12, but that reasoning does not apply to communications that patients are willing to make even when they know that those communications are not private.

   [12]That these health records are not discoverable under rule 16 does not mean that they are not discoverable via a rule 17(c) subpoena duces tecum. See Fed. R. Crim. P. 17(a)("A subpoena must state the court's name and the title of the proceeding, include the seal of the court, and command the witness to attend and testify at the time and place the subpoena specifies."); id. 17(c)(1)("A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates."). Unlike rule 16(a)(1)(E), which imposes a disclosure obligation on the United States, see Fed. R. Crim. P. 16, a rule 17(c) subpoena duces tecum can compel witnesses to produce documents that the United States does not possess, see Fed. R. Crim. P. 17(c).
   Production under rule 17 is more limited than production under rule 16 in several respects, however. First, production under rule 16 generally occurs before trial begins. See United States v. Hernandez-Muniz, 170 F.3d 1007, 1010 (10th Cir. 1999)("Rule 16 is designed to provide the defendant with sufficient information to make an informed decision about a plea, to allow the court to rule on admissibility motions before trial, to minimize prejudicial surprise at trial, and to generally increase the efficiency of litigation."). Rule 17, however, has been "consistently interpreted . . . to permit the issuance of subpoenas only to compel attendance at formal proceedings such as hearings and trials." United States v. Villa-Chaparro, 115 F.3d 797, 804 (10th Cir. 1997). While rule 17(c) permits the court to "direct the witness to produce the designated items in court before trial or before they are to be offered into evidence," Fed. R. Crim. P. 17(c)(1), the Supreme Court has indicated that,

   in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'

United States v. Nixon, 418 U.S. 683, 699-700 (1974)(footnote omitted). "Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial." United States v. Nixon, 418 U.S. at 701.

Second, defendants can obtain rule 16 disclosure regarding an item of evidence that "is material to preparing the defense," Fed. R. Crim. P. 16(a)(1)(E)(i), i.e., an item for which "there is a strong indication that it will 'play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal,'" United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993)(quoting United States v. George, 786 F. Supp. 56, 58 (D.D.C. 1992)(Lamberth, J.)). Obtaining rule 17(c) disclosure is more difficult, because a defendant "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." United States v. Nixon, 418 U.S. at 700. See United States v. Abdush-Shakur, 465 F.3d 458, 467 (10th Cir. 2006)(applying United States v. Nixon's analysis regarding pretrial production under a rule 17(c) subpoena duces tecum to all rule 17(c) subpoenas).

Third, while rule 16 disclosures go directly to the defendants, see Fed. R. Crim. P. 16(a)(1)(E)(requiring the United States to permit the defendants "to inspect and to copy" certain documents), production under a rule 17(c) subpoena takes place at a court and not at a defense attorney's office, see Fed. R. Crim. Proc. 17(c)(1) ("The Court may direct the witness to produce the designated items in court before trial or before they are offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.")(emphasis added). See United States v. Vigil, No. CR 10-2310, 2013 WL 3270995, at *21 (D.N.M. June 3, 2013)(Browning, J.)(denying a defendant's request to have rule 17(c) production occur at her attorney's office and instead ordering production at the Court). See also United States v. Begay, No. CR 14-0747, 2018 WL 401265, at *11 (D.N.M. Jan. 12, 2018)(Browning, J.)("The Court should have ordered [rule 17(c)] production at the courthouse.").

Fourth, under rule 17(c), unlike under rule 16, "[o]n motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive." Fed. R. Crim. P. 17(c)(2). See United States v. Nixon, 418 U.S. at 698 ("A subpoena for documents may be quashed if their production would be 'unreasonable or oppressive,' but not otherwise." (quoting Fed. R. Crim. P. 17(c)(2))).

The Court concludes that, if the Defendants seek to use a rule 17(c) subpoena to obtain the NM Corrections Department-held health records of witnesses -- such as Munoz -- who do not authorize disclosure, their request for "[a]ny medical, psychological or psychiatric evidence tending to show that any informant's ability to perceive, remember, communicate, or tell the truth is impaired" is insufficiently specific. Motion at 16. Production under such a rule 17(c) subpoena would occur at the Court; ex parte production to the Defendants directly would not be permissible. Additionally, a rule 17(c) subpoena cannot reach "confidential communications between a licensed psychotherapist and her patients in the course of diagnosis or treatment" that are solely for the patient's benefit, and not for the NM Corrections Department or law enforcement, because those communications "are protected from compelled disclosure under Rule 501 of the Federal Rules of Evidence." Jaffee v. Redmond, 518 U.S. at 17. See supra note 11 (emphasizing that the psychotherapist privilege applies only to communications that are confidential, i.e., where a patient has a legitimate expectation of privacy).

That a witness takes the stand does not automatically waive the psychotherapist privilege even though parties can waive the psychotherapist privilege by placing their mental condition at

Corrections Department unless, for some reason, the United States has them. "It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).

The Defendants' Sixth Amendment rights also do not demand disclosure of the health records that they seek over the witnesses' objections, and over their assertion of the psychotherapist-patient privilege and their HIPAA rights. United States v. Lavallee, 439 F.3d 670 (10th Cir. 2006), contradicts the Defendants' contentions:

> The Confrontation Clause is not a "constitutionally compelled rule of pretrial discovery." *Pennsylvania v. Ritchie,* 480 U.S. 39, 51 . . . (1987). In rejecting the defendant's claim that the trial court's refusal to permit discovery of privileged

issue. See Dorato v. Smith, 163 F. Supp. 3d at 886. The United States puts its witnesses' mental health at issue insofar as their mental health informs their credibility, but the privilege belongs to the witnesses and not to the United States. See Dorato v. Smith, 163 F. Supp. 3d at 886. Consequently, the United States' decision to call a witness does not waive the witness' psychotherapist privilege. See Dorato v. Smith, 163 F. Supp. 3d at 886 ("Dorato, rather than the Defendants, has attempted to place Smith's medical conditions at issue. The Defendants thus have not waived any privileges on this ground.").

The Court will, however, order disclosure, pursuant to a rule 17(c) subpoena, regarding: (i) psychotropic medications prescribed to witnesses; (ii) summaries of witness diagnoses and prognoses; and (iii) witness treatment plans and progress to date, because those categories of information are expressly exempted from HIPAA regulations' definition of protected psychotherapy notes. See 45 C.F.R. § 164.501 ("Psychotherapy notes excludes medication prescription and monitoring, counseling session start and stop times, the modalities and frequencies of treatment furnished, results of clinical tests, and any summary of the following items: Diagnosis, functional status, the treatment plan, symptoms, prognosis, and progress to date."). If there are competency or psychological reports prepared for a court or prison officials to review, read, and use, those documents also should be provided, but reports prepared for or by a psychiatrist or psychologist who is providing health care to a prisoner solely for the prisoner's benefit are probably privileged, and the Court is not likely to compel their disclosure. The Court's order will direct the NM Corrections Department to produce documents subject to the subpoena "before trial or before they are to be offered in evidence," Fed. R. Crim. P. 17(c)(1), in accordance with the Stipulated Protective Order, filed April 5, 2018 (Doc. 2076). The Court notes, however, that the Defendants have not attempted such a subpoena, relying instead on motions to compel, such as the Motion.

communications by his accuser to be used during cross-examination violated his right to confront witnesses against him, the Court in *Ritchie* stated:

> [T]he right to confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination. The ability to question adverse witnesses, however, does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony. Normally the right to confront one's accusers is satisfied if defense counsel receives wide latitude at trial to question witnesses. In short, the Confrontation Clause only guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.

> *Id.* (citations, quotation marks, and footnote omitted). There is no indication in this case that the Appellants did not have the opportunity to cross-examine Ms. Gutierrez effectively. Indeed, the District Court did not appear to limit the scope of questions that the defendants could ask Ms. Gutierrez on cross-examination. Thus, there has been no Sixth Amendment violation.

United States v. LaVallee, 439 F.3d at 692 (all alterations, except the first, in the original).[13] The

Supreme Court of the United States of America has noted that "the Confrontation Clause

---

[13]The Tenth Circuit imprecisely attributes its Pennsylvania v. Ritchie quotation to the Supreme Court. Justice Powell delivered the Supreme Court's opinion, "with respect to Parts I, II, III-B, III-C, and IV," Pennsylvania v. Ritchie, 480 U.S. at 42, but the Tenth Circuit's quotation comes from Part III-A, see id. at 52-53, an opinion "in which THE CHIEF JUSTICE, Justice White, and Justice O'CONNOR join," id. at 42. Justice Blackmun joined "Parts I, II, III-B, III-C, and IV of the Court's opinion," but he wrote separately, because he did "not accept the plurality's conclusion, as expressed in Part III-A of Justice POWELL's opinion that the Confrontation Clause protects only a defendant's trial rights and has no relevance to pretrial discovery." Pennsylvania v. Ritchie, 480 U.S. at 61 (Blackmun, J., concurring in part and concurring in judgment). The Tenth Circuit's decision to treat the Pennsylvania v. Ritchie plurality opinion as authoritative, however, binds the Court.

Shortly after Pennsylvania v. Ritchie was decided, the Tenth Circuit seized on its language to hold that asking questions alone is enough for Confrontation Clause purposes. See Tapia v. Tansy, 926 F.2d 1554 (10th Cir. 1991). Other Courts of Appeals take the same view and attribute the Pennsylvania v. Ritchie plurality opinion to the Supreme Court. See, e.g., United States v. Mejia, 448 F.3d 436, 458 (D.C. Cir. 2006)(describing that "*Pennsylvania v. Ritchie* . . . held that 'the right to confrontation is a trial right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination," and "does not create a right to pretrial discovery." (quoting Pennsylvania v. Ritchie, 480 U.S. at 52)). The Court observes,

-53-

guarantees an opportunity for effective cross-examination, not cross-examination that is effective

in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474

U.S. 15, 20 (1985)(per curiam)(emphasis in original).

More specifically, the caselaw on the relationship between the Sixth Amendment and the

psychotherapist-patient privilege is unclear. Jaffee v. Redmond does not prescribe how to

---

however, that Justice Blackmun cast the deciding vote in Pennsylvania v. Ritchie and authored a
concurring opinion in which he rejected the Tenth Circuit's interpretation of Pennsylvania v.
Ritchie:

> The plurality recognizes that the Confrontation Clause confers upon a
> defendant a right to conduct cross-examination. It believes that this right is satisfied
> so long as defense counsel can question a witness on any proper subject of cross-
> examination.
>
> . . .
>
> If I were to accept the plurality's effort to divorce confrontation analysis
> from any examination into the effectiveness of cross-examination, I believe that in
> some situations the confrontation right would become an empty formality.

480 U.S. at 62 (Blackmun, J., concurring). The plurality itself also noted that "[t]he constitutional
error in [Davis v. Alaska] was *not* that Alaska made this information confidential; it was that the
defendant was denied the right 'to expose to the jury the facts from which jurors . . . could
appropriately draw inferences relating to the reliability of the witness.'" Pennsylvania v. Ritchie,
480 U.S. at 54 (quoting Davis v. Alaska, 450 U.S. at 318)(emphasis in Pennsylvania v. Ritchie).
Accordingly, despite the Tenth Circuit's interpretation of the Pennsylvania v. Ritchie plurality,
there are likely instances in which a defendant's free rein in cross-examination, by itself, would be
insufficient to satisfy the defendant's Sixth Amendment rights in the face of limited access to
impeachment materials. The Court concludes, however, that such a situation is not present here.
First, the Pennsylvania v. Ritchie plurality pointedly "express[ed] no opinion" as to the outcome
"if the statute had protected the [state's] files from disclosure to anyone, including law-
enforcement and judicial personnel," such as the psychotherapy-patient privilege. Pennsylvania
v. Ritchie, 480 U.S. at 57 n.14. See State v. Gonzales, 1996-NMCA-026, ¶¶ 16-17, 121 N.M. 421,
912 P.2d 297 (affirming dismissal of rape charges because the complaining witness refused to
waive her privilege despite having done so earlier). Further, the state possessed records relevant
to the state's own prosecution in Pennsylvania v. Ritchie, which led the plurality to base its
decision on the state's established due process obligations. See 480 U.S. at 56-60.

reconcile the privilege with criminal defendant's constitutional rights, leaving that task to the lower courts. Since Jaffee v. Redmond, several courts have concluded that the Sixth Amendment does not trump a witness or declarant's psychotherapist-patient privilege. See, e.g., Johnson v. Norris, 537 F.3d 840, 845-47 (8th Cir. 2008); United States v. Chee, 191 F. Supp. 3d 1150, 1153 (D. Nev. 2016)(Dawson, J.); United States v. Shrader, 716 F. Supp. 2d 464, 474 (S.D.W. Va. 2010)(Berger, J.)(holding that the defendant's Sixth Amendment rights do "not include the power to require the pretrial disclosure" of the complaining witness' psychotherapy records just "because the records might be useful in contradicting unfavorable testimony. Defendant will have the opportunity to confront [the witness] at trial, and that is sufficient under the Confrontation clause"); Petersen v. United States, 352 F. Supp. 2d 1016, 1023-24 (D.S.D. 2005)(Kornman, J.)(in a habeas proceeding, rejecting argument that a defendant's rights trump the psychotherapist-patient privilege); United States v. Doyle, 1 F. Supp. 2d 1187 (D. Oregon 1998)(Coffin, J.). The Honorable C. Leroy Hansen, United States District Judge for the District of New Mexico, declined defendants' blanket requests for psychotherapy records in the Sixth Amendment's name. See United States v. Haworth, 168 F.R.D. 660, 662 (D.N.M. 1996)(Hansen, J.)(rejecting the defendants' argument that the Confrontation Clause trumps the privilege, citing Pennsylvania v. Ritchie for the proposition that the Sixth Amendment is implicated only when the trial court limits the scope or nature of cross-examination).

Some courts have reached the opposite conclusion, but these cases typically balance the individual and societal interests behind the privilege against the defendant's constitutional rights, despite Jaffee v. Redmond's express prohibition against such balancing: "We reject the balancing component of the privilege implemented by [the Court of Appeals] and a small number of states." Jaffee v. Redmond, 518 U.S. at 17. See Bassine v. Hill, 450 F. Supp. 2d 1182, 1185-86 (D. Oregon

2006)(Brown, J)(in a § 2255 proceeding, distinguishing Jaffee v. Redmond as a civil case, and holding, without analysis, that the denial of a defendant's access to psychotherapy records for the defendant's alleged victim violated the defendant's "constitutional rights of confrontation and cross-examination, as well as his Fourteenth Amendment Due Process rights"); United States v. Mazzola, 217 F.R.D. 84, 88 (D. Mass. 2003)(Bowler, M.J.)(after balancing competing interests, holding that a defendant's confrontation rights outweigh societal interests in confidentiality and allowed the defendant access to his alleged victim's "treatment records revenant to [the defendant's] cross-examination of [the witness] regarding [the witness'] allegations of abuse and his drug dependency"); United States v. Hansen, 955 F. Supp. 1225, 1226 (D. Mont. 1997)(Molloy, J.)(holding that the defendant's confrontation rights outweighed the deceased victim's confidentiality rights).

Other cases finding a right to psychotherapy records are notable in that the government either already possessed the information, or the witnesses or their psychotherapists had potentially waived the privilege. See United States v. Mazzola, 217 F.R.D. at 86 (allowing disclosure where the district court and the prosecution already possessed the relevant psychotherapy records, but limiting scope to either exculpatory information or non-privileged material, such as drug prescriptions); United States v. Alperin, 128 F. Supp. 2d 1251, 1255 (N.D. Cal. 2001)(Zimmerman, M. J.)(concluding that the defendant's confrontation rights afforded him "access to the complaining witness' [psychotherapy] records . . . to support his claim of self defense" after the prosecution had already disclosed a letter from the witness' psychotherapist describing the witness' mental illness).

Davis v. Alaska, 415 U.S. 308 (1974), grounded in the Sixth Amendment, also illustrates this point. In that case, the defendant sought to cross-examine the prosecution's lead witness

whether he thoughtfully identified the defendant as the perpetrator or whether he did so hastily out of fear that he may be accused himself, jeopardizing his juvenile probation status. See 415 U.S. at 311. The trial court prohibited this line of questioning, relying on a state statute protecting juvenile records confidentiality. See 415 U.S. at 311. The Supreme Court reversed Davis' conviction, holding that the trial court's ruling shielded the jury from information it needed to gauge the witness' credibility and thus make an informed decision as to Davis' guilt. See 415 U.S. at 317. Contrary to the Defendants' position, therefore, Davis v. Alaska does not ground a right to pretrial access to impeachment information in the Sixth Amendment, because the defendant in that case already possessed the impeaching information, but was unable to make use of it at trial.

Here, the Defendants had ample grounds to impeach the United States' witnesses. For example, B. Garcia cross-examined Frederico Munoz, a witness whose psychotherapy records B. Garcia sought, see Motion to Obtain Physical and Mental Health Records, filed March 27, 2018 (Doc. 1985), on a variety of topics, see Transcript of Excerpt of Testimony of Frederico Munoz at 54:6-12 (taken May 8-9, 2018)(Castle, Munoz), filed June 1, 2018 (Doc. 2321)("Munoz Tr."). B. Garcia asked F. Munoz: "You've been diagnosed with antisocial personality disorder, correct? . . . . Or psychopathy, being a psychopath?" Munoz Tr. at 164:17-22 (Castle, Munoz). F. Munoz denied both allegations. See Munoz Tr. at 164:19-23 (Castle, F. Munoz). Similarly, the Defendants received relevant presentence investigation reports and mental health records from at least one consenting cooperating witness. See Order at 2, filed April 5, 2018 (Doc. 2075); Stipulated Protective Order at 1, filed April 5, 2018 (Doc. 2076).

Finally, cases concluding that the Sixth Amendment trumps the psychotherapist-patient privilege contradict the Supreme Court's emphatic language rejecting the use of a balancing test to weigh the psychotherapist-patient privilege against other interests: "Making the promise of

confidentiality contingent upon a trial judge's later evaluation of the relative importance of the patient's interest in privacy and the evidentiary need for disclosure would eviscerate the effectiveness of the privilege." Jaffee v. Redmond, 518 U.S. at 17. Tenth Circuit precedent enforces that language, as the psychotherapist-patient privilege has few exceptions in the Tenth Circuit. See United States v. Glass, 133 F.3d 1356, 1360 (10th Cir. 1998)(drawing a narrow exception to Jaffee v. Redmond where "disclosure [is] the only means of averting [imminent] harm"). The Tenth Circuit has described also that the psychotherapist privilege "is not rooted in any constitutional right of privacy but in a public good which overrides the quest for relevant evidence; the privilege is not subject to a balancing component." United States v. Glass, 133 F.3d at 1358 (internal quotation marks omitted). Similarly, in light of the Tenth Circuit's adoption of the Pennsylvania v. Ritchie plurality's assertion that the Confrontation Clause is not a "'constitutionally compelled rule of pretrial discovery,'" United States v. LaVallee, 439 F.3d at 692 (quoting Pennsylvania v. Ritchie, 480 U.S. at 52 (plurality opinion)), the Sixth Amendment provides no grounds to conclude that the Defendants are entitled to access the witnesses' HIPAA-protected and privileged psychotherapy records to aid them in their cross-examination preparations.

Nor does the Sixth Amendment's guarantee of compulsory process create a right to pretrial disclosure of the cooperating witnesses' psychotherapy records. The majority in Pennsylvania v. Ritchie declined to delineate "whether and how the guarantees of the Compulsory Process Clause differ from those of the Fourteenth Amendment," because Fourteenth Amendment precedent on production of exculpatory evidence "establish[es] a clear framework[.]" Pennsylvania v. Ritchie, 480 U.S. at 56 (concluding that "compulsory process provides no *greater* protections in this area than those afforded by due process" (emphasis in original)).

Accordingly, if anything grants the Defendants access to psychotherapy records over the objections of the United States' witnesses, it is the Due Process Clause. The Court concludes that the United States is not obligated to provide these records under the Due Process Clause, because the United States does not possess those records. See MOO at 104, 2017 WL 271430, at *49. See also United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2. Disclosure is not excused "where the prosecution has not sought out information readily available to it," United States v. Auten, 632 F.2d 478, 481 (5th Cir. 1980), but, here, the NM Corrections Department's records of the cooperating witnesses' mental health treatment are not readily available to the United States, see United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady does not oblige the government to obtain evidence from third parties); Johnson v. Norris, 537 F.3d at 847 (holding, in a habeas proceeding, that the state "court did not unreasonably apply Brady when it said that the State has no obligation to disclose medical records that are not in its possession").

Further, even if the United States had its witnesses' psychotherapy records, a "defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [United States'] files." Pennsylvania v. Ritchie, 480 U.S. at 59. The Defendants' broad request for "[a]ny psychological or psychiatric evidence tending to show that any informant's ability to perceive, remember, communicate, or tell the truth is impaired," Motion at 16, does not comport with established procedure for disclosing impeachment material, see Pennsylvania v. Ritchie, 480 U.S. at 59 (noting that, "in a typical case where a defendant makes only a general request for exculpatory information under [Brady], it is the State that decides which information must be disclosed," and "unless defense counsel becomes aware that other exculpatory

evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.").

The Court recognizes that, on its face, United States v. Robinson, 583 F.3d 1265 (10th Cir. 2009), provides support for the Defendants' contention that the Due Process Clause and the Confrontation Clause entitle them to access the mental health records of the United States' witnesses. In United States v. Robinson, the "government's star witness," a confidential informant without whose testimony the defendant "would not have been convicted," was involuntarily committed to a mental institution less than a week before trial. 583 F.3d at 1267. The informant testified at trial, presented himself as an upstanding member of the law enforcement team, and asserted that his frequent memory lapses were the result of the length of time between the trial and the offense. See 583 F.3d at 1268. The defendant subpoenaed the informant's health records, which the district court reviewed in camera and refused to disclose. See 583 F.3d at 1268. The district court denied the defendant's subpoena to the informant's mental health records and forbade the defendant from cross-examining the informant on his mental health. See 538 F.3d at 1274. The defendant later learned that the informant was abusing large amounts of psychoactive drugs, was diagnosed with "poly-substance abuse, mood disorder with an Axis II, temporary, for anti-social traits," and had "a long history of mental illness" which included auditory hallucinations and "seeing things out the window that are not really there." 538 F.3d at 1272, 1276. The Tenth Circuit reversed the defendant's conviction, concluding that the district court's failure to release the records violated the defendant's due process rights, and its limitation of the informant's cross-examination and impeachment violated the defendant's confrontation rights. See 538 F.3d at 1272. The Tenth Circuit first held that the informant's mental health records were material to the defense, concluding that the defendant's guilty verdict depended almost entirely on the informant's

testimony.  See 538 F.3d at 1271.  The informant's heavy drug use and his hallucinations, along with his central role in the prosecution's case, meant that the defendant had a due process right to the records which the district court possessed.  See 538 F.3d at 1271.  The Tenth Circuit also concluded that the defendant's inability to cross-examine and impeach the defendant's drug use and mental health violated the defendant's Sixth Amendment right to confrontation.  See 538 F.3d at 1272.  The Tenth Circuit emphasized that the records pertained to matters contemporaneous with the informant's testimony and the defendant's inability to elicit "information from which jurors could draw vital inferences in his favor" against the prosecution's sole witness.  538 F.3d at 1275.

United States v. Robinson is distinguishable from the Defendants' present request.  First, unlike the situation in United States v. Robinson, the Due Process Clause does not entitle them access to potential impeachment material in the cooperating witnesses' psychotherapy records because neither the Court nor the United States possesses those records.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady does not oblige the government to obtain evidence from third parties).  If such records could be lawfully produced to the Court, it would conduct an in camera review.  See United States v. Haworth, 168 F.R.D. at 662.  At present, the Court has no documents to review.  Similarly, unlike the situation in United States v. Robinson, the Defendants have -- and extensively impeached the cooperating witnesses at trial about -- thousands of pages of impeachment material on the cooperating witnesses, ranging from their extensive criminal history and drug use, to personal motivations and bias in the form of their incentives to testify and the benefits that they are receiving from the United States.  See, e.g., Transcript of Jury Trial Volume 21 at 49:7-23 (taken May 7, 2018)(Burke, Hernandez), filed November 18, 2019 (Doc. 2991)("May 7 Tr.")(questioning a witness about his "difficulties" with

his mental health, including attempted suicide and bipolar disorder diagnosis); Transcript of Jury Trial Volume 19 at 130:21-24 (taken May 3, 2018)(Blackburn, Rivera), filed November 18, 2019 (Doc. 2989)(asking the United States' witness: "[A]t the same time, you're getting $1,650 from the Government to be able to do your drugs, view your porn, and listen to your music; right?"); id. at 119:6-10 (asserting that the witness has "been addicted to something, no matter wheter it was alcohol, marijuana, Suboxone, heroin, methamphetamine, since basically your entire adult life, . . . correct?"); Transcript of Jury Trial Volume 10 at 161:20-165:5 (taken February 9, 2018)(Jacks, Armenta), filed February 22, 2019 (Doc. 2526)(questioning the United States' witness on his extensive use of drugs and child pornography, as well as on his lengthy criminal history). The Defendants also received several presentence investigation reports for the United States' cooperating witnesses, containing a wealth of information about the witnesses' mental health and criminal history. See Transcript of Hearing at 38:1-14 (taken March 16, 2018)(Castle, Curt, Beck), filed April 3, 2018 (Doc. 2030). The Defendants used this information to impeach the United States' witnesses. See, e.g., May 7 Tr. at 47:3-49:24 (Burke, Hernandez)(discussing with the witness each of his criminal offenses and mental illnesses). Accordingly, neither the Due Process Clause nor the Sixth Amendment's Confrontation Clause entitle the Defendants to inspect the cooperating witnesses' psychotherapy records over those witnesses' assertion of privilege.

In sum, the Court concludes that rule 16, the Due Process Clause, and the Sixth Amendment confer no entitlement to blanket disclosure of the HIPAA-protected and privileged psychotherapy records of the United States' cooperating witnesses. Further, the Defendants do not articulate any theory or even a suspicion how the psychotherapy materials will aid in their impeachment other than that they may reveal mental illness. See Motion at 16. The Court cannot countenance the Defendants' overinclusive request for "[a]ny psychological or psychiatric evidence tending to

show that any informant's ability to perceive, remember, communicate, or tell the truth is impaired." Motion at 16. See United States v. Hardy, 224 F.3d 752, 755-756 (8th Cir. 2000)(rejecting a broad request for materials that could contain impeachment material, because, although the defendant stated why he wanted the requested materials, he could not "set forth what those materials contain"). The records which the Defendants seek are unlikely to consist entirely of impeachment material; the Defendants seek a large category of records solely to search for impeachment materials, see Motion at 16, over the cooperating witnesses' objections, see, e.g., Frederico Munoz' Motion in Opposition to Disclosure of the Defendant's Redacted Mental and Physical Health Records to Third Party Co-Defendants, filed April 25, 2018 (Doc. 2161). Further, the United States acknowledges that it is treating its witnesses' drug use as Brady material and has promised to disclose all non-privileged records pertaining to the witnesses' drug use, see Tr. at 91:5-14)(Court, Beck), thus reducing the Defendants' need for psychotherapy records to search for "[e]vidence of illegal drug use," Motion at 15. Finally, broad latitude on cross-examination to impeach the United States' witnesses will amply protect the Defendants' Sixth Amendment rights. See Pennsylvania v. Ritchie, 480 U.S. at 51. At present, the Court has not restricted the Defendants' cross-examination of the United States' cooperating witnesses. Should the cooperating witnesses consent, as E. Martinez has, the Court stands ready to issue a protective order facilitating the Defendants' access to potential impeachment materials. See Supplemental Protective Order, filed April 27, 2018 (Doc. 2169). Absent such consent, the records are not in the United States' possession, and are not discoverable under rule 16, the Due Process Clause, or the Sixth Amendment.

### III. THE COURT WILL NOT ORDER THE UNITED STATES TO DISCLOSE ITS WITNESSES' PLACEMENT RECORDS.

The Defendants seek prior placement records "for all inmate informants that indicate they were a percipient witness or overheard admissions by any defendant." Motion at 19. The Defendants seek such information so that they "can determine whether or not the inmate was in a position to have perceived or overheard what they claim to have witnessed." Motion at 19. The United States responds that such records are "not *Giglio* materials" unless "the record reflects information inconsistent with a witness's anticipated testimony." Response at 8. The Defendants have not made any attempt -- in briefing or in oral argument -- to substantiate why they are entitled to that broad category of information under Brady, Giglio, or rule 16. The Defendants' request is based on speculation, which is not enough to order wholesale discovery. The United States is aware of its duty to identify and disclose all exculpatory materials. The United States is also in the best position to determine whether it possesses any Brady material, and the Court is not in a position to override the United States' judgment. The Court holds that the Defendants are not entitled to prior placement records for "all inmate informants," Motion at 19, to determine if they contain any exculpatory or impeachment material when the United States already has a preexisting duty to turn over any such material. If the United States gets this serious discovery duty wrong, it endangers any conviction it secures.

**IT IS ORDERED** that the Defendants Omnibus Motion for Timely Discovery of *Giglio* Materials, filed May 24, 2017 (Doc. 1163), is granted in part and denied in part. The United States is ordered to disclose its witness list for the second trial by January 29, 2018. The Court also orders the United States to disclose all cash payments and consideration given to cooperating witnesses and their spouses no later than February 25, 2018.

_____

UNITED STATES DISTRICT JUDGE

Counsel:

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

       *Attorneys for the Plaintiff*

Susan M. Porter
Albuquerque, New Mexico

--and--

Sarah M. Gorman
Albuquerque, New Mexico

       *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

     *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

      *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

      *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

      *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

--and--

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

   *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

   *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

   *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

   *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

   *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

*Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

*Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

*Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

*Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

*Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

*Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

 *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

 *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

 *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

 *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

*Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

*Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

*Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*