# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                     No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a. "Huero
Troup," LEONARD LUJAN, BILLY GARCIA,
a.k.a. "Wild Bill," EUGENE MARTINEZ, a.k.a.
"Little Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo," ARTURO
ARNULFO GARCIA, a.k.a. "Shotgun,"
BENJAMIN CLARK, a.k.a. "Cyclone," RUBEN
HERNANDEZ; JERRY ARMENTA, a.k.a.
"Creeper," JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue," TIMOTHY
MARTINEZ, a.k.a. "Red," MAURICIO VARELA,
a.k.a. "Archie," a.k.a. "Hog Nuts," DANIEL
SANCHEZ, a.k.a. "Dan Dan," GERALD
ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma,"
CONRAD VILLEGAS, a.k.a. "Chitmon,"
ANTHONY RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY PAUL
MARTINEZ, a.k.a. "Shadow," CHRISTOPHER
GARCIA, CARLOS HERRERA, a.k.a. "Lazy,"
RUDY PEREZ, a.k.a. "Ru Dog," ANDREW
GALLEGOS, a.k.a. "Smiley," SANTOS
GONZALEZ; PAUL RIVERA, SHAUNA
GUTIERREZ, and BRANDY RODRIGUEZ,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Objections to the

Presentence Report (PSR), filed April 11, 2019 (Doc. 2614)("J. Gallegos Objections"); (ii) the

Defendant's Objections to the Presentence Report (PSR), filed April 18, 2019

(Doc. 2617)("A. Gallegos Objections"); and (iii) the Defendant's Sentencing Memorandum, filed

April 19, 2019 (Doc. 2618)("A. Gallegos Sentencing Memo.").  The Court held a sentencing hearing for Defendant Andrew Gallegos on May 10, 2019, see Clerk's Minutes at 1, filed May 10, 2019 (Doc. 2722), and for Defendant Joe Lawrence Gallegos on June 11, 2019, see Clerk's Minutes at 1, filed June 11, 2019 (Doc. 2700).  The primary issues are: (i) whether the 2-level adjustment for obstruction of justice under § 3C1.1 of the United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)("U.S.S.G." or "Guidelines")[1] applies to J. Gallegos' and A. Gallegos' convictions for Counts 4 and 5, where J. Gallegos and A. Gallegos burned Adrian Burns' body after murdering Burns; (ii) whether the 2-level adjustment under § 3A1.1(b)(1) of the Guidelines for a vulnerable victim applies to J. Gallegos' conviction for Count 1, where Castillo was incarcerated at the time of his death and the Syndicato de Nuevo Mexico ("SNM") intended to kill him; (iii) whether the 2-level adjustment under U.S.S.G. § 3A1.3 of the Guidelines for

---

[1]The Supreme Court of the United States of America held, in Peugh v. United States, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described.  The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

Peugh v. United States, 569 U.S. at 549 (emphasis in original).  The 2018 Guidelines Manual provides, however, that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless doing so "would violate the *ex post facto* clause of the United States Constitution," in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed."  U.S.S.G. § 1B1.11(a)-(b)(1).  J. Gallegos and A. Gallegos conspired to murder and murdered Adrian Burns on November 12, 2012, see Second Superseding Indictment at 11-12, filed March 9, 2017 (Doc. 947), so the 2012 Guidelines Manual, effective November 1, 2012, is the Guidelines Manual in effect on that date.  Using the "Guidelines Manual in effect on the date" that A. Gallegos committed the offense for which he was convicted does not change the result here.  U.S.S.G. § 1B1.11(b)(1).  Accordingly, the Court uses the 2018 Guidelines Manual.

physical restraint of the victim applies to J. Gallegos' conviction for Count 1, because J. Gallegos held down Frank Castillo in his prison cell when J. Gallegos and others murdered Castillo; (iv) whether J. Gallegos and A. Gallegos owe restitution to Amber Sutton, Burns' girlfriend, for the incineration of her car, lost income or wages, and transportation costs; (v) whether, if J. Gallegos and A. Gallegos owe restitution, the restitution amount should be offset by funds that A. Sutton and her insurance provider received from Federal or State sources; and (vi) whether A. Gallegos is entitled to a downward departure, because he suffered psychological abuse as a child. The Court concludes that: (i) the obstruction-of-justice-adjustment is appropriate, because there is evidence to find by a preponderance that J. Gallegos and A. Gallegos incinerated Burns' body and car to impede law enforcement; (ii) the vulnerable-victim adjustment is appropriate, because a preponderance of the evidence shows that Castillo was incarcerated with fellow SNM members who had a "greenlight" out for Castillo's murder -- meaning that SNM intended to kill Castillo -- and Castillo had just injected heroin at the time of his attack; (iii) the physical-restraint adjustment is appropriate, because a preponderance of the evidence shows that J. Gallegos and Defendant Angel DeLeon held Castillo's arms and body while witness Michael Jaramillo strangled him; (iv) J. Gallegos and A. Gallegos do not owe restitution for A. Sutton's losses, because A. Sutton is not a victim under the Mandatory Victim Restitution Act of 1996, 18 U.S.C. § 3663A; (v) the restitution offset objection is moot, because the Court will not order restitution; and (vi) A. Gallegos is not entitled to a downward departure, because the Court cannot consider the 18 U.S.C. § 3553(a) factors to depart below the statutory minimum sentence. Accordingly, the Court overrules J. Gallegos' and A. Gallegos' obstruction-of-justice adjustment objection, overrules J. Gallegos' vulnerable-victim adjustment objection, overrules J. Gallegos' physical-

restraint adjustment objection, sustains J. Gallegos' and A. Gallegos' restitution objection, and denies A. Gallegos' request for a downward departure.

<h2 style="text-align:center"><u>FACTUAL BACKGROUND</u></h2>

J. Gallegos and A. Gallegos are two Defendants named in a sixteen-Count indictment charging "members/prospects/associates of the" SNM with "acts of violence and other criminal activities, including[] murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Second Superseding Indictment ¶ 1, at 2, filed March 9, 2017 (Doc. 949)("Indictment"). The Indictment alleges that the SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment ¶ 2, at 2-3. The Court has provided background information on the SNM in a number of prior opinions, including in its Memorandum Opinion and Order, 287 F. Supp. 3d 1187, filed March 7, 2018 (Doc. 1882)("MOO"). The Court provides this information, which is gathered from the Indictment, to provide background information on this case and recognizes that this information reflects largely Plaintiff United States of America's version of events:

> SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. . . . Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. <u>See</u> . . . Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. <u>See</u> Indictment at 3. SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. <u>See</u> Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking. <u>See</u> Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also

intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment at 4. If another gang does not abide by SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment at 8. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the Federal Bureau of Investigation's present investigation. See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133).

. . . .

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts. See Indictment at 1, 9-18. All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Indictment at 9-18. Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta, Defendant Benjamin Clark, [Defendant Mario] Rodriguez, Defendant Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez, and [Defendant Daniel] Sanchez are the enterprise's alleged leaders. See Indictment at 6. The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders. See Indictment at 6. The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Indictment at 9.

. . . .

For fuller factual context, there are now four cases before the Court related to SNM's alleged criminal activity. In a related case -- United States v. Baca, No. CR 16-1613, 2016 WL 6404772 (D.N.M.)(Browning, J.) -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d). There is also a separate prosecution of [Defendant Christopher] Garcia for drug crimes, see United States v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959. See United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

MOO at 5-12, 287 F. Supp. 3d at 1195-99 (footnotes omitted)(first four alterations in the MOO, last two added). The Indictment charges J. Gallegos in seven counts: (i) Count 1's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(1), (2), for the March 26, 2001, murder of Castillo; (ii) Count 4's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(5), for the November, 2012 conspiracy to murder Burns; (iii) Count 5's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(1), (2), for the November 12, 2012, murder of Burns; (iv) Count 13's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(3), for the March 17, 2015, assault with a dangerous weapon upon Jose Gomez.; (v) Count 14's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(5), for the February, 2016, conspiracy to murder Gomez; (vi) Count 15's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(3), (5), for the February 27, 2016, attempted murder of Gomez and assault with a dangerous weapon upon Gomez, resulting in serious bodily injury to Gomez; and (vii) Count 16's tampering with a witness, victim, or informant by physical force or threat, 18 U.S.C. § 1512(a)(2)(A), for the February 27, 2016, assault with a dangerous weapon upon Gomez with the intent to influence, delay, or prevent Gomez from testifying against J. Gallegos. See Indictment at 9, 11-12, 16-18. The Indictment charges A. Gallegos in two Counts: (i) Count 4's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(5), for the November, 2012, conspiracy to murder Burns; and (ii) Count 5's

violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(1), (2), for the November 12, 2012, murder of Burns. <u>See</u> Indictment at 11-12.

On April 9, 2018, the Court began jury selection for the trial on the Indictment's Counts 1-5 and 13-16. <u>See</u> Clerk's Minutes at 6-7, filed April 9, 2018 (Doc. 2324)("Trial Minutes"). J. Gallegos and A. Gallegos went to trial with five co-Defendants. <u>See</u> Trial Minutes at 6 (stating that J. Gallegos and A. Gallegos went to trial along with co-Defendants Edward Troup, Billy Garcia, Allen Patterson, Christopher Chavez, and Arturo Arnulfo Garcia); Indictment at 11-12. The parties gave their opening statements on Thursday, April 12, 2018, and the United States began its case in chief the same day. <u>See</u> Trial Minutes at 11.

For J. Gallegos, the Court takes the offense conduct facts from the Presentence Investigation Report, filed March 28, 2019 (Doc. 2599)("J. Gallegos PSR"), and the Second Addendum to the Presentence Report, filed June 4, 2019 (Doc. 2676)("J. Gallegos Second Addendum"), because, although J. Gallegos objects to portions of the J. Gallegos PSR's recitation of the facts, the J. Gallegos Second Addendum relies on relevant conduct and trial testimony transcripts to determine that the J. Gallegos PSR's information is accurate. <u>See</u> J. Gallegos Objections ¶ 1, at 1; J. Gallegos Second Addendum at 1; Draft Transcript of Hearing at 40:12-13 (taken June 11, 2019)("June 11 Tr.")(Court)(stating that "the second addendum states the Court's findings").[2] The Court's findings of fact regarding J. Gallegos on Castillo's murder for this sentencing are as follows:

> 14.     On March 26, 2001, officers with New Mexico State Police (NMSP) Criminal Investigations were advised by officials at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico, that

---

[2]The Court's citations to the Draft Transcript of Hearing (taken June 11, 2019)("June 11 Tr."), refer to the court reporter's original, unedited versions. Any final transcripts may contain slightly different page and/or line numbers.

an inmate was discovered dead in his cell. Upon arrival, NMSP investigators were informed the victim, identified as F.C., was located in his pod and appeared to have been strangled. Investigators were also advised the victim was a member of the SNM Gang.

15.     On March 27, 2001, a report of findings was completed by the Office of the Medical Investigator regarding F.C.'s autopsy. The autopsy report revealed a tightly rolled laundry bag was around F.C.'s neck and was twisted around itself. The ligature passed just below the mouth across the upper part of the chin and wrapped tightly around the back of the neck just below the base of the skull. Upon removal of the ligature from the upper neck and chin, a depressed ligature abrasion around the neck and lower face remained. The following injuries were noted: the face and chest were marked with postmortem lividity; petechial hemorrhages were extremely apparent within both eyes; there was hemorrhaging within the left sternocleidomastoid muscle of the lower neck; there was a large contusion on the left upper chest area and left shoulder that was not apparent on the surface of the skin due to the high levels of livor mortis; there was a 1½ x ¾ inch contusion on the right hip; and there were several abrasions and contusions of both knees as well as on the left foot. The cause of death was identified as ligature strangulation, and it was ruled a homicide.

16.     According to a statement made on July 22, 2003 by a confidential informant (CI), who was an inmate at the SNMCF, the morning of F.C.'s murder, the CI observed Troup and Angel DeLeon sitting on the bed in Troup's cell removing the string from a laundry bag. The CI then observed **Joe Gallegos** talking with F.C., both of whom were in the upstairs portion of the pod. As the CI returned to his cell, he observed Troup sitting on a table, and F.C.'s cell door was closed. The CI started to walk up the stairs when Troup warned him not to go up the stairs; however, the CI continued to his cell, at which time, he heard a sound consistent with a door being kicked coming from F.C.'s cell. The CI observed Troup go to F.C.'s cell door and kick it in order to keep it closed. The CI entered his cell but continued to look out when he observed DeLeon and **Gallegos** exit F.C.'s cell and walk straight to the showers.

17.     The CI stated they were all called to go to breakfast, and he walked with DeLeon, who told the CI that **Gallegos** and F.C. had been in F.C.'s cell shooting up heroin. When it was F.C.'s turn, DeLeon stated he grabbed F.C.'s arm, and **Gallegos** wrapped the string around F.C.'s neck. F.C. attempted to get away; however, Troup pushed the cell door closed to keep it from opening and to prevent F.C. from escaping. DeLeon stated he continued to hold F.C., while **Gallegos** strangled him. It was during breakfast when F.C. was found murdered in his cell. The CI indicated

**Gallegos** showed him a burn mark on his hand, which he admitted he received when he strangled F.C.

18.    On September 12, 2007, NMSP officers met with Leonard Lujan to conduct a follow-up interview regarding F.C.'s murder. According to Lujan, Billy Garcia advised he wanted F.C. "removed". Although Garcia wanted other inmates murdered, he wanted F.C. killed first by strangulation. Lujan admitted he ordered **Gallegos** and DeLeon to murder F.C. Lujan further admitted **Gallegos** and DeLeon had "green lights" on them, and their names would be cleared by murdering F.C. On October 17, 2007, Lujan positively identified **Gallegos** and DeLeon in a photo lineup as the individuals he ordered to carry out F.C.'s murder. It was later revealed F.C. was murdered, because he allegedly provided information to law enforcement regarding criminal activity.

19.    In summary, **Gallegos** conspired with other SNM gang members to murder F.C. and participated in F.C.'s murder at the direction and under the leadership of the SNM. While incarcerated at the SNMCF, **Gallegos** and DeLeon strangled F.C. to death in his cell, while Troup served as a lookout and helped prevent F.C. from escaping his attackers by keeping his cell door closed. Due to the close quarters of F.C.'s cell, which had only one way in and out and was out, F.C. was not able to fight off his assailants or escape while he was being strangled out of the view of correctional officers. Thus, F.C. can be identified as a vulnerable victim in this case. Furthermore, DeLeon held F.C.'s arm, while **Gallegos** wrapped the string about his neck, thus, restraining F.C. By virtue of his membership in the SNM, **Gallegos** was ordered to participate in the murder by the SNM's leadership, but because his actions led to F.C.'s death, neither an aggravating nor a mitigating role adjustment is warranted in this case.

J. Gallegos PSR ¶¶ 14-19, at 9-11 (bold in original). Additionally,

at trial, Leonard Lujan stated that in or around March of 2001, he spoke with Joe Gallegos and others about two murders that were planned by members of the SNM gang. Lujan informed the individuals "this is coming from Wild Bill, Bill you know, but he chose me to choose who I wanted, and I'm choosing you guys." Lujan testified he told Gallegos "they got to hit Pancho." (page 83-84 of Lujan transcript). "Pancho" has been identified as F.C., the victim in one of the 2001 murders. According to Lujan, he explained to Gallegos and two others that Wild Bill wanted the murder completed by strangulation early in the morning, to which Gallegos responded "well, let me give him a hotshot.[3] He don't want us to give him a

---

[3]Urban Dictionary defines "hotshot" as "[a]n intentionally lethal dose of a drug that is introduced into the body by way of intravenous injection." Urban Dictionary, Hotshot, https://www.urbandictionary.com/define.php?term=hot-shot (last visited Jan. 23, 2020).

hotshot?" Lujan testified that he informed Gallegos that murder was not to be completed as such (via "hotshot"), and again specified it was to be done by strangulation (page 86 of Lujan transcript).

Additionally, Michael Jaramillo testified he, Joe Gallegos, and Angel DeLeon met in Gallegos' prison cell in March of 2001, at which time Gallegos told them they "were going to be taking out" F.C. (page 15 of Jaramillo transcript). Jaramillo testified Gallegos stated they were waiting for heroin to be brought into the prison and within a few days, they would kill "Pancho." During this same meeting, the three devised a plan to go into F.C.'s room, give him a shot of heroin, and then strangle him (page 15 of Jaramillo transcript). According to Jaramillo, Gallegos assigned everyone a role, noting Gallegos and DeLeon would hold F.C. while Jaramillo strangled him. Additionally, Jaramillo noted Edward Troup's role was to keep all of the inmates in the dayroom and not allow them near F.C.'s room (page 16 of Jaramillo transcript). Jaramillo stated that, after F.C. entered the cell and injected himself with heroin, Gallegos and DeLeon grabbed him (F.C.) by his arms and rolled him over onto his bed. Jaramillo admitted to strangling F.C. with the drawstring of a laundry basket while Gallegos and DeLeon held F.C. during the struggle. (page 21 of Jaramillo transcript).

J. Gallegos Second Addendum at 1-2.

The Court's findings of fact regarding J. Gallegos on the conspiracy to murder Burns and

Burns' murder are as follows:

20.     On November 12, 2012, investigators responded to the Veguita area near U.S. Highway 60 in Socorro County. A body had been discovered at the scene of a reported vehicle fire. The body, later identified as A.B., was found on the ground about six feet from the trunk of the burnt vehicle. The A.B.'s body was severely burnt, with both his hands handcuffed to the back, while lying in the fetal position. The vehicle had been heavily consumed by fire; however, investigators were able to identify it as a 2012 Mitsubishi Gallant, registered to the A.B.'s girlfriend.

21.     Information obtained through interviews with A.B.'s family and friends and cellphone records revealed the last two individuals to communicate with A.B. were brothers **Joe Lawrence Gallegos** and Andrew "Smiley" Gallegos. **Joe** and Andrew were identified as A.B.'s main heroin buyers and would meet with A.B. daily to obtain controlled substances. On November 12, 2012, A.B. left his residence to meet with **Joe** and Andrew at their home for the purpose of selling them heroin. A.B.'s family could not reach him thereafter. That same day, **Joe** and Andrew were observed at a convenient store in Valencia County within hours of the reported vehicle fire one county away. While at the convenient store, a witness reported **Joe**

was selling heroin that was packaged in the same manner A.B. was known to package the heroin he sold.

22.     On November 14, 2012, an autopsy was conducted on A.B. The results of the autopsy revealed A.B. sustained extensive burns throughout his body and a gunshot wound to the head, caused by a .22 caliber firearm. It was determined the gunshot caused A.B.'s death. The cause of death was noted as a homicide.

23.     On November 15, 2012, a search of **Joe** and Andrew's home was conducted, and the following notable items were located: handcuffs similar to those used on A.B., a handgun holster, .22 caliber ammunition, and two red gas cans.

24.     On November 20, 2012, **Joe** and Andrew were arrested at a motel in Albuquerque, New Mexico. An agent asked Andrew to go over the events of November 12, 2012; however, Andrew seemed reluctant to commit to a story of his activities that day, indicating he could not remember due to being "high." Andrew did confirm A.B. had delivered drugs to their home.

25.     Through confidential sources, law enforcement learned **Joe** and Andrew were identified as active SNM gang members, and the death of A.B. was a result of A.B. disrespecting the SNM gang.

26.     In summary, **Joe Lawrence Gallegos**, an identified SNM gang member, conspired to, and did, commit the murder of A.B., an individual who was identified by the SNM gang as having disrespected the SNM. **Joe**, along with his brother Andrew, handcuffed and shot A.B. in the head with a .22 caliber firearm. After murdering A.B., and in an effort to impede the criminal investigation, **Joe** and Andrew placed A.B.'s body near his vehicle and set both on fire. Based on the limited information provided, **Joe's** role cannot be determined as either aggravated or mitigating; therefore, no role adjustment is warranted.

J. Gallegos PSR ¶¶ 20-26, at 11-12 (bold in original).

For A. Gallegos, the Court takes the offense conduct facts from the Presentence Investigation Report, filed March 28, 2019 (Doc. 2597)("A. Gallegos PSR"), and the Addendum to the Presentence Report, filed May 3, 2019 (Doc. 2630)("A. Gallegos First Addendum"), because, although A. Gallegos objects to portions of the A. Gallegos PSR's recitation of the facts, the trial record supports the A. Gallegos PSR's and A. Gallegos First Addendum's information.

A. Gallegos First Addendum at 2. See Draft Transcript of Hearing at 36:10-15, taken May 10, 2019 ("May 10 Tr.")(Court)(concluding that it is "appropriate [to] adopt[] the Presentence Report factual findings").[4]  Accordingly, the Court adopted all of the A. Gallegos PSR's factual findings with the exception of one change to the A. Gallegos PSR ¶ 98, at 25, in which the Court struck the word "maximum" preceding "term of imprisonment is life."  May 10 Tr. 8:3-5 (Court).  See id. at 36:12-16 (Court)(stating that the Court did not make "any changes to" the A. Gallegos PSR except for "one change to paragraph . . . 98").  The Court's findings of fact regarding A. Gallegos on the conspiracy to murder Burns and Burns' murder are as follows:

14.     On November 12, 2012, investigators responded to the Veguita area near U.S. Highway 60 in Socorro County.  A body had been discovered at the scene of a reported vehicle fire.  The body, later identified as A.B., was found on the ground about six feet from the trunk of the burnt vehicle.  The A.B.'s body was severely burnt, with both his hands handcuffed to the back, while lying in the fetal position.  The vehicle had been heavily consumed by fire; however, investigators were able to identify it as a 2012 Mitsubishi Gallant, registered to A.B.'s girlfriend.

15.     Information obtained through interviews with A.B.'s family and friends and cellphone records revealed the last two individuals to communicate with A.B. were brothers Joe Lawrence Gallegos and **Andrew "Smiley" Gallegos**. Joe and **Andrew** were identified as A.B.'s main heroin buyers and would meet with A.B. daily to obtain controlled substances.  On November 12, 2012, A.B. left his residence to meet with Joe and **Andrew** at their home for the purpose of selling them heroin.  A.B.'s family could not reach him thereafter.  That same day, Joe and **Andrew** were observed at a convenient store in Valencia County within hours of the reported vehicle fire one county away.  While at the convenient store, a witness reported Joe was selling heroin that was packaged in the same manner A.B. was known to package the heroin he sold.

16.     On November 14, 2012, an autopsy was conducted on A.B. The results of the autopsy revealed A.B. sustained extensive burns throughout his body and a gunshot wound to the head, caused by a .22 caliber firearm.  It was

_____

[4]The Court's citations to the transcript of the proceedings refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

determined the gunshot caused A.B.'s death. The cause of death was noted as a homicide.

17. On November 15, 2012, a search of Joe and **Andrew**'s home was conducted, and the following notable items were located: handcuffs similar to those used on A.B., a handgun holster, .22 caliber ammunition, and two red gas cans.

18. On November 20, 2012, Joe and **Andrew** were arrested at a motel in Albuquerque, New Mexico. An agent asked **Andrew** to go over the events of November 12, 2012; however, **Andrew** seemed reluctant to commit to a story of his activities that day, indicating he could not remember due to being "high". **Andrew** did confirm A.B. had delivered drugs to their home.

19. Through confidential sources, law enforcement learned Joe and **Andrew** were identified as active SNM gang members, and the death of A.B. was a result of A.B. disrespecting the SNM gang.

20. In summary, **Andrew Gallegos, a.k.a., "Smiley,"** an identified SNM gang member, conspired to, and did, commit the murder of A.B., an individual who was identified by the SNM gang as having disrespected the SNM. **Andrew**, along with his brother Joe, physically restrained A.B. with handcuffs and shot him in the head with a .22 caliber firearm. After murdering A.B., and in an effort to impede the criminal investigation, Joe and **Andrew** placed A.B.'s body near his vehicle and set both on fire. Based on the limited information provided, **Andrew**'s role cannot be determined as either aggravated or mitigating; therefore, no role adjustment is warranted.

A. Gallegos PSR ¶¶ 14-20, at 8 (bold in original). The A. Gallegos PSR purports that A. Gallegos'

version of the facts is as follows:

21. During the presentence report interview the defendant stated he had no involvement in this case and maintains his innocence. The defendant reported the situation for him goes back to when he was a small child. He stated his uncles and brothers had a bad reputation in the town of Belen, New Mexico, and he and his family have been targeted by law enforcement. The defendant believes law enforcement has identified his family as "bad" and blame them for most of the crimes in town.

A. Gallegos PSR ¶ 21, at 9. A. Gallegos provides additional information in the A. Gallegos Objections, see A. Gallegos Objections ¶ 6, at 2, which the United States Probation Office ("USPO") incorporates in the A. Gallegos First Addendum as follows:

> Mr. Gallegos says much of his problems are due to the fact that his brothers are known gang members, specifically, known SNM gang members. Because of their associations, being a "Gallegos" has labeled him in the police['s] eyes. Mr. Andrew Gallegos admits he was an East Side Loco when he was young, but he says it was more of doing stupid things as a teen. He denies gang activity as an adult. Andrew Gallegos says he never knew his father, and was essentially raised by his older brother Joe Gallegos, as such lots of people associate, he and Joe as "very tight."

A. Gallegos First Addendum at 2.

## PROCEDURAL BACKGROUND

The parties gave their closing statements and turned over the case to the jury for it to begin deliberations on Tuesday, May 22, 2018. See Trial Minutes at 53-54. The jury returned its verdict on Friday, May 25, 2018. See Verdict at 1 (dated May 25, 2018), filed May 25, 2018 (Doc. 2332). The jury found J. Gallegos: (i) "guilty of violent crimes in aid of racketeering in the murder of Frank Castillo, as charged in Count 1 of the Indictment"; (ii) "guilty of violent crimes in aid of racketeering in conspiring to murder Adrian Burns, as charged in Count 4 of the Indictment"; (iii) "guilty of violent crimes in aid of racketeering in the murder of Adrian Burns, as charged in Count 5 of the Indictment"; (iv) "not guilty of violent crimes in aid of racketeering in the assault with a dangerous weapon against Jose Gomez, as charged in Count 13 of the Indictment"; (v) "not guilty of violent crimes in aid of racketeering in conspiring to murder Jose Gomez, as charged in Count 14 of the Indictment"; (vi) "not guilty of violent crimes in aid of racketeering in the attempted murder of Jose Gomez, or the assault resulting in serious bodily injury to Jose Gomez, or assault with a dangerous weapon upon Jose Gomez, as charged in Count 15 of the Indictment";

and (vii) "not guilty of tampering with a witness by physical force or threat, as charged in Count 16 of the Indictment." Verdict at 1-3. The Court originally set J. Gallegos' sentencing for May 15, 2019, see Notice of Hearing as to Joe Lawrence Gallegos, filed March 11, 2019 (Doc. 2583)(this is a text-only entry on the docket); however, the Court later ordered a continuance, and the sentencing was rescheduled for June 11, 2019, see Order Continuing Trial Setting, filed May 13, 2019 (Doc. 2649). The jury found A. Gallegos "guilty of violent crimes in aid of racketeering in conspiring to murder Adrian Burns, as charged in Count 4 of the Indictment," and "guilty of violent crimes in aid of racketeering in the murder of Adrian Burns, as charged in Count 5 of the Indictment." Verdict at 4-5. The Court set A. Gallegos' sentencing for May 10, 2019. See Notice of Hearing as to Andrew Gallegos, filed March 11, 2019 (Doc. 2589)(this is a text-only entry on the docket).

1.      **The J. Gallegos PSR.**

In calculating J. Gallegos' Guidelines sentence, the USPO notes that J. Gallegos "ha[s] not clearly demonstrated acceptance of responsibility for the offense." J. Gallegos PSR ¶ 30, at 12. As to Count 1, the USPO determines that the underlying crime of racketeering activity is first-degree murder, resulting in a base offense level of 43. See J. Gallegos PSR ¶ 33, at 12 (citing U.S.S.G. §§ 2A1.1(a), 2E1.3(a)(2)). The USPO applies a 2-level adjustment for physical restraint of the victim, because DeLeon and J. Gallegos held down Castillo while Jaramillo strangled him. See J. Gallegos PSR ¶ 41, at 13; J. Gallegos Second Addendum at 2. The USPO also applies a 2-level adjustment for a vulnerable victim, because "[Castillo] was not able to fight off his assailants or escape while he was being strangled out of the view of correctional officers." J. Gallegos PSR ¶ 19, at 10. See id. ¶ 42, at 13. The USPO does not apply an adjustment for J. Gallegos' role in the murder, determining that, "because his actions led to [Castillo]'s death, neither an aggravating

nor a mitigating role adjustment is warranted in this case." J. Gallegos PSR ¶ 19, at 10. See id.

¶ 43, at 13. The USPO also does not apply an adjustment for obstruction of justice, see J. Gallegos

PSR ¶ 44, at 13, and calculates an adjusted offense level of 47 for Count 1, see J. Gallegos PSR

¶ 45, at 13.

The USPO groups Counts 4 and 5 for calculating J. Gallegos' Guidelines sentence, because

both counts "involve the same victim and two or more acts or transactions connected by a common

criminal objective or constituting part of a common scheme or plan." J. Gallegos PSR ¶ 32, at 12

(citing U.S.S.G. § 3D1.2(b)). As to Counts 4 and 5, the USPO determines that the underlying

crime of racketeering activity, and aiding and abetting, is first-degree murder, which entails a base

level of 43. See J. Gallegos PSR ¶ 33, at 12 (citing U.S.S.G. §§ 2A1.1(a) and 2E1.3(a)(2)). The

USPO applies a 2-level adjustment for physical restraint of the victim, because J. Gallegos, "along

with his brother [A. Gallegos], handcuffed and shot [Burns] in the head with a .22 caliber firearm."

J. Gallegos PSR ¶ 26, at 11. See id. ¶ 35, at 13. The USPO also applies a 2-level adjustment for

obstruction of justice, because, "[a]fter murdering [Burns], and in an effort to impede the criminal

investigation," J. Gallegos and his brother "placed [Burns'] body near his vehicle and set both on

fire." J. Gallegos PSR ¶ 26, at 11-12. See id. ¶ 37, at 13. The USPO does not apply an adjustment

for J. Gallegos' role in the murder, determining that J. Gallegos' "role cannot be determined as

either aggravated or mitigating." J. Gallegos PSR ¶ 26, at 12. See id. ¶ 36, at 13. Accordingly,

the USPO calculates an adjusted offense level of 47 for both Counts 4 and 5. See J. Gallegos PSR

¶ 38, at 13.

The USPO calculates the combined adjusted offense level as 49. See J. Gallegos PSR ¶ 49,

at 14. Accordingly, the USPO determines that the total offense level is 43. See J. Gallegos PSR

¶ 52, at 14 (citing U.S.S.G. ch. 5, pt. A n.2).  The USPO then provides J. Gallegos' criminal history, which the Court summarizes in the following table.

| Date of Arrest | Charge/Court | Guideline | Points |
|---|---|---|---|
| June 21, 1988<br>Age 18 | Shooting at Inhabited Dwelling or Occupied Building<br>13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.2(e)(3) | 0 |
| May 30, 1994<br>Age 24 | Aggravated Battery on a Peace Officer<br>13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.1(c) | 1 |
| March 26, 1995<br>Age 25 | Possession of a Firearm by a Felon<br>13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.1(c) | 1 |
| July 29, 1995<br>Age 25 | Criminal Damage to Property Under $1,000<br>13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.1(c) | 1 |
| October 27, 1995<br>Age 26 | Contributing to the Delinquency of a Minor<br>13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.1(a) | 3 |
| December 8, 1996<br>Age 27 | Retaliation Against a Witness Involving Bodily Injury<br>13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.1(a) | 3 |
| March 19, 1997<br>Age 27 | Accessory to Bringing Contraband into a Place of Imprisonment<br>13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.1(a) | 3 |

See J. Gallegos PSR ¶¶ 55-61, at 14-18.  The USPO notes that these convictions "result in a subtotal criminal history score of 12," but that, because J. Gallegos "committed the instant offense while under a criminal justice sentence for the conviction listed in paragraph 61," 2 points are added, for a total criminal history score of 14.  J. Gallegos PSR ¶¶ 62-64 (citing U.S.S.G. § 4A1.1(d)).  This criminal history score places J. Gallegos in a criminal history category of VI. See J. Gallegos PSR ¶ 64, at 18.  The total offense level of 43 and criminal history category of VI provide a Guidelines imprisonment term of life.  See J. Gallegos PSR ¶ 107, at 27.

The USPO further contends that "[t]he provisions of the Mandatory Victim Restitution Act of 1996 [('MVRA')] apply to these Title 18 offenses." J. Gallegos PSR ¶ 28, at 12. According to the USPO, Burns' girlfriend, A. Sutton, submitted a request for restitution. See J. Gallegos PSR ¶ 22, at 9. A. Sutton requests $21,000.00 for her 2012 Mitsubishi Gallant, which was burned along with Burns; $7,200.00 for lost income or wages, calculated from $15.00 per hour at forty hours per week; and $280.00 for transportation costs, for a total of $28,480.00. See J. Gallegos PSR ¶ 29, at 12.

### 2.    The J. Gallegos Objections.

J. Gallegos objects to some of the J. Gallegos PSR's facts, the J. Gallegos PSR's Guidelines calculations, and to paying restitution. See J. Gallegos Objections ¶¶ 1-24, at 1-4. First, J. Gallegos objects to the facts that the J. Gallegos PSR ¶¶ 1-26, at 5-12, provide, which he argues were "obtained [from] the discovery materials" and are "substantially different" from the facts litigated at trial. J. Gallegos Objections ¶ 1, at 1. J. Gallegos then provides specific objections to many of the above paragraphs. See J. Gallegos Objections ¶¶ 2-15, 20-24, at 1-4. J. Gallegos asserts that the J. Gallegos PSR ¶¶ 6-10, at 8-9, "are not specific and are more than likely a regurgitation of a prosecution memorandum and therefore vague and not helpful." J. Gallegos Objections ¶¶ 2-6, at 1-2. Moreover, with respect to the J. Gallegos PSR ¶ 10, at 9, J. Gallegos contends that he "was a minor during most of the 1980's and is not alleged to have been involved with the SNM at that time." J. Gallegos Objections ¶ 6, at 2. Next, J. Gallegos argues that the J. Gallegos PSR ¶ 11, at 9, is not relevant to him, as it constitutes "an allegation in a separate trial." J. Gallegos Objections ¶ 7, at 2. J. Gallegos asserts that the J. Gallegos PSR ¶ 12, at 9, contains "self-serving testimony . . . and dealt only with trial group 1 defendants," and is thus irrelevant to him. J. Gallegos Objections ¶ 8, at 2. J. Gallegos also contends that the J. Gallegos

PSR ¶¶ 16-17, at 10, contain "incorrect" facts derived from self-serving testimony, which were "admitted at trial in violation of [J. Gallegos'] due process rights and in violation of the law regarding disclosure of witnesses in a capital murder." J. Gallegos Objections ¶ 9-10, at 2-3. J. Gallegos objects, as he did at trial, to the testimony contained in the J. Gallegos PSR ¶ 18, at 10. J. Gallegos Objections ¶ 11, at 3. J. Gallegos also objects to the J. Gallegos PSR ¶ 19, at 10-11, because "[t]here was no competent evidence tying Joe Gallegos to SNM membership introduced at trial." J. Gallegos Objections ¶ 12, at 3.

Next, J. Gallegos denies that he and A. Gallegos "were the 'last two individuals' to communicate with [Burns]," as the J. Gallegos PSR ¶ 21, at 11, purports, because, at trial, law enforcement "could not prove who or what phone number had communicated with [Burns]." J. Gallegos Objections ¶ 13, at 3 (quoting J. Gallegos PSR ¶ 21, at 11). J. Gallegos further contends that he and A. Gallegos "were seen at the convenience store in Valencia County at a time that made their participation in the murder at the Bosque impossible," and that this information should be included in the J. Gallegos PSR. J. Gallegos Objections ¶ 13, at 3. J. Gallegos objects to the reference to "'handcuffs'" and "'gas can[s]'" in the J. Gallegos PSR ¶ 23, at 11, because "[a]ll of those items were ordinary items that were not traced to [Burns'] murder." J. Gallegos Objections ¶ 14, at 3 (quoting J. Gallegos PSR ¶ 23, at 11). J. Gallegos next argues that the J. Gallegos PSR ¶ 25, at 11, lacks supporting testimony from trial and that "it derives solely from the government's files." J. Gallegos Objections ¶ 15, at 3. J. Gallegos also avers that the J. Gallegos PSR ¶¶ 65,73, at 18, 21, are factually incorrect, because "[h]is first prison sentence was in New Mexico in 1996." J. Gallegos Objections ¶¶ 20, 22, at 4. J. Gallegos contends that the J. Gallegos PSR ¶ 71, at 20-21, is "factually inaccurate and not supported by any credible evidence," and he further states that "[n]o charges were ever filed and the event was not listed in

the RICO indictment." J. Gallegos Objections ¶ 21, at 4. Next, J. Gallegos requests that, in the J. Gallegos PSR ¶ 103, at 27, the statement "'take advantage of him'" be replaced with "as the [sic] would the statements that the owners would take advantage of him and not pay him for work performed." J. Gallegos Objections ¶ 23, at 4 (quoting J. Gallegos PSR ¶ 103, at 27). As to the last factual objection, J. Gallegos requests that, in the J. Gallegos PSR ¶ 126, at 30-31, the Court change the statement "[p]eriod of five years" to "period of 11 years," and that the Court change the statement about his past heroin use to indicate that his "last use of illegal drugs was 2015[,] not 2016." J. Gallegos Objections ¶ 24, at 4.

Next, J. Gallegos objects to the J. Gallegos PSR's restitution calculations, and he argues that the J. Gallegos PSR's "figures should be offset by funds 'the girlfriend' and insurance received from State or Federal sources." J. Gallegos Objections ¶ 16, at 3 (quoting J. Gallegos PSR ¶ 29, at 11). J. Gallegos also objects to three of the J. Gallegos PSR's sentence adjustments, starting with the obstruction-of-justice adjustment in the J. Gallegos PSR ¶ 37, at 13. See J. Gallegos Objections ¶ 17, at 3. First, J. Gallegos avers that "no facts [] support the adjustment" and that "an investigation must be underway when the conduct is committed or [there must be] knowledge that it is 'probably' underway." J. Gallegos Objections ¶ 17, at 3 (citing United States v. Baggett, 342 F.3d 536 (6th Cir. 2003)). According to J. Gallegos, "[t]here was no investigation until the fire was spotted and accordingly the adjustment does not apply to the conflagration." J. Gallegos Objections ¶ 17, at 4. Second, J. Gallegos objects to the physical-restraint adjustment in the J. Gallegos PSR ¶ 41, at 13, because "[t]he facts used to assess this adjustment are inaccurate and not based on credible trial testimony." J. Gallegos Objections ¶ 18, at 4. The physical-restraint adjustment applies to Count 1's violent crimes in aid of racketeering, and aiding and abetting, for Castillo's murder, because Castillo "was physically restrained in the course of the offense."

J. Gallegos PSR ¶ 41, at 13.  Third, J. Gallegos objects to the vulnerable-victim adjustment in the J. Gallegos PSR ¶ 42, at 13, because "[t]here is no credible testimony that [Castillo] was vulnerable," and because "[Castillo] was not 'locked' in his cell per testimony."  J. Gallegos Objections ¶ 19, at 4 (quoting J. Gallegos PSR ¶ 42, at 13, and citing United States v. Lambright, 320 F.3d 517 (5th Cir. 2003)).

### 3. The J. Gallegos First Addendum.

The USPO responds to J. Gallegos' Objections.  See Addendum to the Presentence Report, filed May 2, 2019 (Doc. 2627)("J. Gallegos First Addendum").  First, the USPO maintains that the J. Gallegos PSR ¶¶ 6-24, at 8-11 -- which J. Gallegos argues are based on discovery material and facts that were substantially different from the facts litigated at trial -- contain accurate information about the SNM's history, and that the information "was obtained directly from discovery material provided by the United States Attorney's Office."  J. Gallegos First Addendum at 2-3.  Next, the USPO contends that the factual information in the J. Gallegos PSR ¶ 65, at 18, "was located on [J. Gallegos'] New Mexico rap sheet," and that the factual information in the J. Gallegos PSR ¶ 73, at 21, "was obtained through Court documents"; therefore, the information in both paragraphs "shall remain in the [J. Gallegos PSR] at this time."  J. Gallegos First Addendum at 3.  The USPO asserts that the information in the J. Gallegos PSR ¶ 71, at 20-21, "was obtained directly from police reports and Court documentation [and,] . . . therefore, the [J. Gallegos PSR] shall remain unchanged at this time."  J. Gallegos First Addendum at 3.  Next, the USPO states that the J. Gallegos PSR ¶ 103, at 27, "is reworded to state 'he worked for this company whenever necessary but admitted it is difficult to work for family members, as they would take advantage of him and not pay him for work performed.'"  J. Gallegos First Addendum at 3 (quoting J. Gallegos Objections ¶ 23, at 4)(alterations in J. Gallegos First Addendum).  The USPO also states that, in

the J. Gallegos PSR ¶ 126, at 30-31, "period of five years" is amended to "period of 11 years," and "last used the drug in 2016" is amended to "last used the drug in 2015." J. Gallegos First Addendum at 3.

The USPO next asserts that the restitution information in the J. Gallegos PSR ¶ 29, at 12, "is a necessary component" of the J. Gallegos PSR. J. Gallegos First Addendum at 3. According to the USPO, "[t]here is no additional documentation to indicate the victim's family received insurance payments; therefore, the [J. Gallegos PSR] will remain unchanged at this time." J. Gallegos First Addendum at 3. As to the obstruction-of-justice adjustment in the J. Gallegos PSR ¶ 37, at 13, the USPO argues that the adjustment is appropriate, because, after murdering Burns, J. Gallegos and A. Gallegos moved Burns' body near his vehicle and set him and the car on fire "in an effort to impede the criminal investigation." J. Gallegos First Addendum at 3 (citing J. Gallegos PSR ¶ 26, at 11-12). Next, as to the physical-restraint adjustment in the J. Gallegos PSR ¶¶ 35, 41, at 13, the USPO argues that this adjustment is appropriate, because accurate information supports the adjustment and because the "victim's cell[] only [had] one entrance and exit"; "the victim was not able to fight off his assailants or escape while being held down and strangled by multiple individuals"; and "the attacks occurred behind closed doors out of the view of prison guards." J. Gallegos First Addendum at 3. Last, as to the vulnerable-victim adjustment in the J. Gallegos PSR ¶ 42, at 13, the USPO asserts that the adjustment is appropriate, because "[s]everal Circuits have found that the enhancement is warranted when there is an assault against incarcerated or detained individuals." J. Gallegos First Addendum at 3.

4. **The United States' J. Gallegos Response**.

The United States responds to J. Gallegos' Objections. See United States' Response to Defendant's PSR Objections, filed May 29, 2019 (Doc. 2669)("United States' J. Gallegos

Response"). The United States asserts that "the guideline calculations in the [J. Gallegos PSR] . . . are correct, as well as the factual assertions contained therein, and that there are no grounds for sustaining the defendant's objections." United States' J. Gallegos Response at 1. As to the J. Gallegos PSR ¶¶ 6-13, at 8-9, the United States maintains that "the information obtained from the discovery in this case is accurate [and] . . . was presented at length during trial." United States' J. Gallegos Response at 1. Moreover, the United States explains that the information in these paragraphs is "relevant because it describes [SNM's] actions," and because the "United States had to prove the existence of the enterprise . . . and [J. Gallegos'] membership or relation to that [enterprise]." United States' J. Gallegos Response at 1-2. The United States also notes that, "although it is a good practice to include information from trial in a PSR, the Court 'may consider, without limitation, any information concerning the background, character[,] and conduct of the defendant, unless otherwise prohibited by law.'" United States' J. Gallegos Response at 2 (quoting U.S.S.G. § 1B1.4, and citing 18 U.S.C. § 3661).

The United States argues that J. Gallegos should pay restitution, because his brother, A. Gallegos, admitted that they shot and killed Burns. See United States' J. Gallegos Response at 4. The United States contends that the obstruction-of-justice adjustment applies, because, after killing Burns, J. Gallegos and A. Gallegos "moved [Burns'] body and the vehicle to another location to burn them. Consequently, law enforcement investigators were unable to obtain DNA or fingerprint evidence from the scene of the burn." United States' J. Gallegos Response at 5. The United States adds that J. Gallegos also "removed the carpet from his home and instructed his brother to throw away a watch and keys believed to belong to Burns." United States' J. Gallegos Response at 5.

The United States argues that the physical-restraint adjustment applies to Count 1, because J. Gallegos "physically restrained Frank Castillo while Jaramillo strangled him." United States' J. Gallegos Response at 5. The United States also notes that the adjustment should apply to Counts 4 and 5, because "Burns' body was found handcuffed." United States' J. Gallegos Response at 5. Finally, the United States asserts that the vulnerable-victim adjustment applies, because Castillo was incarcerated, and J. Gallegos helped murder Castillo "immediately following [Castillo's] ingestion of heroin." United States' J. Gallegos Response at 5. According to the United States, "Castillo was in a more difficult position to fight off his attackers while trapped in his own cell with three others and while under the influence of a narcotic drug." United States' J. Gallegos Response at 5.

### 5. The J. Gallegos Second Addendum.

The USPO filed a Second Addendum to the J. Gallegos PSR. See J. Gallegos Second Addendum at 1. In the J. Gallegos Second Addendum, the USPO notes that the United States "has not submitted any objections" to the J. Gallegos PSR, and J. Gallegos has not filed additional objections to the J. Gallegos PSR. J. Gallegos Second Addendum at 1. The USPO concludes that, "based on Court findings during the sentencing hearing of codefendants Andrew Gallegos on May 10, 2019, and the sentencing hearing of Edward Troup on May 13, 2019," the USPO "maintains the presentence report offense conduct and information therein is accurate, as determined by relevant conduct and trial testimony from SNM members during the Joe Lawrence Gallegos trial." J. Gallegos Second Addendum at 1. The USPO says that, as to Count 1, Leonard Lujan testified that around March, 2001, Lujan instructed J. Gallegos to kill Castillo "by strangulation." J. Gallegos Second Addendum at 1. The USPO also says that Jaramillo testified that J. Gallegos told him in March, 2001, that J. Gallegos and Defendant Angel DeLeon "were

waiting for heroin to be brought into the prison and within a few days, they would kill [Castillo]." J. Gallegos Second Addendum at 2. According to the USPO, Jaramillo testified that J. Gallegos "assigned everyone a role, noting [that J.] Gallegos and DeLeon would hold [Castillo] while Jaramillo strangled him. Additionally, Jaramillo noted Edward Troup's role was to keep all the inmates in the dayroom and not allow them near [Castillo's] room." J. Gallegos Second Addendum at 2. The USPO also asserts that, after Castillo injected himself with heroin inside his cell, J. Gallegos and DeLeon grabbed Castillo "by his arms and rolled him over onto his bed. Jaramillo admitted to strangling [Castillo] with the drawstring of a laundry basket while Gallegos and DeLeon held [Castillo] during the struggle." J. Gallegos Second Addendum at 2. The USPO adds that Castillo's sister "is not requesting any monetary restitution." J. Gallegos Second Addendum at 2.

For Count 1, the USPO argues that the physical-restraint adjustment applies, because the Court determined that the adjustment applies for Castillo's murder during Troup's sentencing hearing. See J. Gallegos Second Addendum at 3. The USPO reiterates that J. Gallegos, along with DeLeon, held Castillo's "arms and body, while Jaramillo strangled him to death," and thus the physical-restraint adjustment applies. J. Gallegos Second Addendum at 3. The USPO also argues that the vulnerable-victim adjustment applies to Castillo's murder, because the Court ruled that the adjustment applies to Castillo's murder at Troup's sentencing hearing. See J. Gallegos Second Addendum at 3 (citing United States v. Tapia, 59 F.3d 1137 (11th Cir. 1995); United States v. Lambright, 320 F.3d 517). The USPO asserts:

> The Court found that this increase was appropriate as it was well known that [Castillo], a member of the SNM gang, had a "green light," which meant he was to be killed. The Court determined that he was not inclined to agree with the adjustment solely based on the victim's being prisoners, but because of their

circumstance of being in prison where they were being sought-after to be killed as cooperators with law enforcement.

J. Gallegos Second Addendum at 3.

As to Counts 4 and 5, the USPO notes:

[O]n May 10, 2019, during the sentencing hearing of co-defendant Andrew Gallegos, the Court determined the restitution requested by [Burns'] girlfriend was not justified. The Court determined [Burns'] girlfriend could not be identified as the "victim," as she did not meet the requirements contained in 18 U.S.C. §3663A(b)(2)(A)-(C). This clause specifically identifies the victim as having sustained bodily injury; thus all payments are to be paid directly to said victim. As [Burns] sustained the injury, not his girlfriend, the Court determined restitution could not be ordered paid by Andrew Gallegos. Based on the Court's findings in *U.S. v. Andrew Gallegos*, restitution is not authorized for [Burns'] girlfriend.

J. Gallegos Second Addendum at 2. Last, the USPO also contends that the J. Gallegos PSR's base level of 43 "was correctly applied," because the underlying crime is murder, and the base offense level for murder is 43 under U.S.S.G. § 2A1.1. J. Gallegos Second Addendum at 2.

**6.    The June 11, 2019, Hearing.**

The Court sentenced J. Gallegos on June 11, 2019. See June 11 Tr. at 1. J. Gallegos confirmed that he has reviewed the PSR, the United States' J. Gallegos Response, and the USPO's addendums, and he agreed to hear the Court's tentative rulings before arguing his objections. See June 11 Tr. at 3:15-23 (Court, Benjamin); id. at 6:4-7 (Court, Benjamin). The Court first addressed Count 1's 2-level adjustment for a vulnerable victim under U.S.S.G. § 3A1.1(b)(1). See June 11 Tr. at 4:1-5 (Court). The Court noted that the United States Court of Appeals for the Eleventh Circuit held in United States v. Tapia that the vulnerable-victim adjustment applies to a victim who is "vulnerable by virtue of his incarceration . . . and his inability to escape, and [where] the victim was targeted because of this vulnerability." June 11 Tr. at 7:18-21 (Court). The Court also noted that, in United States v. Lambright, the United States Court of Appeals for the Fifth Circuit

upheld the vulnerable-victim adjustment's application where a corrections officer killed an inmate, because the inmate was "completely dependent upon the care of the correctio[s] officers, was locked in his cell prior to the assault, and he could not protect himself from the assault." June 11 Tr. at 8:1-4 (Court).

The Court stated that the vulnerable-victim adjustment "shall apply when the victim is less able to resist than the typical victim, and requires greater societal protection." June 11 Tr. at 8:5-9 (Court)(citing United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)). The Court instructed that the vulnerable-victim adjustment is "reserved for exceptional cases in which the victim is unusually vulnerable or particularly susceptible to the crime committed, where the victims are unable to protect themselves." June 11 Tr. at 8:13-17 (Court)(citing United States v. Castaneda, 239 F.3d 978, 990 (9th Cir. 2001); United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002)). The Court noted, however, that the sentencing court is not required to "find that the defendant intentionally targeted the victim because of the victim's vulnerability to apply the adjustment." June 11 Tr. at 8:18-22 (Court)(citing United States v. Checora, 175 F.3d 782, 789 n.4 (10th Cir. 1999)). The Court also emphasized that "in assessing vulnerability the sentencing court must make an individualized determination. It's not enough that a victim belongs to a class generally considered vulnerable." June 11 Tr. at 8:23-9:1 (Court)(citing United States v. Scott, 529 F.3d at 1300-01; United States v. Proffit, 304 F.3d at 1007; United States v. Hardesty, 105 F.3d 558, 560 (10th Cir. 1997)). The Court noted that, based upon Lujan's testimony, "the SNM targeted Castillo to be killed because of his alleged cooperation with law enforcement." June 11 Tr. at 9:4-6 (Court). The Court added that the SNM ordered Castillo's murder by issuing a "green light . . . pursuant to the gang's prohibition of snitching," because Castillo had snitched on other SNM members. June 11 Tr. at 9:10-11 (Court). The Court said that DeLeon, J. Gallegos, and Jaramillo

"had easy access to Mr. Castillo, because they were housed together, and specifically attacked Mr. Castillo in his cell, where it would be harder for Mr. Castillo to escape," and where they "outnumbered Mr. Castillo." June 11 Tr. at 10:19-11:6 (Court). The Court further noted that Castillo "had ingested heroin," and that DeLeon, J. Gallegos, and Jaramillo "used Mr. Castillo's vulnerable, intoxicated state to their advantage." June 11 Tr. at 11:8-10 (Court). The Court explained that, in United States v. Checora, the United States Court of Appeals for the Tenth Circuit upheld the vulnerable-victim adjustment's application "where the victim was outnumbered, drunk, and had little ability to defend himself." June 11 Tr. at 11:18-20 (Court). The Court stated:

> the Court is inclined to state that credible testimony establishes that Mr. Castillo was vulnerable because of the SNM's hit on him, his incarceration with other SNM members who were ordered to act on the hit, his being outnumbered, his intoxication from the heroin, and his limited ability to defend himself or escape from the surprise attack in his cell.

June 11 Tr. at 11:21-12:3 (Court).

J. Gallegos responded that he thinks that United States v. Tapia "is not particularly applicable," but he conceded that United States v. Lambright "add[s] some merit to the Court's position in this particular matter." June 11 Tr. at 12:14-22 (Court). J. Gallegos noted, however, that nearly everyone "involved . . . in this trial had [] a green light on them," that Jaramillo and Lujan cooperated with the United States, that Jaramillo avoided any charges in the case, and that Lujan's testimony contained "inconsistencies." June 11 Tr. at 13:16-14:13 (Benjamin). J. Gallegos said that he has nothing further to add with respect to the vulnerable-victim adjustment's application. See June 11 Tr. at 12:23-24 (Sindel). The United States shared that it has nothing to add, that it agrees with the Court's analysis, and that it "believe[s] that the enhancement applies." June 11 Tr. at 13:5-8 (Castellano). The Court then concluded that it will

overrule the objection, because Lujan's and Jaramillo's testimonies corroborated each other.  See
June 11 Tr. at 14:24-15:4 (Court).

The Court turned next to the physical-restraint adjustment's application under U.S.S.G.
§ 3A1.3.  See June 11 Tr. at 15:16-17 (Court).  The Court noted that the United States contends
that J. Gallegos "physically restrained Frank Castillo while Jaramillo strangled him," and the
USPO contends that DeLeon and J. Gallegos held Castillo's arms and body while Jaramillo
strangled him to death."  June 11 Tr. at 16:9-15 (Court).  The Court said that the Guidelines define
"'physically restrained' as the forcible restraint of the victim such as tied, bound, or locked up."
June 11 Tr. at 16:22-24 (Court)(quoting U.S.S.G. § 1B1.1(L)).  The Court noted, however, that
"these examples are merely illustrative, and not exhaustive."  June 11 Tr. at 17:2-3 (Court)(citing
United States v. Checora, 175 F.3d at 790); United States v. Rodella, No. CR 14-2783, 2015 WL
711941, at *27 (D.N.M. Feb. 5, 2015)(Browning, J.)).  The Court added that the Tenth Circuit "has
consistently applied the adjustment where the victim was [] kept within bounds or under control
to make her a better target."  June 11 Tr. at 17:10-12 (Court)(citing United States v. Ivory, 532
F.3d 1095, 1106 (10th Cir. 2008); United States v. Checora, 175 F.3d at 791).

The Court reiterated that, according to Jaramillo's testimony, DeLeon and J. Gallegos held
Castillo down while Jaramillo strangled him.  See June 11 Tr. at 17:14-16 (Court).  The Court
noted that Jaramillo's exact words were that J. Gallegos participated by "helping hold down"
Castillo.  June 11 Tr. at 17:21-22 (Court).  The Court said that Defendant Benjamin Clark testified
that J. Gallegos held Castillo "down with the monkey grip or gorilla grip, something like that, and
that it was easy."  June 11 Tr. at 18:2-3 (Court).  The Court said that it finds Jaramillo's and Clark's
testimonies to be credible.  See June 11 Tr. at 18:6-15 (Court).  The Court noted that applying the
physical-restraint adjustment "does not involve impermissible double counting, because

Mr. Castillo's physical restraint by Mr. DeLeon and Mr. Gallegos to make it easier for Mr. Jaramillo to strangle Mr. Castillo is not being used as [the] basis of a different adjustment." June 11 Tr. at 18:17-21 (Court)(citing United States v. Flinn, 18 F.3d 826, 829 (10th Cir. 1994)). The Court then stated its inclination "to conclude that Mr. Castillo was physically restrained during his murder so that the" physical-restraint adjustment applies. June 11 Tr. at 19:4-7 (Court).

J. Gallegos responded that he disagrees with the "double counting matter." June 11 Tr. at 19:13 (Sindel). J. Gallegos noted that the Court referred to Castillo's restraint as one reason for applying the vulnerable-victim adjustment, and J. Gallegos therefore argued that "there is an overlap" between the vulnerable-victim adjustment and the physical-restraint adjustment. June 11 Tr. at 19:21 (Sindel). The United States argued that "the physical restraint is largely what made murder successful." June 11 Tr. at 20:6-7 (Castellano). The United States also contended that "strangulation, which included restraint," is a "common means of killing people in the SNM." June 11 Tr. at 20:10-12 (Castellano). The United States added that Burns' murder also involved physical restraint, because Burns "was found handcuffed." June 11 Tr. at 20:14-15 (Castellano). The Court concluded that, after reviewing the double counting issue, it will overrule J. Gallegos' objection and apply the physical-restraint adjustment. See June 11 Tr. at 20:21-21:1 (Court).

The Court then turned to the obstruction-of-justice adjustment. See June 11 Tr. at 21:2-3 (Court). As to Counts 4 and 5, the Court notes that J. Gallegos objects to the adjustment, because "an investigation must be underway when the conduct is committed or knowledge that [it] is probably underway, and that there was no investigation . . . till the fire was spotted." June 11 Tr. at 21:11-15 (Court). The Court said that the USPO argues that, "after murdering Burns, [] in an effort to impede the criminal investigation[, J. Gallegos and A. Gallegos] placed [Burns'] body near his vehicle and set both on fire." June 11 Tr. at 21:19-21 (Court). The Court said that the

United States argues that J. Gallegos and A. Gallegos "moved the body and the vehicle to another location to burn them, consequently, law enforcement investigators were unable to obtain DNA or fingerprint evidence from the scene of the burn." June 11 Tr. at 22:3-7 (Court). The Court added that, according to the United States, J. Gallegos removed "carpet from his home and instructed his brother to throw away a watch and keys believed to belong to Burns, which [was] . . . designed to inhibit the investigation." June 11 Tr. at 22:8-14 (Court).

The Court stated that, under U.S.S.G. § 3C1.1, the obstruction-of-justice adjustment applies "if the defendant willfully obstructed or impeded or attempted to obstruct and impede the administration of justice with respect to the investigation, prosecution or sentencing of the instance offense of conviction," and if "the obstructive conduct related to [] the defendant's offense of conviction." June 11 Tr. at 22:17-23 (Court). The Court instructed that "obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered . . . if the conduct was purposely calculated or likely to thwart the investigation or prosecution of the offense of conviction." June 11 Tr. at 23:1-6 (Court). The Court noted that it has held that "the defendant must have deliberately, not accidentally, or incidentally, or mistakenly, done some act with the specific purpose of thwarting the investigation or prosecution." June 11 Tr. at 23:8-12 (Court)(citing United States v. Yuselaw, No. CR 09-1035 JB, 2010 WL 3834418, at *12 (D.N.M. Aug. 5, 2010)(Browning, J.)). The Court added that "attempts to obstruct justice may be sufficient if the acts were of a kind that were likely to thwart the investigation and eventual prosecution." June 11 Tr. at 23:13-16 (Court)(citing United States v. Yuselaw, 2010 WL 3834418, at *13).

The Court concluded that J. Gallegos' reliance on United States v. Baggett "for the proposition that obstructive conduct must occur during the investigation," is misplaced, because United States v. Baggett "applied a prior version" of the obstruction-of-justice adjustment, which

required obstructive conduct to occur during the investigation. June 11 Tr. at 23:18-20 (Court). According to the Court, the "current version" of the adjustment "has been in place since 2006," and "states only that the obstructive conduct must be [] with respect to the investigation, prosecution, or sentencing of the instant offense of conviction." June 11 Tr. at 24:14-17 (Court). The Court concluded that the "act of burning the body in the car was a necessarily willful impediment to the investigation of Burns' murder, with an easy inference that such burning was done to destroy the evidence." June 11 Tr. at 24:18-21 (Court). The Court stated its inclination to overrule J. Gallegos' objection to the obstruction-of-justice adjustment. See June 11 Tr. at 25:4-6 (Court).

J. Gallegos argued that the "Court is . . . making an assumption . . . that the only reason for the burning would be to destroy the evidence." June 11 Tr. at 25:14-17 (Benjamin). J. Gallegos contended that the United States' "proffered motive for this crime was disrespect" and "anger," and he argued that he intended to show disrespect and anger by burning the body. June 11 Tr. at 25:18-19 (Benjamin). J. Gallegos also asserted that the Court's inference that J. Gallegos burned the body to obstruct the investigation is not an "easy inference," and the Court said that it would "delete 'easy'" and instead conclude that it is a "reasonable inference" based on a "preponderance of the evidence." June 11 Tr. at 26:11-22 (Sindel, Court). The United States conceded that, while the United States argued that disrespect for Burns motivated J. Gallegos to kill him, disrespect did not motivate J. Gallegos' "coverup of the murder, which concealed or destroyed evidence." June 11 Tr. at 27:2-15 (Castellano, Court). The Court then concluded that it will apply the obstruction-of-justice adjustment. See June 11 Tr. at 28:7-9 (Court).

Turning to restitution, the Court noted that the J. Gallegos PSR states that the MVRA applies to the offenses and that Burns' girlfriend, A. Sutton, requested restitution. See June 11 Tr.

at 28:23-29:2 (Court). The Court said that A. Sutton requests $21,000.00 for a 2012 Mitsubishi

Gallant, $7,200.00 for lost income or wages, and $280.00 for transportation, totaling $28,480.00.

See June 11 Tr. at 29:2-6 (Court). The Court noted that the United States agrees with the USPO

that J. Gallegos should pay restitution, because Billy Cordova testified that J. Gallegos admitted

that he and his brother "shot Burns, bound him, and burned him up." June 11 Tr. at 29:16-17

(Court). The Court determined, however, that it cannot "use that testimony against

Mr. J. Gallegos, [] because it's inadmissible nonhearsay evidence only to Andrew Gallegos."

June 11 Tr. at 29:21-23 (Court). The Court recognized that the USPO "clarifies in its second

addendum that pursuant to the Court's holding in Andrew Gallegos' sentencing, [] restitution is

not authorized for [Burns'] girlfriend." June 11 Tr. at 30:4-7 (Court). The Court emphasized that

courts "have no inherent power to order restitution. And they do so only as authorized by statute."

June 11 Tr. at 30:13-15 (Court)(citing United States v. Serawop, 505 F.3d 1112, 1118 (10th Cir.

2007); United States v. Gordon, 480 F.3d 1205, 1210 (10th Cir. 2007)). The Court said that the

MVRA defines "victim" as "a person directly and [proximately] harmed as a result of a conviction

of an offense for which restitution may be ordered." June 11 Tr. at 30:12-14 (Court). The Court

also said that "crime of violence" is defined as an "offense that has as an element the use, attempted

use, or threatened use of physical force against the person or property of another, or [] any other

offense that is a felony, and that by its nature involves a substantial risky of physical force."

June 11 Tr. at 31:21-32:1 (Court). The Court determined that the MVRA "applies in this case

because murder and conspiracy to murder are [] crimes of violence." June 11 Tr. at 32:22-24

(Court)(citing United States v. Juvenile Male, 923 F.2d 614, 620 (8th Cir. 1991); United States v.

Cruz, 805 F.2d 1464, 1474 n.11 (11th Cir. 1986)).

The Court identified that the "question remaining" is whether A. Sutton is properly considered "a victim of the offense, such that she may receive restitution." June 11 Tr. at 33:20-23 (Court). The Court noted that the United States has not "made any attempt" to show that A. Sutton qualifies as a "victim of Burns' murder." June 11 Tr. at 34:1-3 (Court)(citing United States v. Kieffer, 681 F.3d 1143, 1171 (10th Cir. 2012); United States v. Speakman, 594 F.3d 1165, 1172-73, 1173 n.5 (10th Cir. 2010)). The Court stated that A. Sutton "is a victim of the offense if the commission of the murder [] directly and proximately harmed her." June 11 Tr. at 34:15-17 (Court). The Court noted that a gunshot caused Burns' death and that burning the car was "separate conduct from the act of murdering Burns," and the Court thus concluded that A. Sutton's "loss of her car is not the direct and proximate result of the commission of the murder." June 11 Tr. at 34:23-35:1 (Court). The Court determined that A. Sutton is not entitled to restitution for her car's destruction or for her transportation costs, which stemmed from her car's destruction. See June 11 Tr. at 35:3-13. The Court further determined that A. Sutton is not entitled to restitution for lost income or wages, because, under the MVRA, A. Sutton did not suffer any physical injuries and her lost wages and income were "not a result of her participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." June 11 Tr. at 37:5-8 (Court). The Court noted, however, that, if the United States or USPO provides "facts so that the Court may determine restitution amounts that are appropriate . . . , such as the costs of necessary funeral or related services, the Court will order such appropriate restitution." June 11 Tr. at 37:13-17 (Court). The Court concluded that it is inclined to sustain J. Gallegos' objection to restitution, because "restitution itself is improper." June 11 Tr. at 37:22 (Court). The United States and J. Gallegos had no response to the Court's analysis, and the Court sustained J. Gallegos' restitution objection. See June 11 Tr. at 37:23-38:9 (Court, Benjamin, Sindel, Castellano).

As to factual objections, J. Gallegos argued that he interpreted the trial testimony differently from how the USPO presents the facts in the J. Gallegos PSR, and that he is concerned that some of the J. Gallegos PSR's facts appear to come "directly from the discovery that's provided." June 11 Tr. at 39:5-6 (Benjamin). The Court noted that the J. Gallegos PSR relies on discovery, but, in the J. Gallegos Second Addendum, the USPO "went back and looked at the actual trial testimony. So that's the reason I'm wondering if the second addendum now maybe addresses all the concerns." June 11 Tr. at 39:9-12 (Court). The Court concluded that, after "review[ing] carefully" the J. Gallegos Second Addendum, the facts track the trial testimony, and the Court thus overruled "any remaining factual objection[s]." June 11 Tr. at 40:7-12 (Court). The Court added that "the second addendum states the Court's findings." June 11 Tr. at 40:12-13 (Court).

The Court then confirmed that the offense level is 43, the criminal history category is IV, and the Guidelines imprisonment term is "life as to counts 1 and 5, which is consistent with the statutory provision of mandatory life imprisonment, and 120 months as to Count 4, pursuant to USSG Section 5G1.2." June 11 Tr. at 40:20-23 (Court). J. Gallegos asked the Court not "to stack these punishments and run them consecutive as opposed to concurrent." June 11 Tr. at 41:12-13 (Sindel). The Court then gave J. Gallegos an opportunity to speak on his own behalf, and J. Gallegos said:

> First of all, I'd like to maintain my innocence in this case.
>
> I'd like to point out a couple of facts that I failed to show to my lawyers and the Court, the fact there was a good time sheet that shows I was working the kitchen that day. And the Government stated that it doesn't show the times. Well, the good time sheet doesn't have to show times, because there was only one shift working the kitchen that day. And they further stated that the outcome didn't show that I was -- that I was put on outcome. However, the good time sheet shows I was docked one hour for showing up late. And that's the one hour after count.

So I'm just saying, due to the fact that evidence is destroyed on Count 1, I understand it was a long time ago, and I think it hurt me. It was evidence that could prove me innocent. And also on Count 2, all the evidence in the state was destroyed also. I think that was a big factor in the conviction on my case.

June 11 Tr. at 42:22-43:17 (J. Gallegos). J. Gallegos then clarified that his statements about Count 2 actually refer to Count 4. See June 11 Tr. at 43:19-22 (Benjamin). J. Gallegos continued:

Yeah, Count 1 was the 2001, and the evidence was destroyed. And then again in the state case there was evidence that could have helped me, but all the evidence was destroyed from the state also. And I just think it's -- I mean, it was a big factor in the conviction. And I believe I proved my innocence on Counts 4 and 5. But it didn't show, I guess.

. . . .

And I will say, even though I maintain my innocence, I do like to say sorry to the families for their loss. And that's about it.

June 11 Tr. at 43:23-44:10 (J. Gallegos). Burns' mother, Maxine Burns, and sister, Sheena Burns, also addressed the Court. See June 11 Tr. at 44:22-46:20 (Maxine Burns, Court, Sheena Burns).

The Court next stated the sentence. See June 11 Tr. at 47:4 (Court). The Court said that it adopts the J. Gallegos PSR, overrules the remaining objections, and relies "primarily on the factual statements in the second addendum." June 11 Tr. at 47:9-10 (Court). The Court determined that it agrees with the Guidelines and the USPO "that the life sentence is adequate but also necessary to reflect the seriousness of the offense, promote respect for the law, provide[] just punishment, afford adequate deterrence, both at a specific and general level, [and] protect the public." June 11 Tr. at 49:13-18 (Court). The Court concluded that the Guidelines sentence, "which is also a statutory sentence[,] fully and effectively reflects each of the factors embodied in 18 USC Section 3553(a)." June 11 Tr. at 50:3-5. The Court also announced the following conditions for supervised release: (i) "you must submit to a search your person, property, residence, vehicle,

papers, computers, as defined in 18 USC Section 1030(e)(1), other electronic communications or data storage device or media or office under of your control"; (ii) "[y]ou must inform any residents or occupants [at your residence] that [your residence's] premises may be subject to a search"; (iii) "you must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program"; (iv) "you shall waive your right of confidentiality and allow the treatment provider to release treatment records to the probation officer"; (v) "you must submit to substance abuse testing to [determine] if you have used a prohibited substance"; (vi) "you must not use or possess alcohol"; (vii) "you must not knowingly purchase, possess, distribute, administer, or otherwise use any psychoactive substances"; (viii) "you must not possess, sell, offer for sale, transport, cause to be transported, cause to affect interstate commerce, import or export any drug paraphernalia, as defined in 21 USC Section 863D"; (ix) "you must reside in a residential reentry center for a term of six months"; (x) "you must not communicate or otherwise interact with co-defendants [or] co-conspirators"; (xi) "you must not communicate or otherwise interact with any known gang member"; and (xii) "you must not communicate or otherwise interact with the victim or victims, either directly or through someone else."  June 11 Tr. at 51:3-55:10 (Court). The Court explained that these conditions are imposed "based on the history and characteristics of the defendant who disclosed a long history of narcotic and alcohol use, last using heroin in 2015," and that the conditions are "meant to deter the defendant from further crimes involving violence and deadly weapons and to protect the public, including the supervising probation officer, from such crimes of the defendant."  June 11 Tr. at 52:2-54:10 (Court).

The Court stated that it will not order restitution or impose a fine.  See June 11 Tr. at 55:16-24 (Court).  The Court noted, however, that J. Gallegos "shall pay a special assessment of $100.00 as to each count of conviction for a total of $300.00, which is due immediately."

June 11 Tr. at 56:9-11 (Court). J. Gallegos asked that the Court modify the condition prohibiting contact with other co-Defendants to exempt his brother, A. Gallegos. See June 11 Tr. at 56:20-25 (Benjamin). The United States and the USPO did not object, and the Court modified the condition to allow contact with A. Gallegos. See June 11 Tr. at 57:1-9 (Court, Castellano). The Court then "ordered that the sentence is imposed as the Court has stated it," June 11 Tr. at 57:11-12 (Court), and the Court informed J. Gallegos of his rights to appeal, see June 11 Tr. at 57:17-58:1 (Court). Last, the Court wished J. Gallegos and the victims' families "[g]ood luck." June 11 Tr. at 61:2 (Court). See id. at 61:8-12 (Court).

### 7. The A. Gallegos PSR.

In calculating A. Gallegos' Guidelines sentence, the USPO notes that A. Gallegos "has not clearly demonstrated acceptance of responsibility for the offense." A. Gallegos PSR ¶ 33, at 10. The USPO groups Counts 4 and 5 for calculating A. Gallegos' Guidelines sentence, because both counts "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." A. Gallegos PSR ¶ 25, at 10. As to Counts 4 and 5, the USPO determines that the underlying crime of racketeering activity, and of aiding and abetting, is first-degree murder, which entails a base offense level of 43. See A. Gallegos PSR ¶ 26, at 10 (citing U.S.S.G. § 2A1.1). The USPO applies a 2-level adjustment for physical restraint of the victim, because A. Gallegos, "along with his brother Joe, physically restrained [Burns] with handcuffs and shot him in the head with a .22 caliber firearm." A. Gallegos PSR ¶ 20, at 9. See id. ¶ 28, at 10. The USPO also applies a 2-level adjustment for the obstruction of justice, because, "[a]fter murdering [Burns], and in an effort to impede the criminal investigation," A. Gallegos and his brother "placed [Burns'] body near his vehicle and set both on fire." A. Gallegos PSR ¶ 20, at 9. See id. ¶ 30, at 10. The USPO does not apply an adjustment

for A. Gallegos' role in the murder, determining that A. Gallegos' "role cannot be determined as either aggravated or mitigating." A. Gallegos PSR ¶ 20, at 9. Accordingly, the USPO calculates an adjusted offense level of 47 for both Counts 4 and 5. See A. Gallegos PSR ¶ 31, at 10.

Because the total offense level exceeds 43, the USPO concludes that "the offense level will be treated as a level 43." A. Gallegos PSR ¶ 34, at 10 (citing U.S.S.G. ch. 5, pt. A n.2). The USPO then provides A. Gallegos' criminal history, which the Court summarizes in the following table.

| Date of Arrest | Charge/Court | Guideline | Points |
|---|---|---|---|
| March 25, 1995 Age 19 | Criminal Sexual Penetration 13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.1(a) | 3 |
| January 29, 1996 Age 20 | Assault; Battery 13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.2(e)(3) | 0 |
| July 27, 2000 Age 24 | Attempted Possession of a Firearm or Destructive Device by a Felon; Negligent Use of a Deadly Weapon 13th Judicial District Court of Valencia County, Los Lunas, New Mexico | § 4A1.2(e)(3) | 0 |
| April 9, 2004 Age 28 | Possession of Drug Paraphernalia Valencia County Magistrate Court, Belen, New Mexico | § 4A1.1(c) | 1 |
| April 25, 2004 Age 28 | Reckless Driving; Concealing Identity; No Driver's License; Consume or Possess Open Container of Alcoholic Beverage; No Insurance Valencia County Magistrate Court, Los Lunas, New Mexico | § 4A1.2(c)(1) | 0 |
| February 16, 2005 Age 29 | Use of Communication Facility, to wit: a Telephone, in Connection with a Drug Offense United States District Court for the District of New Mexico, Albuquerque, New Mexico | § 4A1.1(a) | 3 |
| October 24, 2010 Age 35 | Use or Possession of Drug Paraphernalia; Shoplifting Valencia County Magistrate Court, Belen, New Mexico | § 4A1.1(c) | 1 |

| | | | |
|---|---|---|---|
| January 7, 2012<br>Age 36 | Negligent Use of a Deadly Weapon;<br>Consume or Possess Open Container of<br>Alcoholic Beverage<br>Valencia County Magistrate Court, Belen,<br>New Mexico | § 4A1.1(c) | 1 |
| May 14, 2013<br>Age 37 | Aggravated Fleeing a Law Enforcement<br>Officer<br>Valencia County Magistrate Court, Los<br>Lunas, New Mexico | § 4A1.1(b) | 2 |
| May 14, 2013<br>Age 37 | Possession of a Controlled Substance<br>13th Judicial District Court of Valencia<br>County, Los Lunas, New Mexico | § 4A1.2(a)(2) | 0 |
| January 21, 2014<br>Age 38 | Contributing to the Delinquency of a Minor<br>13th Judicial District Court of Valencia<br>County, Los Lunas, New Mexico | § 4A1.1(b) | 2 |
| August 3, 2014<br>Age 38 | Resisting, Evading, or Obstructing an Officer<br>Valencia County Magistrate Court, Los<br>Lunas, New Mexico | § 4A1.2(c)(1) | 0 |

See A. Gallegos PSR ¶¶ 37-48, at 11-16. The USPO notes that these convictions "result in a subtotal criminal history score of 13," which places A. Gallegos in a criminal history category of VI. A. Gallegos PSR ¶¶ 49-50, at 16. The total offense level of 43 and criminal history category of VI provide a Guidelines imprisonment term of life. See A. Gallegos PSR ¶ 99, at 25.

The USPO further contends that "[t]he provisions of the Mandatory Victim Restitution Act of 1996 apply to these Title 18 offenses." A. Gallegos PSR ¶ 22, at 9. According to the UPSO, Burns' girlfriend, A. Sutton, submitted a request for restitution. See A. Gallegos PSR ¶ 22, at 9. A. Sutton requests $21,000.00 for her 2012 Mitsubishi Gallant [car], which was burned along with Burns; $7,200.00 for lost income or wages, calculated from $15.00 per hour at forty hours per week; and $280.00 for transportation costs, for a total of $28,480.00. See A. Gallegos PSR ¶ 22, at 9.

8.    **The A. Gallegos Objections.**

A. Gallegos objects to some of the A. Gallegos PSR's facts and to paying restitution, see A. Gallegos Objections ¶¶ 1-7, at 1-2, and he "further adopts and incorporates all object[ions] enumerated by co-defendant, Joe Gallegos, in Doc. 2614, so far as they specifically relate to counts 4 and 5 of the indictment." A. Gallegos Objections ¶ 8, at 3. In his first Guidelines objection, A. Gallegos denies that his nickname is "Homeboy," asserting instead that his nickname is "Smiley," as this is the nickname to which he was referred in testimony at trial. A. Gallegos Objections ¶ 1, at 1. A. Gallegos next objects to the A. Gallegos PSR ¶¶ 1-13, at 4-13, arguing that "much of this information was not admitted against him," A. Gallegos Objections at ¶ 2, at 1. A. Gallegos also objects to the A. Gallegos PSR ¶ 15, at 8, which states that, on the day of Burns' murder, A. Gallegos and his brother "'were observed at a convenient store in Valencia County within hours of the reported vehicle fire one county away,'" A. Gallegos Objections ¶ 3, at 1 (quoting A. Gallegos PSR ¶ 15, at 8). According to A. Gallegos, "evidence at trial [shows that] Andrew Gallegos was recorded on video at the Allsup[']s[5] within minutes of the time the flames were seen in the Bosque" and that the drive between the vehicle fire and the Allsup's was "over 30 minutes." A. Gallegos Objections ¶ 3, at 1-2.

A. Gallegos also denies that he is an SNM member, as the USPO asserts in the A. Gallegos PSR ¶¶ 19-20, at 9. See A. Gallegos Objections ¶ 4, at 2. A. Gallegos states that there "was no testimony at trial as to when, where[,] or how" he joined SNM, and that his "zia tattoo" is not gang-related. A. Gallegos Objections ¶ 4, at 2. Next, A. Gallegos objects to the following statement in the A. Gallegos PSR ¶ 20, at 9: "'Based on the limited information provided,

---

[5]Allsup's is a privately owned chain of convenience stores with locations throughout New Mexico and Texas.

Andrew's role cannot be determined as either aggravated or mitigating; therefore, no role adjustment is warranted.'" A. Gallegos Objections ¶ 5, at 2 (quoting A. Gallegos PSR ¶ 20, at 9). A. Gallegos objects to this statement on the basis that he "maintains his innocence," even though "the jury found otherwise." A. Gallegos Objections ¶ 5, at 2.

A. Gallegos adds information to the USPO's statement of the "Defendant's Version" of the facts in the A. Gallegos PSR ¶ 20, at 9. A. Gallegos Objections ¶ 6, at 2. A. Gallegos provides the following additional information:

> Mr. Gallegos says much of his problems are due to the fact that his brothers are known gang members, specifically, known SNM gang members. Because of their associations, being a "Gallegos" has labeled him in the police['s] eyes. Mr. Andrew Gallegos admits he was an East Side Loco when he was young, but he says it was more of doing stupid things as a teen. He denies gang activity as an adult. Andrew Gallegos says he never knew his father, and was essentially raised by his older brother Joe Gallegos, as such lots [sic] of people associate he and Joe as "very tight."

A. Gallegos Objections ¶ 6, at 2. Furthermore, A. Gallegos contends that he "does not believe he owes restitution as he did not set the vehicle on fire and there was no trial evidence that he incinerated the Mitsubishi." A. Gallegos Objections ¶ 7, at 2.

Finally, A. Gallegos "further adopts and incorporates all object[ions] enumerated by co-defendant, Joe Gallegos, in Doc. 2614, so far as they specifically relate to counts 4 and 5 of the indictment." A. Gallegos Objections ¶ 8, at 3 (citing J. Gallegos Objections). The objections relating to Counts 4 and 5 in the J. Gallegos Objections are as follows:

> 13. Defendant denies the claims in paragraph 21 that he and Andrew Gallegos were 'the last two individuals' to communicate with A.B. At trial it was revealed that law enforcement failed to request phone records and could not prove who or what phone number had communicated with A.B. Further Joe and Andrew Gallegos were seen at the convenience store in Valencia County at a time that made their participation in the murder at the Bosque impossible. Defendant believes this information should be included in the PS[R] report.

14.    Defendant objects to paragraph 23 with regards to "similar handcuffs, . . . gas can". [sic]  All of those items were ordinary items that were not traced to A.B. murder.

15.    Defendant objects to paragraph 25, there was no testimony at trial to support this assertion and it derives solely from the government's files.

16.    Defendant objects to the restitution calculations as contained in paragraph 29.  These figures should be offset by funds "the girlfriend" and insurance received from State or Federal sources.

17.    Defendant objects to the adjustment under paragraph 37 for Obstruction of Justice.  There are no facts to support the adjustment.  However, an investigation must be underway when the conduct is committed or knowledge that it is "probably" underway.  *See U.S. v. Baggett*, 342 F.3d 536 (6th Cir. 2003)(rejecting increase where defendant threatened his wife as he was beating her up, before the investigation commenced, but upholding increase based on later threats).  There was no investigation until the fire was spotted and accordingly the adjustment does not apply to the conflagration.

J. Gallegos Objections ¶¶ 13-17, at 3-4.

**9.      The A. Gallegos Sentencing Memorandum.**

In addition to filing the A. Gallegos Objections, A. Gallegos filed a Sentencing Memorandum "requesting a sentence of 15 years, or alternatively, a sentence which would allow the possibility of parole."  A. Gallegos Sentencing Memo. at 1.  A. Gallegos asserts that he "agrees with [the] probation computation" in the A. Gallegos PSR.  A. Gallegos Sentencing Memo. at 2.  A. Gallegos notes that, if he receives a sentence of fifteen years, he "will be approximately 58 years old when [he is] eligible for parole."  A. Gallegos Sentencing Memo. at 3.  A. Gallegos maintains that, before his arrest in this case, he had "finally gotten clean and sober from heroin and other addictive drugs," and that he had given "his life to Christ."  A. Gallegos Sentencing Memo. at 3.  A. Gallegos also asserts that, because he was trying to "'clean up' his life," he "surrendered himself to authorities to do his time on an outstanding warrant and to be free of his

past transgressions." A. Gallegos Sentencing Memo. at 3. After serving most of his sentence for an earlier offense, A. Gallegos states that he was taken to the FBI office where he met with Acee, whom A. Gallegos told he knew nothing about the Burns murder. See A. Gallegos Sentencing Memo. at 3. A. Gallegos asserts that he was indicted for the Burns murder a few weeks later -- "only 3 months prior to his release on his other charges." A. Gallegos Sentencing Memo. at 3.

A. Gallegos argues that, because United States v. Booker, 543 U.S. 220 (2005), made the Guidelines "advisory instead of mandatory," A. Gallegos Sentencing Memo. at 4, the Court should give him a sentence that is less than life and that includes the possibility of parole, see A. Gallegos Sentencing Memo. at 5. A. Gallegos contends that a "life sentence, to be spent in isolation, is much worse than an actual death sentence, as it is mentally torturing, psychologically damaging[,] and void of any human intimate contact." A. Gallegos Sentencing Memo. at 5. Moreover, A. Gallegos requests that the Court "permit the possibility of parole so that the [sic] can have the hope that things will get better in the future." A. Gallegos Sentencing Memo. at 5.

A. Gallegos next argues that the "sentencing courts are free to simply disagree with the Guidelines' recommended sentence" and may instead give sentences in accordance with the factors that 18 U.S.C. § 3553(a) outlines. A. Gallegos Sentencing Memo. at 5-6 (citing Rita v. United States, 551 U.S. 338 (2007)). According to A. Gallegos, the Guidelines are "'simply one factor'" among "several co-equal factors set forth in [§] 3553(a)." A. Gallegos Sentencing Memo. at 6 (quoting United States v. Colon, 474 F.3d 95, 100 (3d Cir. 2007)). A. Gallegos requests that the Court give him a "minimal sentence with the possibility of parole," and he discusses United States v. Floyd, 945 F.2d 1096 (9th Cir. 1993), in which the United States Court of Appeals for the Ninth Circuit "affirmed a downward departure from the Guildene [sic] range of 30 years to 17

years because of the defendant['s] abandonment by his parents and lack of guidance as a youth." A. Gallegos Sentencing Memo. at 7.

A. Gallegos provides some information about his personal background and about the offense's circumstances, and he argues that these details warrant a lighter sentence under 18 U.S.C. § 3553(a)'s factors. See A. Gallegos Sentencing Memo. at 8-19. First, A. Gallegos maintains that he has had an "extremely difficult life," having been abandoned by his father and raised by a mother who "was gone a lot and always busy." A. Gallegos Sentencing Memo. at 8. According to A. Gallegos, his two sisters are dead, and all of his brothers except for one are currently incarcerated. See A. Gallegos Sentencing Memo. at 8. A. Gallegos states that alcohol and drug use were commonplace in his home as a child, and that he "began drinking alcohol at age 6, when his mother would have parties at their home and the alcohol was free flowing." A. Gallegos Sentencing Memo. at 8. Moreover, A. Gallegos contends that he witnessed a lot of violence as a child, such as when A. Gallegos was in kindergarten or first grade, and "his mother's boyfriend stabbed a man who expressed interest in his mother." A. Gallegos Sentencing Memo. at 9. A. Gallegos explains that, by the time he was fourteen, his brothers were involved with gangs and his mother no longer lived with him. See A. Gallegos Sentencing Memo. at 9. A. Gallegos contends that, when he was a teenager, he "was shot in a drive by shooting" in which "the bullet just 'grazed' his chest," leaving a scar. A. Gallegos Sentencing Memo. at 9-10. A. Gallegos recalls often being hungry as a child, which led him to steal food at the grocery store. See A. Gallegos Sentencing Memo. at 10. A. Gallegos states that he did not graduate from high school, but that he knows how to read and write. See A. Gallegos Sentencing Memo. at 10. A. Gallegos asserts that he enjoys reading the Bible daily and that, when he was out of custody, he "had dreams of becoming a pastor." A. Gallegos Sentencing Memo. at 10.

A. Gallegos recounts that he had a "lack of guidance" growing up and that the Court should consider this circumstance when determining his sentence. A. Gallegos Sentencing Memo. at 12-13. A. Gallegos states that he "'smoked weed' and drank beers with his uncles as young as 6 years old," and that his uncles sometimes took him to bars to drink beer. A. Gallegos Sentencing Memo. at 13. A. Gallegos contends that, although his father was mostly absent, his father taught him how to "cook cocaine." A. Gallegos Sentencing Memo. at 13. A. Gallegos remembers that he sometimes slept in abandoned homes to "get away from his situation." A. Gallegos Sentencing Memo. at 13. A. Gallegos argues that "perhaps" his abuse and neglect "made hi[m] particularly susceptible to negative influences and poor choices." A. Gallegos Sentencing Memo. at 14. Furthermore, A. Gallegos argues that, "[a]lthough U.S.S.G. § 5H[1.2] indicates that lack of guidance as a youth is generally not relevant in determining whether a departure is warranted," after United States v. Booker, "lack of guidance as a youth is relevant as a factor for this Court to consider for arriving at a sentence under the factors of 18 U.S.C. § 3553(a)." A. Gallegos Sentencing Memo. at 13. Moreover, A. Gallegos cites 18 U.S.C. § 3661, which states that "'[n]o *limitation* shall be placed on the information concerning the background, character and conduct of a [person convicted] which a Court of the United States may receive and consider for the purpose of imposing an appropriate sentence.'" A. Gallegos Sentencing Memo. at 14 (quoting 18 U.S.C. § 3661)(emphasis added by A. Gallegos Sentencing Memo.). A. Gallegos argues that § 3661 "overrides the now-advisory-policy statements in Part H of the Sentencing Guidelines," which, A. Gallegos contends, state that "factors such as the Defendant's mental and emotional conditions, drug or alcohol dependence and lack of guidance as a youth" were "'not ordinarily relevant.'" A. Gallegos Sentencing Memo. at 14 (citing U.S.S.G. § 5H1).

A. Gallegos next argues that it is important for the Court to consider his history of "domestic psychological abuse at the hands of adults" when determining his sentence. A. Gallegos Sentencing Memo. at 11-12 (citing Penny v. Lynaugh, 492 U.S. 302, 319 (1989); United States v. Whitetail, 956 F.2d 857 (8th Cir. 1992); United States v. Lopez, 938 F.2d 1293, 1298 (D.C. Cir. 1991); United States v. Apple, 915 F.2d 899, 903 n.12 (4th Cir. 1990); United States v. Deigert, 916 F.2d 916, 918-19 (4th Cir. 1990); United States v. Gaviria, 804 F. Supp. 476 (E.D.N.Y. 1992)). A. Gallegos maintains that the "severe exposure to abuse [that he] endured as a child [] is very difficult for him to vocalize," but he recalls witnessing his mother using drugs and enduring physical abuse. A. Gallegos Sentencing Memo. at 12. A. Gallegos remembers his mother sometimes "having black eyes and looking battered." A. Gallegos Sentencing Memo. at 15. Moreover, he contends that his father used cocaine, was an "alcoholic," and encouraged him to use drugs and alcohol. A. Gallegos Sentencing Memo. at 12. A. Gallegos argues that the Court "may consider the psychological abuse and neglect [he] endured as a child as a basis for imposing a sentence with the possibility of parole." A. Gallegos Sentencing Memo. at 12. See id. at 15 ("[C]ourts have specifically embraced and approved childhood abuse as an appropriate ground for a sentencing departure." (citing United States v. Browning, 252 F.3d 1153 (10th Cir. 2001)). A. Gallegos cites U.S.S.G. § 5K2.0, which he argues "provides the Court with the discretion to depart from the applicable sentencing range if 'there exists a[] . . . mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing formulating the guidelines [and] that should result in a sentence different from that described.'" A. Gallegos Sentencing Memo. at 15 (quoting U.S.S.G. § 5K2.0(b)(2)-(3)). Moreover, A. Gallegos argues that "mental and emotional conditions 'may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics,

are present to an unusual degree and distinguish the case from the typical case[s] covered by the guidelines.'"  A. Gallegos Sentencing Memo. at 15-16 (quoting U.S.S.G. § 5H1.3).  A. Gallegos cites and discusses several cases in which courts departed from the Guidelines because the defendant suffered an abusive childhood, such as United States v. Nowicki, 252 F. Supp. 2d 1242 (D.N.M. 2003)(Vázquez, J.).  A. Gallegos states that, in United States v. Nowicki, the Honorable Martha Vázquez, United States District Judge for United States District Court for the District of New Mexico, granted a 5-level downward departure because the defendant "'suffered extreme childhood abuse . . . [which] caused mental and emotional conditions that contributed to his commission of the instant offense.'"  A. Gallegos Sentencing Memo. at 17 (quoting United States v. Nowicki, 252 F. Supp. 2d at 1250).

A. Gallegos also contends that his "severe drug addiction . . . is now a part of his history and not a part of who he is today."  A. Gallegos Sentencing Memo. at 17.  A. Gallegos explains that he "clean[ed] up his life" by converting to Christianity, "put[ting] his criminal life in the past," and turning himself into custody, with plans of becoming a pastor and helping others suffering from drug addiction upon release.  A. Gallegos Sentencing Memo. at 17.  A. Gallegos acknowledges that "[t]he Guidelines discourage reliance on a defendant's history of drug addiction, [but] since Booker, a court may depart or vary because of the defendant's use of addictive drugs or alcohol."  A. Gallegos Sentencing Memo. at 17 (citing U.S.S.G. § 5H1.4; Gall v. United States, 552 U.S. 38. 59-60 (2007)).  Nevertheless, A. Gallegos maintains that "his addiction to heroin was relevant to assessing his history and characteristics under 18 U.S.C. § 3553, subdivision (a)(1)[,] because he is now drug and alcohol free."  A. Gallegos Sentencing Memo. at 17.  A. Gallegos asks that the Court give him a sentence with the possibility of parole so that he is "not [] punished more than necessary."  A. Gallegos Sentencing Memo. at 18.

Next, A. Gallegos argues that, although he maintains his innocence, the evidence surrounding the nature and circumstances of the offense reveal that his role in Burns' murder was "de minimis." A. Gallegos Sentencing Memo. at 11. A. Gallegos states that there was no evidence of the following: that he was a "leader or instigator in the murder"; that he had a motive to murder Burns; that he initiated any drug deals; that he handed out heroin the evening of the murder; that he bragged about his involvement in Burns' murder; that he owned a gun or possessed "gas accelerant" on the day of the murder; that anyone disrespected him; or that he "knew about [Burns'] disrespect of his brother." A. Gallegos Sentencing Memo. at 10-11. A. Gallegos further asserts that "[t]he only witness that accused [him] of discussing the murder was a paid F.B.I. informant who testified [] years later," and that the paid informant "got the facts of the murder wrong" and "was lying." A. Gallegos Sentencing Memo. at 10. Furthermore, A. Gallegos argues that, while "[t]he evidence showed [him] at the Allsup[']s within minutes of the burning at the bosque," traveling between the bosque and Allsup's in such a short span of time was "a physical impossibility." A. Gallegos Sentencing Memo. at 11. According to A. Gallegos, he feels "simply being a 'Gallegos' has been harmful to him," and that being tried with his brother hurt his defense. A. Gallegos Sentencing Memo. at 11.

Finally, A. Gallegos argues that a life sentence without parole would be "contrary" to the Eighth and Fourteenth Amendments to the Constitution of the United States of America. A. Gallegos Sentencing Memo. at 18. According to A. Gallegos, he may be confined in a small cell or subjected to solitary confinement with "limited access to fresh air and sunlight." A. Gallegos Sentencing Memo. at 18. A. Gallegos contends that his human contact will be limited to "talking through ventilation vents," and that, in prison, he will live in constant fear of "violence, assault, sexual abuse, and rape." A. Gallegos Sentencing Memo. at 18. A. Gallegos asserts that

such punishment, "coupled with [his] suicidal thoughts and hopelessness are not the conditions in which a man, who still proclaims his innocence, should spend the remainder of his life." A. Gallegos Sentencing Memo. at 18.

        **10.     The A. Gallegos First Addendum.**

The USPO responds to the A. Gallegos Objections.  See Addendum to the Presentence Report, filed May 3, 2019 (Doc. 2630)("A. Gallegos First Addendum").  As to A. Gallegos' denial that his nickname is "Homeboy," the USPO responds that "[t]he nickname 'Homeboy' is derived from records with the National Crime Information Center," and that these records were "provided by law enforcement through previous contact with the defendant."  A. Gallegos First Addendum at 2.  The USPO thus asserts that the nickname "Homeboy" will remain in the A. Gallegos PSR. A. Gallegos First Addendum at 2.  Regarding A. Gallegos' objections to the A. Gallegos PSR ¶¶ 1-13, at 4-8, the USPO maintains that the information "in these paragraphs provide the Court and all parties with historical information about Syndicato de Nuevo Mexico."  A. Gallegos First Addendum at 2.  The USPO maintains that the information is accurate and that "it was obtained directly from discovery material provided by the United States Attorney's Office."  A. Gallegos First Addendum at 2.  The USPO thus asserts that the paragraphs will remain in the A. Gallegos PSR.  See A. Gallegos First Addendum at 2.  Further, as to the A. Gallegos PSR ¶¶ 15, 19, 20, at 8-9, the USPO again asserts that the information is accurate, "obtained directly from discovery material provided by the United States Attorney's Office," and thus will remain in the A. Gallegos PSR.  A. Gallegos First Addendum at 2.

The USPO states that it will amend the A. Gallegos PSR ¶ 21, at 9, which describes the "Defendant's Version" of the facts, to include additional information that A. Gallegos provides in

the A. Gallegos Objections.  <u>See</u> A. Gallegos First Addendum at 2.  The following information

will be included in the paragraph:

> Mr. Gallegos says much of his problems are due to the fact that his brothers
> are known gang members, specifically, known SNM gang members.  Because of
> their associations, being a "Gallegos" has labeled him in the police['s] eyes.  Mr.
> Andrew Gallegos admits he was an East Side Loco when he was young, but he says
> it was more of doing stupid things as a teen.  He denies gang activity as an adult.
> Andrew Gallegos says he never knew his father, and was essentially raised by his
> older brother Joe Gallegos, as such lots of people associate, he and Joe as "very
> tight."

A. Gallegos First Addendum at 2.  As to A. Gallegos' objection to paying restitution, the USPO

asserts that "[t]he defendant was found guilty of Violent Crimes in Aid of Racketeering

(Conspiracy to Murder) and (Murder); therefore, the Mandatory Victim Restitution Act of 1996

applies to these offenses."  A. Gallegos First Addendum at 2.  Last, as to A. Gallegos' adoption of

all of J. Gallegos' objections, the USPO states that it has no response, because A. Gallegos "does

not provide any justification[] specific[] to his case."  A. Gallegos First Addendum at 2.

### 11.      The United States' A. Gallegos Response.

The United States responds to the A. Gallegos Objections.  <u>See</u> United States' Response to

Defendant's PSR Objections, filed May 7, 2019 (Doc. 2638)("United States' A. Gallegos

Response").  The United States asserts that "the guideline calculations in the [A. Gallegos PSR]

. . . are correct, as [are] the factual assertions contained therein, and that there are no grounds for

sustaining the defendant's objections."  United States' A. Gallegos Response at 1.  The United

States maintains that it "agrees with the probation office's reasons for including the nickname

['Homeboy'] in the PSR."  United States' A. Gallegos Response at 2.  Next, the United States

contends that the information in the A. Gallegos PSR ¶¶ 1-13, at 4-8, is "relevant because it

describes the actions of the defendant's gang."  United States' A. Gallegos Response at 1.

Moreover, the United States asserts that information about SNM is relevant because the "United States had to prove the existence of the enterprise . . . and the defendant's membership or relation to [SNM]." United States' A. Gallegos Response at 1-2.

As to the A. Gallegos PSR ¶ 15, at 8, the United States contends that the "statement is accurate; however, it is more accurate to say that the Gallegos brothers were seen at the Allsup's convenience store within approximately 30 minutes of the time the fire was reported in the bosque." United States' A. Gallegos Response at 2. The United States further notes that Burns' body was found in the bosque, that A. Gallegos and J. Gallegos were seen at the Allsup's by Michael Sutton and Leroy Vallejos, and that, at the Allsup's, one of the Gallegos brothers "handed out heroin that was packaged in the same manner that Adrian Burns packaged his drugs." United States' A. Gallegos Response at 2. As to the A. Gallegos PSR ¶¶ 19-20, at 9, the United States asserts that "[a]t least one witness identified [A. Gallegos] as an SNM member." United States' A. Gallegos Response at 2. Moreover, the United States maintains that "'when, where[,] or how Andrew Gallegos became an SNM gang member'" is "irrelevant," United States' A. Gallegos Response at 2 (quoting A. Gallegos Objections ¶ 4, at 2), and that "Billy Cordova testified that [A. Gallegos] is an SNM member," United States' A. Gallegos Response at 2 (citing Transcript of Excepted Testimony of Billy Cordova at 44:11-14 (taken May 9-10, 2018)(Castellano, Cordova), filed May 23, 2018 (Doc. 2312)("Cordova Tr."); id. at 62:24-63:2 (Castellano, Cordova)).

The United States also asserts that it agrees with the USPO that A. Gallegos is required to pay restitution. See United States' A. Gallegos Response at 2. The United States contends that A. Gallegos "admitted" to B. Cordova that A. Gallegos and J. Gallegos "'shot him, bound him, and burned him up.'" Cordova Tr. 58:5-10 (Castellano, Cordova). Last, the United States argues that it need not respond to A. Gallegos' incorporation of J. Gallegos' objections, because

A. Gallegos "did not provide any justification specific to his case for the generalized objection." United States' A. Gallegos Response at 3.

12.      **The A. Gallegos Second Addendum.**

The USPO filed the Second Addendum on May 9, 2019.  <u>See</u> Second Addendum to the Presentence Report, filed May 9, 2019 (Doc. 2642)("A. Gallegos Second Addendum").  The USPO maintains that the United States "asserts the guideline calculations are correct, as well as the factual assertions contained therein, and there are no grounds for sustaining the defendant's objections."  A. Gallegos Second Addendum at 1.  The USPO also notes that A. Gallegos "agrees with the United States Probation Office computations and requests a sentence of 15 years imprisonment based on 18 U.S.C. § 3553 factors."  A. Gallegos Second Addendum at 1.  Last, the USPO states that, "[b]ased on the factors identified in Part E, and in consideration of 18 U.S.C. § 3553(a)(1)-(7) noted in Part F of the A. Gallegos PSR, a sentence within the advisory guideline range may be warranted in this case."  A. Gallegos Second Addendum at 1.

13.      **The A. Gallegos Third Addendum.**

The USPO filed the Third Addendum on May 9, 2019.  <u>See</u> Third Addendum to the Presentence Report, filed May 9, 2019 (Doc. 2645)("A. Gallegos Third Addendum").  The USPO provides additional information "[f]or clarification purposes regarding the application of the Mandatory Victim Restitution Act of 1996 in this case."  A. Gallegos Third Addendum at 1.  The USPO maintains that A. Gallegos was found guilty of Count 5 and that the "underlying offense of the racketeering activity is . . . murder."  A. Gallegos Third Addendum at 1.  The USPO quotes 18 U.S.C. § 3663A(a)(1), which requires courts to order defendants to make restitution to the victims of certain offenses, such as "a crime of violence," and the USPO argues that the statute applies in this case.  A. Gallegos Third Addendum at 1 (quoting 18 U.S.C. § 3663A(a)(1)).  The USPO

further states the statutory definition of the term "'crime of violence,'" which is "'(a) an offense that has [as] an element the use, attempted use, or threatened use of physical force against the person or property of another, or (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.'"  A. Gallegos Third Addendum at 1 (quoting 18 U.S.C. § 16).

14.     **The May 10, 2019, Hearing.**

The Court sentenced A. Gallegos on May 10, 2019.  See May 10 Tr. at 39:13-19 (Court). The Court began by inquiring whether A. Gallegos had reviewed the A. Gallegos PSR, the A. Gallegos First Addendum, the A. Gallegos Second Addendum, and the A. Gallegos Third Addendum, and A. Gallegos answered affirmatively.  See May 10 Tr. at 3:2-5 (Court, Torraco). The Court then asked for the United States' position on A. Gallegos' sentence.  See May 10 Tr. at 3:20-22 (Court).  The United States noted that the A. Gallegos PSR's cover page "accurately reflects that the sentence for conviction for the murder is life imprisonment or death."  May 10 Tr. at 4:7-8 (Castellano).  The United States asserted, however, that the A. Gallegos PSR ¶ 98, at 25, "refers to Count 5 [and] says the maximum term of imprisonment is life."  May 10 Tr. at 4:10-11 (Castellano).  The United States asserted that the word "maximum" should be removed from the A. Gallegos PSR ¶ 98, at 25.  May 10 Tr. at 4:13 (Castellano).  The United States argued that, under 18 U.S.C. § 1959(a)(1), the Court must impose a life sentence for murder.  See May 10 Tr. at 4:14-5:1 (Castellano).  The Court noted that the A. Gallegos PSR's cover page is correct that the sentence "has to be life imprisonment or death."  May 10 Tr. at 5:3 (Court).  The Court inquired whether the probation officer agreed that the word "maximum" should be removed from the

A. Gallegos PSR ¶ 98, at 25, and the probation officer responded affirmatively. May 10 Tr. at 5:14-19 (Court, Cordova).

A. Gallegos disagreed that the Court must impose a life sentence. See May 10 Tr. at 5:21 (Torraco). A. Gallegos argued that, after United States v. Booker, the Court "now has discretion to make deviations [when] sentencing." May 10 Tr. at 5:23-24 (Torraco). The Court stated that it understood the required sentence of death or life imprisonment to come not from the Guidelines, but rather from a statute, and the Court confirmed with the United States and with the probation officer that the requirement is statutory. See May 10 Tr. at 5:25-6:9 (Court, Castellano, Cordova). The Court then stated that it can deviate from the Guidelines, but that the Court does not "have a lot of options" when the sentence requirement comes from a statute. May 10 Tr. at 6:12 (Court). A. Gallegos asked the Court whether there is a possibility of parole to which A. Gallegos may argue he is entitled. See May 10 Tr. at 6:19-23 (Torraco). The Court informed A. Gallegos that the federal system does not have parole, but instead has supervised release; however, if a defendant is sentenced to life imprisonment, then supervised release is less applicable to the defendant's sentence. See May 10 Tr. at 6:25-7:5 (Court). The Court noted that supervised release may be imposed for Count 4, and the Court asked the probation officer whether there is any reason to impose supervised release for both Counts 4 and 5. See May 10 Tr. at 7:5-8 (Court). The probation officer responded that supervised release must be imposed for both counts because A. Gallegos may appeal his sentence. See May 10 Tr. at 7:9-15 (Cordova). The Court confirmed with the probation officer that the mandatory minimum supervised release period for Count 5 is five years. See May 10 Tr. at 7:18-8:2 (Court, Cordova).

Next, the Court turned to the A. Gallegos Objections, the United States' A. Gallegos Response, and the USPO's three addenda, and it asked A. Gallegos whether he still would like to

pursue any of J. Gallegos' objections, which A. Gallegos had incorporated into his objections. See May 10 Tr. at 8:13-15 (Court). A. Gallegos responded that his incorporation of J. Gallegos' objections "have been preserved and we need no oral argument on that." May 10 Tr. at 8:16-17 (Torraco). The Court then overruled the objections. See May 10 Tr. at 8:18-19 (Court).

The Court then turned to the requests that A. Gallegos pay restitution. See May 10 Tr. at 8:23-25 (Court). The Court first recounted that Burns' girlfriend, A. Sutton, submitted a request for restitution, including $21,000.00 for her 2012 Mitsubishi, $7,200.00 for lost income or wages, calculated from $15.00 per hour at forty hours per week, and $280.00 for transportation costs, for a total of $28,480.00. See May 10 Tr. at 9:8-13 (Court). The Court also noted that A. Gallegos "states that he does not believe he owes restitution as he did not set the vehicle on fire and there was no trial evidence [that] he [incinerated] the Mitsubishi." May 10 Tr. at 9:13-16 (Court). Moreover, the Court stated the USPO's position, which is that A. Gallegos was found guilty of violent crimes in aid of racketeering and that the MVRA applies, and the Court noted that the United States agrees with the USPO. See May 10 Tr. at 9:17-21 (Court). The Court next acknowledged that the MVRA "applies in all sentencing proceedings for convictions of any offense that is a crime of violence as defined in § 16 in which an identifiable victim or victims may have suffered a physical injury or pecuniary loss." May 10 Tr. at 10:10-14 (Court). The Court stated that it agrees with the USPO that the MVRA applies in the case, but the Court questioned whether A. Sutton, as the girlfriend of the murder victim, "is properly considered [] a victim of the offense such that she may receive restitution under the MVRA" for the destruction of her car, lost income or wages, and transportation costs. May 10 Tr. at 11:9-11 (Court).

The Court stated its opinion that A. Sutton is not properly considered a victim of Burns' murder under the MVRA. See May 10 Tr. at 11:12-15 (Court). The Court stated that, because the

burning of the car was separate from the act of murdering Burns, A. Sutton's loss of her car "is not the direct and approximate result of the commission of the murder." May 10 Tr. at 12:6-8 (Court). In addition, the Court stated that, because Burns' murder did not result in bodily injury to A. Sutton, A. Sutton likely is not entitled to lost income or wages under the MVRA. See May 10 Tr. 13:24-14:17 (Court). The Court concluded that it is "inclined not to order restitution," but that it would listen to what the United States has to say. May 10 Tr. at 14:17-24 (Court).

The Court next turned to the issue of obstruction of justice under U.S.S.G. § 3C1.1. See May 10 Tr. 15:6-13 (Court). The Court noted that A. Gallegos asserts that burning Burns' body in the car cannot be the basis of a § 3C1.1 enhancement and that A. Gallegos relies on United States v. Baggett "for the proposition that obstructive conduct must occur during the investigation." May 10 Tr. at 15:14-16 (Court, Torraco). The Court noted, however, that United States v. Baggett applies to an earlier version of § 3C1.1, and that the 2006 version of § 3C1.1 "states only that obstructive conduct must be with respect [to the] investigation, prosecution, or sentencing of the instant offense of conviction" and that the Guidelines now apply to obstructive conduct that occurs before investigation. May 10 Tr. at 15:19-22 (Court). The Court then stated its opinion that burning the car and Burns' body "squarely [falls], I think, within the . . . the Guidelines commentary provision [for] destroying or concealing evidence that is material to an official investigation or judicial proceeding." May 10 Tr. at 16:5-9 (Court). The Court concluded that it would overrule A. Gallegos' objection to the obstruction of evidence enhancement under § 3C1.1, but that it was inclined not to award restitution. See May 10 Tr. 16:13-17 (Court).

The United States responded that the Mitsubishi was "burned as part of [the] offense conduct," and that, because of the burning, officials could not obtain fingerprints or other forensic evidence. May 10 Tr. at 17:1-2 (Castellano). The United States argued, therefore, that the vehicle

was "sufficiently close and related to the crime" such that the vehicle's destruction should warrant a payment of restitution to A. Sutton. May 10 Tr. at 17:7 (Castellano). The United States contended that, although its theory is that a gunshot killed Burns before he was burned in the car, "the burning of the body afterwards to impede the administration of justice is very close in time to the actual [homicide]." May 10 Tr. at 17:19-21 (Catellano). The Court then stated that it would sustain A. Gallegos' objection to restitution and that it would provide an opinion. See May 10 Tr. at 18:11-14 (Court). Furthermore, the Court summarized the current status of the sentencing hearing, stating that the offense level is 43, the criminal history category is 6, the Guidelines imprisonment range is 120 months as to Count 4, and the Guidelines imprisonment range is life as to Count 5. See May 10 Tr. 18:15-20 (Court).

The Court asked A. Gallegos whether he would like to pursue any requests for a downward departure, to which A. Gallegos responded affirmatively and approached the podium. See May 10 Tr 18:20-24 (Court, Torraco). A. Gallegos requested that the Court give him fourteen days "to do some legal research and see if I can form a Booker argument that the Court is not bound by the maximum life sentence, and that indeed the Court may deviate." May 10 Tr. at 19:12-15 (Torraco). The Court responded that it understands A. Gallegos to be asking for a continuance of the sentencing hearing and stressed that, once the Court gives a sentence, "we're all stuck with it." May 10 Tr. at 20:10 (Court).

A. Gallegos' counsel then approached the bench for a bench conference, and she stated that she did not want to pursue her requests for a downward departure because she realized that the Court must give a life sentence. See May 10 Tr. at 18:21-19:6 (Court, Torraco). The Court stated to her that the Defendants in the other cases were "not quibbling over" the life sentence for Count 5. May 10 Tr. at 21:3 (Court). The Court explained that it is "stuck with" giving a life

sentence because of Congress and the mandatory statutory sentence.  May 10 Tr. at 21:5-20

(Court).  A. Gallegos' counsel agreed that the Court should go ahead with sentencing, and

A. Gallegos' counsel also stated that she felt "obligated" to argue an ineffective assistance of

counsel argument.  May 10 Tr. at 22:3-9 (Torraco).  The Court stated that it was not in "[her]

interest or [A. Gallegos'] interest [] to start talking about ineffective assistance . . . in the middle

of [her] work for [A. Gallegos]."  May 10 Tr. at 22:18-21 (Court).  The Court also stated that the

Tenth Circuit does not "entertain ineffective assistance claims on a direct appeal."  May 10

Tr. at 22:22-24 (Court).  The Court stressed to A. Gallegos' counsel that the Court was "not telling

[her] how to" proceed, but that "there will be a time for [arguing ineffective assistance of counsel],

and it's not now."  May 10 Tr. at 23:7-10 (Court).  The Court and A. Gallegos' counsel then agreed

to proceed with sentencing and stepped down from the bench.  See May 10 Tr. at 23:24-24:7

(Court, Torraco).

The Court then concluded that it had reviewed carefully A. Gallegos' requests for a

downward departure and that it would deny those requests.  See May 10 Tr. at 24:8-11 (Court).

The Court explained that it was "having trouble squaring much of the request for downward

departure with" all the things it knows about A. Gallegos, such as that he is "an intelligent person,"

that he has a criminal history, and that he has had a difficult life, but the Court concluded that these

factors did not warrant a downward departure.  May 10 Tr. at 24:11-21 (Court).  The Court noted

that prisons are filled with people, like A. Gallegos, who have had a difficult life of drug addiction,

so it is difficult to distinguish A. Gallegos' case from others.  See May 10 Tr. at 25:1-5 (Court).

A. Gallegos next extended his "condolences to [Burns'] family."  May 10 Tr. at 26:9 (Torraco).

A. Gallegos also asked the Court "[i]f there is anyway that this Court can give [him] hope that

perhaps one day he will get out" of prison, and A. Gallegos requested that his 120-month sentence

for Count 4 run concurrent to his life sentence for Count 5 so "that he doesn't have life plus 120 months." May 10 Tr. at 27:18-28:2 (Torraco). A. Gallegos concluded by thanking the United States and the Court. See May 10 Tr. at 28:15-16 (Torraco).

The Court then requested A. Gallegos' counsel to approach the bench before giving A. Gallegos an opportunity to speak. See May 10 Tr. at 29:5-7 (Court). The Court told A. Gallegos' counsel that it had a "high regard for [her] legal abilities." May 10 Tr. at 29:15 (Court). The Court commended A. Gallegos' counsel for providing A. Gallegos with effective representation throughout the trial. See May 10 Tr. at 29:21-30:14 (Court). The Court then gave A. Gallegos an opportunity to speak to the courtroom. See May 10 Tr. at 31:11-14 (Court). A. Gallegos said to Burns' family:

> I would like to say I'm sorry [for your] loss, and regardless whatever you guys believe[,] [Burns] was my friend and I did not do it to him. And so I pray that you guys will have some comfort in the Lord as I do and God bless you guys and I'll keep you in my prayers.

May 10 Tr. at 31:17-22 (A. Gallegos).

The United States then stated that it agreed that the sentences for Counts 4 and 5 would probably run concurrently. See May 10 Tr. at 32:22-23 (Court). The United States gave Burns' next of kin an opportunity to address the Court. See May 10 Tr. at 32:25-33:1 (Court). First, Burns' mother spoke about the murder's emotional impact on her and her family, and she stated that she forgave A. Gallegos so that she could "move on." May 10 Tr. at 33:18-35:9 (Burns). Next, A. Sutton -- sometimes identified as A.S. -- spoke directly to A. Gallegos about how her children would grow up without a father. See May 10 Tr. at 35:13-36:2 (A. Sutton).

The Court next stated that it adopted the A. Gallegos PSR's factual findings and that the only change to the A. Gallegos PSR was the deletion of the word "maximum" in the A. Gallegos

PSR ¶ 98, at 25, which the Court further adopted.  See May 10 Tr. at 36:13-18 (Court).  The Court also reiterated that the offense level is 43, the criminal history category is 6, the Guidelines imprisonment range is 120 months as to Count 4, and the Guidelines imprisonment range is, pursuant to U.S.S.G. § 5G1.1, life as to Count 5.  See May 10 Tr. at 36:21-37:1 (Court).  The Court concluded that there is sufficient evidence to show that A. Gallegos was a member of SNM, even though A. Gallegos disputed that fact.  See May 10 Tr. at 37:1-5 (Court).  Furthermore, even if A. Gallegos is not an SNM member, the Court concluded that A. Gallegos "conspired to and did commit various crimes that were indicted under the Racketeering Influence and Corrupt Organizations [] Act."  May 10 Tr. at 37:7-9 (Court).  The Court further concluded that A. Gallegos, along with J. Gallegos, conspired to and did murder Burns, and then set fire to Burns and his vehicle "in an attempt to impede the criminal investigation."  May 10 Tr. at 37:14-15 (Court).

In arriving at its sentence, the Court stated that it considered the Guidelines and other sentencing goals as to Count 4, and that the Court was bound by Congress to give a life sentence as to Count 5.  See May 10 Tr. at 37:22-38:4 (Court).  As to Count 4, the Court concluded that a downward departure is not warranted under the circumstances.  See May 10 Tr. at 38:9-12 (Court).  The Court stated that it agreed with the United States and with the USPO that a 120-month sentence was appropriate for Count 4.  See May 10 Tr. at 39:12-19 (Court).  The Court further explained that a 120-month sentence "reflects the seriousness of the offense, promotes respect for the law, provides just punishment, affords adequate deterrence both at a specific and general level[,] [and] [p]rotects the public."  May 10 Tr. at 39:19-22 (Court).  The Court further stated that this sentence "fully and effectively reflects each of the factors embodied in" 18 U.S.C. § 3553(a).  May 10 Tr. at 39:5-7 (Court).

The Court then sentenced A. Gallegos to a 120-month imprisonment for Count 4 and life imprisonment for Count 5, with the two terms running "concurrently for a total term of life." May 10 Tr. at 39:13-19 (Court). Furthermore, the Court stated that A. Gallegos is placed on supervised release for a term of three years as to Count 4, for a term of five years as to Count 5, and that the two "terms will run concurrently for a total term of five years." May 10 Tr. at 39:20-25 (Court). The Court then stated the conditions of supervised released, which first includes submitting to a search of his person, property residence, vehicle, papers, computers, and other electronic communications or data storage devices. See May 10 Tr. at 40:3-7 (Court). The Court also stated additional conditions for supervised release: participating in an outpatient substance abuse treatment program; releasing treatment records to probation officers; committing to substance abuse testing; refraining from using or possessing alcohol; refraining from purchasing, possessing, distributing, administering, or otherwise using any psychoactive substances; and refraining from selling or transporting any drug paraphernalia. See May 10 Tr. at 41:6-42:16 (Court). The Court explained that "[t]hese six conditions are imposed based on the . . . characteristics of the defendant who disclosed a long history of drug and alcohol use." May 10 Tr. at 42:16-19 (Court). Furthermore, the Court instructed that A. Gallegos must reside at a residential reentry center for six months as part of his supervised release, because A. Gallegos "does not have [a] permanent residence of his own and would benefit from a structured environment." May 10 Tr. at 43:7-9 (Court). Moreover, A. Gallegos must not communicate or interact with co-Defendants, conspirators, or any known gang members, as this condition will help "deter [A. Gallegos] from entering into [a] new conspiracy with other gang members and [will] protect the public from such criminal schemes." May 10 Tr. at 44:7-9 (Court). Last, the Court instructed A. Gallegos that he must not communicate or interact "with the victim or victims[,]

either directly or through someone else[,] . . . to protect the victim's family." May 10 Tr. at 44:10-17 (Court).

Next, the Court reiterated that it would sustain A. Gallegos' objection to the restitution request, and the Court further stated that it would not impose a fine based on A. Gallegos' "lack of financial resources." May 10 Tr. at 44:21 (Court). A. Gallegos must pay, however, a special assessment of $100 for each count of conviction. See May 10 Tr. at 45:2-8 (Court). The Court then asked the United States and A. Gallegos if they had any objections to the sentence, and A. Gallegos requested to be placed at the prison in Beaumont, Texas. See May 10 Tr. at 45:8-20 (Court, Torraco). The United States did not object to this request, but it noted that A. Gallegos' brother is housed in Beaumont, so A. Gallegos may not be allowed to be housed there. See May 10 Tr. at 46:1-4 (Castellano). The Court stated that it would recommend that A. Gallegos be housed in Beaumont but emphasized that the Bureau of Prisons makes the final decision. See May 10 Tr. at 46:5-12 (Court). A. Gallegos next requested that, if he cannot be placed in Beaumont, he be placed in Lea County, New Mexico, to which the USPO responded that there were three SNM members housed in Lea County. See May 10 Tr. 46:14-24 (Court, Torraco, Cordova). The Court stated that it would not recommend that A. Gallegos be placed at Lea County. See May 10 Tr. 46:25-47:3 (Court). The Court then ordered its sentence to be imposed as it had stated it and instructed A. Gallegos that he may appeal his conviction if he believes that his conviction was somehow unlawful or involuntary, and that any notice of appeal must be filed within fourteen days of the judgment's entry. See May 10 Tr. 47:8-48:3 (Court). A. Gallegos responded that he understood his rights to an appeal. See May 10 Tr. 48:2-4 (Court, A. Gallegos). Last, the Court wished "good luck" to A. Gallegos and to Burns' family. May 10 Tr. 48:18-49:3 (Court, A. Gallegos).

# RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, the Supreme Court of the United States severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory. See United States v. Booker, 543 U.S. at 245. In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a). To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available

sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007). The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349).  A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d at 1264.  This presumption, however, is an appellate presumption, and not one that the trial court

can or should apply.  See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v. United

States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption

of reasonableness "is an *appellate* court presumption" (emphasis in original); United States v.

Conlan, 500 F.3d 1167, 1169-70 (10th Cir. 2007)(stating that "the government rightly concedes

the district court erred in affording a presumption of reasonableness to the recommended advisory

sentence," because "the guideless are presumptively reasonable only at the appellate level").

Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption

in favor of the advisory[6] Guidelines sentence.  See Kimbrough v. United States, 552 U.S. at 90-91;

Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

---

[6]Attorneys and courts often say that the "Guidelines" are advisory, Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker, 543 U.S. 220], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."), but it appears more appropriate to say that the resulting Guidelines ranges are advisory.  The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-*Booker* have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, departing from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole.  The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they

---

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "'in

---

will subsequently depart from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to depart from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.).

a superior position to find facts and judge their import under § 3553(a)' in each particular case."

Kimbrough v. United States, 552 U.S. at 89 (quoting Gall v. United States, 552 U.S. at 51).

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute."  530 U.S. at 481 (emphasis in original).  The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Apprendi v. New Jersey, 530 U.S. at 490.  In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*."  Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2013)).  In United States v. Booker, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime."  United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259).  See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing

rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement." (second alteration added by United States v. Booker)(quoting United States v. Booker, 543 U.S. at 221)). More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine. See United States v. Magallanez, 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines. See United States v. Magallanez, 408 F.3d at 682. The district court's findings increased the defendant's Guidelines sentencing range from sixty-three to seventy-eight months, based on the jury's fifty grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount. See United States v. Magallanez, 408 F.3d at 682-83. On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made the Guidelines ranges "effectively advisory," United

States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before," United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[7] "[T]he application of an enhancement . . . does not implicate the Supreme Court's holding in Apprendi v. New Jersey." United States v. Reyes-Vencomo, No.

---

[7]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level by 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.).  The Tenth

Circuit applies <u>Apprendi v. New Jersey</u>'s requirement that a fact be submitted to a jury only where

the fact would increase a defendant's sentence "above the statutory maximum permitted by the

statute of conviction."  <u>United States v. Price</u>, 400 F.3d 844, 847 (10th Cir. 2005).  <u>Accord</u> <u>United</u>

<u>States v. Ray</u>, 704 F.3d at 1314.  A defendant may assert an error under <u>Apprendi v. New Jersey</u>

only where the fact at issue increased his sentence beyond the statutory maximum.  <u>See</u> <u>United</u>

<u>States v. O'Flanagan</u>, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not

assert an error under <u>Apprendi v. New Jersey</u>, because "his sentence does not exceed the statutory

maximum");  <u>United States v. Hendrickson</u>, 592 F. App'x 699, 705 (10th Cir.

2014)(unpublished)[8](holding that, after <u>Alleyne v. United States</u>, "[i]t is well-established that

sentencing factors need not be charged in an indictment and need only be proved to the sentencing

judge by a preponderance of the evidence").  The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in <u>Alleyne v.</u>
> <u>United States</u> . . . expands the rule from <u>Apprendi v. New Jersey</u>, . . . (holding that
> facts that increase the maximum sentence a defendant faces must be proven to a
> jury beyond a reasonable doubt), to cover facts that increase the mandatory

---

[8]<u>United States v. Hendrickson</u> is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th
Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive
value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to
> unpublished opinions is not favored.  However, if an unpublished opinion . . . has
> persuasive value with respect to a material issue in a case and would assist the court
> in its disposition, we allow a citation to that decision.

<u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
concludes that <u>United States v. Hendrickson</u>, 592 F. App'x 699 (10th Cir. 2014)(unpublished),
<u>United States v. Schmidt</u>, 353 F. App'x 132 (10th Cir. 2009)(unpublished), <u>United States v. Leroy</u>,
298 F. App'x 711 (10th Cir. 2008)(unpublished), <u>United States v. Banda</u>, 168 F. App'x 284 (10th
Cir. 2006)(unpublished), have persuasive value with respect to a material issue, and will assist the
Court in its disposition of this Memorandum Opinion and Order.

minimum sentence, as well as the maximum sentence, it does not prohibit district
judges from continuing to find advisory sentencing factors by a preponderance of
the evidence. See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL
4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.). The

Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the

legally prescribed penalty.' [] And under our Constitution, when 'a finding of fact alters the legally

prescribed punishment so as to aggravate it[,]' that finding must be made by a jury of the

defendant's peers beyond a reasonable doubt." United States v. Haymond, 139 S. Ct. 2369, 2378

(2019)(quoting Alleyne v. United States, 570 U.S. at 112-14). Further, the Tenth Circuit has

determined that a district court could use its own finding on drug quantity to enhance a defendant's

Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its

own drug quantity finding to alter the defendant's *statutory* sentencing range." United States v.

Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

### LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of

conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning

is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 Application Note 1(I). In

United States v. Booker, the Supreme Court notes:

Congress' basic statutory goal -- a system that diminishes sentencing disparity --
depends for its success upon judicial efforts to determine, and to base punishment
upon, the *real conduct* that underlies the crime of conviction. That determination
is particularly important in the federal system where crimes defined as, for example,
"obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article
or commodity in commerce, by . . . extortion," 18 U.S.C. § 1951(a), . . . can
encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis and alterations in original). The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

(1)     (A)     all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

        (B)     in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were --

        (i)  within the scope of the jointly undertaken criminal activity,

        (ii) in furtherance of that criminal activity, and

        (iii) reasonably foreseeable in connection with that criminal activity;

        that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2)     solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3)     all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4)     any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard.

See United States v. Banda, 168 F. App'x 284, 289 (10th Cir. 2006)(unpublished)(stating that "there is no prohibition on considering hearsay testimony at sentencing, provided it bears indicia of reliability"); United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.), aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge. See 515 U.S. at 404-06. The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991. See Witte v. United States, 515 U.S. at 392-93. In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association only with the defendant's latter attempt to import narcotics. See Witte v. United States, 515 U.S. at 392-93. At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and thus the court calculated the defendant's base offense level

based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See Witte v. United States, 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990.  See Witte v. United States, 515 U.S. at 392-94.  The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See Witte v. United States, 515 U.S. at 395. The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States.  See Witte v. United States, 515 U.S. at 395.  The Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Wittie, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including a Tenth Circuit opinion, that had previously considered this question.  See United States v. Wittie, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See Witte v. United States, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct does not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  Witte v. United States, 515 U.S. at 401.

The Supreme Court reasoned that sentencing courts had always considered relevant conduct and agreed with the United States' argument that "[t]he fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense." Witte v. United States, 515 U.S. at 402 (internal quotation marks omitted)(quoting Brief for the United States at 23, Witte v. United States, 515 U.S. 389 (1995)(No. 94-6187), 1995 WL 130559, at *23). Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." Witte v. United States, 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted. See United States v. Watts, 519 U.S. at 149. The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Court of Appeals for the Ninth Circuit -- and that each Court of Appeals had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, "if the Government establishes that conduct by a preponderance of the evidence." United States v. Watts, 519 U.S. at 149 & n.1 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (internal quotation marks omitted)(quoting 18 U.S.C. § 3661). According to the Supreme

Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts. See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause). In United States v. Banda, the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." United States v. Banda, 168 F. App'x at 290. The Tenth Circuit explained that "[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance [the defendant's] sentence *mandatorily*." United States v. Banda, 168 F. App'x at 290 (alterations added by United States v. Banda, emphasis in United States v. Lauder)(internal quotation marks omitted)(quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant appealed the district court's sentence enhancement for firearms possession after he was convicted of conspiracy to possess with intent to distribute and possession of a controlled substance with intent to distribute, but he was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime. See United States v. Coleman, 947 F.2d at 1426, 1428. The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a

defendant's acquittal on firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(Green, J.)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing the defendant's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) the weapons had been located at the arrest scene for several days; (ii) the weapons were handled at will by individuals who lived at the apartment; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing relevant federal caselaw, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted."  United States v. Coleman, 947 F.2d at 1429.

In United States v. Washington, the defendant argued that the United States needed to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence.  See United States v. Washington, 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, which the court found by a

preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison. See United States v. Washington, 11 F.3d at 1515. The defendant argued "that[,] because the additional drug quantities effectively resulted in a life sentence[,] a higher standard of proof should be required." United States v. Washington, 11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." United States v. Washington, 11 F.3d at 1516. See United States v. Sangiovanni, 2014 WL 4347131, at *22-26 (concluding that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1314-17 (cross-referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court previously has held that it may consider a defendant's refusal to answer questions for the presentence investigation report, while not drawing an adverse inference from the refusal. See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. Feb. 13, 2012)(Browning, J.). The Court also has held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence. See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.). Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may

have attempted to orchestrate while incarcerated" is relevant information which the Court can consider in fashioning a proper sentence. United States v. Romero, No. CR 09-1253, 2012 WL 6632493, at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).

## LAW REGARDING CALCULATING CRIMINAL HISTORY

Section 4A1.1 of the U.S.S.G states, in relevant part: "The total points from items (a) through (f) determine the criminal history category in the Sentencing Table in Chapter Five, Part A." U.S.S.G. § 4A1.1. Subsection (a) states: "Add **3** points for each prior sentence of imprisonment exceeding one year and one month." U.S.S.G. § 4A1.1(a) (bold in original). Application Note 1 to U.S.S.G. § 4A1.1 states:

> Certain prior sentences are not counted or are counted only under certain conditions:
>
> > A sentence imposed more than fifteen years prior to the defendant's commencement of the instant offense is not counted unless the defendant's incarceration extended into this fifteen-year period. *See* § 4A1.2(e).
> >
> > A sentence imposed for an offense committed prior to the defendant's eighteenth birthday is counted under this subsection only if it resulted from an adult conviction. *See* § 4A1.2(d).
> >
> > A sentence for a foreign conviction, a conviction that has been expunged, or an invalid conviction is not counted. *See* § 4A1.2(h) and (j) and the Commentary to § 4A1.2.

U.S.S.G. § 4A1.1 Application Note 1. Subsection (b) to U.S.S.G. § 4A1.1 states: "Add **2** points for each prior sentence of imprisonment of at least sixty days not counted in (a)." (bold in original). There is no limit to the number of points that may be added under either subsection (a) or subsection (b). See U.S.S.G. § 4A1.1 Application Notes 1, 2.

Section 4A1.2(d) handles "offenses committed prior to age eighteen." U.S.S.G. § 4A1.2(d) (title case omitted). It provides that, "[i]f the defendant was convicted as an adult and received a

sentence of imprisonment exceeding one year and one month, add **3** points under § 4A1.1(a) for

each such sentence." U.S.S.G. § 4A1.2(d) (bold in original). Application Note 7 to U.S.S.G.

§ 4A1.2 provides that,

> for offenses committed prior to age eighteen, only those that resulted in adult
> sentences of imprisonment exceeding one year and one month, or resulted in
> imposition of an adult or juvenile sentence or release from confinement on that
> sentence within five years of the defendant's commencement of the instant offense
> are counted.

U.S.S.G. § 4A1.2 Application Note 7.

Section 4A1.2(a)(2), which announces definitions and instructions for computing criminal

history, provides:

> If the defendant has multiple prior sentences, determine whether those
> sentences are counted separately or as a single sentence. Prior sentences always
> are counted separately if the sentences were imposed for offenses that were
> separated by an intervening arrest (*i.e.*, the defendant is arrested for the first offense
> prior to committing the second offense). If there is no intervening arrest, prior
> sentences are counted separately unless (A) the sentences resulted from offenses
> contained in the same charging instrument; or (B) the sentences were imposed on
> the same day. Count any prior sentence covered by (A) or (B) as a single sentence.

U.S.S.G. § 4A1.2(a)(2). According to § 4A1.2(a)(2)'s plain language, if an intervening arrest

separates two sentences, the two sentences are considered separate for the purposes of criminal

history calculation, even if the sentences were imposed at the same hearing. See, e.g., United

States v. Chavez, No. CR 18-0836 JB, 2018 WL 6621283, at *11 (D.N.M. Dec. 18,

2018)(Browning, J.). For the two prior sentences to be considered a single sentence when no

intervening arrest separates the two sentences, one of § 4A1.2(a)(2)'s preconditions must apply,

and the sentences must have either emanated from the same charging instrument or been imposed

on the same day. See U.S.S.G. § 4A1.2(a)(2). "That observation is, accordingly, the end of the

debate for purposes of applying § 4A1.2(a)(2)." United States v. Bhakta, No. CR 16-1090 JB,

2017 WL 4785953, at *9 (D.N.M. Oct. 21, 2017)(Browning, J.).

Section 4A1.1(e) provides: "Add **1** point for each prior sentence resulting from a conviction of a crime of violence that did not receive any points under (a), (b), or (c) above because the sentence was treated as a single sentence, up to a total of **3** points for this subsection."  U.S.S.G. § 4A1.1(e) (bold in original).  Application Note 5 to U.S.S.G. § 4A1.1 provides, in relevant part:

> In a case in which the defendant received two or more prior sentences as a result of convictions for crimes of violence that are treated as a single sentence (*see* § 4A.1.2(a)(2)), one point is added under § 4A1.1(e) for each such sentence that did not result in any additional points under § 4A1.1(a), (b), or (c).  A total of up to 3 points may be added under § 4A1.1(e).

U.S.S.G. § 4A1.1 Application Note 5 (italics in original).

## LAW REGARDING THE OBSTRUCTION-OF-JUSTICE ADJUSTMENT

Under U.S.S.G. § 3C1.1, a defendant's offense level must be enhanced by 2 levels if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S.S.G. § 3C1.1 (bold in original).  See United States v. Fleming, 667 F.3d at 1109 ("Section 3C1.1 expressly applies to attempts by defendants to directly or *indirectly* threaten, intimidate, or influence a potential witness.")(emphasis in original).  The enhancement applies even for attempted obstruction of justice if the United States demonstrates that the defendant intended to obstruct justice and that the defendant committed an act that constitutes a substantial step toward the obstruction of justice.  See United States v. Fleming, 667 F.3d at 1107.  Moreover, a "defendant's offense level is enhanced by two levels for attempted obstruction of justice when the Government demonstrates that the defendant: (1) intended to obstruct justice, and (2) committed an act that constitutes a substantial step toward the obstruction of justice."  United States v.

Fleming, 667 F.3d at 1107 (citing United States v. Washington, 653 F.3d 1251, 1264 (10th Cir. 2011)). "A substantial step must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime. . . . Whether a defendant's actions amount to an attempt, and, in particular, whether his actions qualify as a substantial step, is a highly fact-specific inquiry." United States v. Washington, 653 F.3d at 1264.

## LAW REGARDING THE VULNERABLE-VICTIM ADJUSTMENT

The vulnerable-victim adjustment, U.S.S.G. § 3A1.1(b), provides:

> (b)    (1)    If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels.
>
> (2) If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by **2** additional levels.

U.S.S.G. § 3A1.1(b)(1) (bold in original). Application Note 2 to U.S.S.G. § 3A1.1 explains:

> For purposes of subsection (b), "**vulnerable victim**" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.
>
> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.
>
> Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

U.S.S.G. § 3A1.1 Application Note 2 (bold in original). "In order to classify a victim as

'vulnerable,' 'the sentencing court must make particularized findings of vulnerability.'" United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995)(quoting United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992)). "The focus of the inquiry must be on the 'victim's personal or individual vulnerability.'" United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 835).

"'[V]ulnerable victims' are those who are in need of greater societal protection." United States v. Brunson, 54 F.3d at 676. "Specifically, the enhancement should apply when the victim is 'less able to resist than the typical victim.'" United States v. Scott, 529 F.3d at 1300 (quoting United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001)). "Moreover, the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged." United States v. Smith, 133 F.3d 737, 749 (10th Cir. 1997).

In United States v. Janusz, 135 F.3d 1319 (10th Cir. 1998), the Tenth Circuit held that an enhancement under U.S.S.G. § 3A1.1 was appropriate. See 135 F.3d at 1325. The enhancement was appropriate, because the sentencing court "made specific findings as to the vulnerability of both [of the victims]. [One victim] was bedridden, unable to tend for himself, sick and extremely vulnerable." United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted). The other victim "was confused about many things, very susceptible to suggestion from anyone, including the defendant [and] . . . was extremely trusting in many respects." United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted). The enhancement was also appropriate, because the sentencing court "found a nexus between [the victims]' vulnerability and the commission of the crimes." United States v. Janusz, 135 F.3d at 1325. The Tenth Circuit

commented:

> It would be difficult, indeed, to imagine a stronger nexus. The evidence indicate[d that the defendant] recognized [the victims]' age, wealth, and diminished physical capacity, and believing they would both soon die . . . devised a scheme to separate them from their money by making loans which he would collect for himself after their death.

United States v. Janusz, 135 F.3d at 1325 (citations omitted). The Tenth Circuit provides that the vulnerable-victim adjustment is warranted where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics." United States v. Pearce, 967 F.2d 434, 435 (10th Cir. 1992). The vulnerable-victim adjustment, however, "does not require a finding that the defendant targeted the victim because of the victim's vulnerability." United States v. Checora, 175 F.3d 782, 789 n.4 (10th Cir. 1999). See United States v. Smith, 133 F.3d at 749; United States v. Hardesty, 105 F.3d 558, 560-61 (10th Cir. 1997).

## LAW REGARDING THE PHYSICAL-RESTRAINT ADJUSTMENT

U.S.S.G. § 3A1.3 states that "[i]f a victim was physically restrained in the course of the offense, increase by **2** levels." U.S.S.G. § 3A1.3 (bold in original). "'***Physically restrained***' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1 Application Note 1(L) (bold in original). The examples of physical restraint in Guidelines "are merely illustrative and not exhaustive." United States v. Checora, 175 F.3d at 790 (citing United States v. Roberts, 898 F.2d 1465, 1479 (10th Cir. 1990)). The physical-restraint adjustment applies where "there [is] a forcible restraint of a victim which occurs during commission of the offense." United States v. Checora, 175 F.3d at 790 (footnote omitted). There does not have to be "physical touching of the victim," because "[k]eeping someone from doing something is inherent within the concept of restraint." United States v. Fisher, 132 F.3d 1327, 1329-30 (10th Cir. 1997)(applying § 3A1.3 where a "coconspirator deliberately kept the security guard at bay by

pointing a gun directly at his head").  The Tenth Circuit has held that the physical-restraint adjustment applies when two defendants tackled a victim to the ground to prevent the victim from escaping.  See United States v. Checora, 175 F.3d at 790.  The restraint of the victim need not occur during the offense of conviction, as long as the restraining occurred as part of the relevant conduct.  See United States v. Holbert, 285 F.3d 1257, 1262-63 (10th Cir. 2002)("We hold that, for the purpose of applying § 3A1.3, the defendant must have physically restrained a victim in the course of the offense, and that the course of the offense includes any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct).").

## LAW REGARDING DOWNWARD DEPARTURES

"[T]he Guidelines place essentially no limit on the number of potential factors that may warrant a departure."  Burns v. United States, 501 U.S. 129, 136 (1991), abrogated on other grounds by United States v. Booker, 543 U.S. 220.  See United States v. Coleman, 188 F.3d 354, 358 (6th Cir. 1999)(en banc)(stating that "[t]here are a potentially infinite number of factors which may warrant a departure"); 18 U.S.C. § 3661 (stating that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").  A departure is warranted if the case is "unusual enough for it to fall outside the heartland of cases in the Guideline."  Koon v. United States, 518 U.S. 81, 98 (1996).  Accord United States v. Lewellen, No. CR 11-1524 JB, 2012 WL 2175769, at *5 (D.N.M. June 5, 2012)(Browning, J.).

It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.  We do not understand it to have been the

congressional purpose to withdraw all sentencing discretion from the United States district judge.

Koon v. United States, 518 U.S. at 113.

For example, in United States v. Jim, 877 F. Supp. 2d 1018 (D.N.M. 2012)(Browning, J.), the Court did not grant a defendant's request for a downward departure under U.S.S.G. § 4A1.3(b), where the defendant argued that his criminal history category overrepresented the seriousness of his criminal history and the likelihood that he would commit other crimes. See United States v. Jim, 877 F. Supp. 2d at 1044-45. The Court noted that Jim's criminal history included: "(i) two DWI convictions; (ii) a conviction for Roadway Laned for Traffic; and (iii) Abandonment or Abuse of a Child." United States v. Jim, 877 F. Supp. 2d at 1045. The Court concluded that a criminal history category of II did not over-represent Jim's criminal history, explaining that Jim's previous convictions involved alcohol and driving, demonstrating a pattern of aberrant use of alcohol also seen in the offense for which he was sentenced -- sexual assault -- as Jim asserted that both he and the victim were intoxicated at the time he assaulted the victim. See United States v. Jim, 877 F. Supp. 2d at 1022-23, 1044-45. The Court noted that "[i]t does not take much for a defendant to qualify for a criminal history category of II" and that the Court could not distinguish Jim's criminal history from that of other defendants that the Court regularly sees who also have a criminal history category of II, and thus denied Jim's request for a downward departure under U.S.S.G. § 4A1.3. United States v. Jim, 877 F. Supp. 2d at 1045.

In United States v. Jager, No. CR 10-1531 JB, 2011 WL 831279 (D.N.M. Feb. 17, 2011)(Browning, J.), the Court denied a defendant's request for a downward departure, under U.S.S.G. § 5H1.11, based upon the defendant's eleven years of military service. See United States v. Jager, 2011 WL 831279, at *10-11. Even though Jager had received exemplary reviews in his

military performance reports, earning either the highest or second highest ratings possible, the Court concluded that his service was not present in an unusual degree or distinguishable from other cases which the Guidelines cover.  See United States v. Jager, 2011 WL 831279, at *10-11.  The Court noted that in many child pornography cases, such as Jager's case, the defendant leads an exemplary life publicly, while engaging in a sordid secret life privately.  See United States v. Jager, 2011 WL 831279, at *11.  Additionally, Jager was not in intense combat during his military career; most of his time was spent in the support role of a mechanic.  See United States v. Jager, 2011 WL 831279, at *11.  The Court concluded, thus, that Jager's military service did not distinguish his case from those of many other defendants who commit child pornography, and the Court denied Jager's request for a downward departure.  See United States v. Jager, 2011 WL 831279, at *11.

## LAW REGARDING RESTITUTION

Courts do not have inherent power to order restitution and may do so only when a statute grants such authority.  See United States v. Harwood, 854 F. Supp. 2d 1035, 1051 (D.N.M. 2012)(Browning, J.)(citing United States v. Gordon, 480 F.3d 1205, 1210 (10th Cir. 2007)).  The MVRA, 18 U.S.C. § 3663A, is a general act establishing a court's authority to order restitution.  See 3 C. Wright, A. Leipold, P. Henning, & S. Welling, Federal Practice & Procedure: Criminal § 546, at 241 (4th ed 2011)("3 C. Wright").  In the Tenth Circuit, restitution is not criminal punishment, but is based "in the field of compensation and remediation."  United States v. Serawop, 505 F.3d 1112, 1123 (10th Cir. 2007)(acknowledging that other Courts of Appeals treat criminal restitution as a criminal penalty).

In 1996, Congress enacted the MVRA, which made restitution mandatory in certain cases, "particularly crimes of violence and theft crimes with identifiable victims who 'suffered a physical

injury or pecuniary loss.'"   United States v. Serawop, 505 F.3d at 1117 (quoting 18 U.S.C.

§ 3663A(c)(1)).   The MVRA applies:

> **(c)(1)** . . . in all sentencing proceedings for convictions of, or plea agreements relating to charges for, any offense --
>
>> **(A)**    that is --
>>
>>> **(i)**    a crime of violence, as defined in section 16;
>>>
>>> **(ii)**    an offense against property under this title, or under section 416(a) of the Controlled Substances Act (21 U.S.C. 856(a)), including any offense committed by fraud or deceit;
>>>
>>> **(iii)**    an offense described in section 1365 (relating to tampering with consumer products); or
>>>
>>> **(iv)**    an offense under section 670 (relating to theft of medical products); and
>>
>> **(B)**    in which an identifiable victim or victims has suffered a physical injury or pecuniary loss.
>
> **(2)**    In the case of a plea agreement that does not result in a conviction for an offense described in paragraph (1), this section shall apply only if the plea specifically states that an offense listed under such paragraph gave rise to the plea agreement.

18 U.S.C. § 3663A(c)(1).   The MVRA envisions that, if the district court determines that difficulty

in calculating restitution would complicate and prolong the sentencing process, the court may

decline to order restitution; the MVRA provides:

> **(3)** This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) if the court finds, from facts on the record, that --
>
>> **(A)** the number of identifiable victims is so large as to make restitution impracticable; or
>>
>> **(B)** determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3).   The term "victim" means

a person directly and proximately harmed as a result of the commission of an offense as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. In the case of a victim who is under 18 years of age, incompetent, incapacitated, or deceased, the legal guardian of the victim or representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section, but in no event shall the defendant be named as such representative or guardian.

18 U.S.C. § 3663A(a)(2).

Section 3664 governs how courts issue and enforce restitution awards for the MVRA. See 18 U.S.C. § 3663A(d); 18 U.S.C. § 3556. Any dispute "as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence" and the "burden of demonstrating the amount of loss sustained by a victim as a result of the offense shall be on the attorney for the Government." 18 U.S.C. § 3664(e). See United States v. Serawop, 505 F.3d at 1117 (stating that the United States bears the burden of proving amount of loss under the MVRA). The burden of "demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents" is on the defendant. 18 U.S.C. § 3664(e). "The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires." 18 U.S.C. § 3664(e).

Section 3664(a) requires that a court order the USPO to include in its presentence report "information sufficient for the court to exercise its discretion in fashioning a restitution order." 18 U.S.C. § 3664(a). If the USPO cannot "reasonably ascertain" "the number or identity of victims" or it is "clearly impracticable" to meet the requirements for other reasons, the USPO must "inform the court." 18 U.S.C. § 3664(a). The United States should provide the USPO a listing of the restitution claims sixty days before sentencing, but § 3664(d)(5) allows a court to "set a date

for the final determination of the victim's losses, not to exceed 90 days after sentencing," "if the victim's losses are not ascertainable by the date that is 10 days prior to sentencing." 18 U.S.C. § 3664(d)(5). "If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order." 18 U.S.C. § 3664(d)(5). A court may grant such an order "only upon a showing of good cause for the failure to include such losses in the initial claim for restitutionary relief." 18 U.S.C. § 3664(d)(5).

## ANALYSIS

The Court overrules J. Gallegos' and A. Gallegos' objections to the obstruction-of-justice adjustment, overrules J. Gallegos' objection to the vulnerable-victim adjustment, overrules J. Gallegos' objection to the physical-restraint adjustment, and sustains J. Gallegos' and A. Gallegos' restitution objection. First, the Court imposes the 2-level obstruction-of-justice adjustment under § 3C1.1 of the Guidelines to J. Gallegos' and A. Gallegos' sentences for Counts 4 and 5, because J. Gallegos and A. Gallegos willfully obstructed and impeded the administration of justice when they burned Burns' body and A. Sutton's car after killing Burns. Second, the Court imposes the 2-level vulnerable-victim adjustment under § 3A1.1(b)(1) of the Guidelines to J. Gallegos' sentence for Count 1, because Castillo was incarcerated with fellow SNM members and SNM intended to kill him. Third, the Court imposes the 2-level physical-restraint adjustment under § 3A1.3 of the Guidelines to J. Gallegos' sentence for Count 1, because J. Gallegos helped hold down Castillo's arms and body when J. Gallegos and other SNM members killed Castillo. Fourth, the Court concludes that J. Gallegos and A. Gallegos do not owe restitution for A. Sutton's losses, because the Court has determined that A. Sutton is not a victim under the MVRA. Fifth, the Court denies A. Gallegos' request for a downward departure.

I.     **THE COURT OVERRULES J. GALLEGOS' AND A. GALLEGOS' OBJECTIONS TO THE J. GALLEGOS PSR'S AND THE A. GALLEGOS PSR'S OBSTRUCTION-OF-JUSTICE ADJUSTMENTS UNDER U.S.S.G. § 3C1.1.**

J. Gallegos objects to the obstruction-of-justice adjustment in the J. Gallegos PSR ¶ 37, at 13, for Counts 4 and 5.  See J. Gallegos Objections ¶ 17, at 3.  J. Gallegos avers that "no facts [] support the adjustment," and that "an investigation must be underway when the conduct is committed or [there must be] knowledge that it is 'probably' underway."  J. Gallegos Objections ¶ 17, at 3 (citing United States v. Baggett, 342 F.3d 536).  According to J. Gallegos, "[t]here was no investigation until the fire [from Burns' body and car] was spotted and accordingly the adjustment does not apply to the conflagration."  J. Gallegos Objections ¶ 17, at 4.  At the June 11, 2019, hearing, J. Gallegos argued that the "Court is . . . making an assumption . . . that the only reason for the burning would be to destroy the evidence."  June 11 Tr. at 25:14-17 (Benjamin).  J. Gallegos contended that the United States' "proffered motive for this crime was disrespect" and "anger," and he argued that he intended to show disrespect and anger by burning the body.  June 11 Tr. at 25:18-19 (Benjamin).

A. Gallegos incorporates J. Gallegos' objections and similarly objects to obstruction-of-justice adjustment for Counts 4 and 5.  See A. Gallegos Objections ¶ 8, at 3.  A. Gallegos, by way of adopting J. Gallegos' Objections, argues that, for conduct to be obstructive, the conduct must be committed when an investigation is already underway or with knowledge that an investigation is probably underway.  See J. Gallegos Objections ¶ 17, at 3-4 (citing United States v. Baggett).  Moreover, at the May 10, 2019, hearing, the Court noted that A. Gallegos continues to rely on United States v. Baggett "for the proposition that obstructive conduct must occur during the investigation."  May 10 Tr. at 15:14-16 (Court, Torraco).  Accordingly,

A. Gallegos asserts that burning the body and the car cannot be the basis for the adjustment. See J. Gallegos Objections ¶ 17, at 3-4.

The USPO counters that J. Gallegos and A. Gallegos "obstruct[ed] the administration of justice with respect to the investigation," because, after murdering Burns and "in an effort to impede the criminal investigation, they placed Burns' body near his vehicle and set both on fire." J. Gallegos First Addendum at 3. Furthermore, at the May 10, 2019, hearing, the United States argued that "because of the burning, officials could not obtain fingerprints or other forensic evidence." May 10 Tr. at 17:1-2 (Castellano). At the June 11, 2019, hearing, the United States conceded that, while the United States argued that disrespect for Burns motivated J. Gallegos and A. Gallegos to kill him, disrespect did not motivate their "coverup of the murder, which concealed or destroyed evidence." June 11 Tr. at 27:2-15 (Castellano, Court).

Under U.S.S.G. § 3C1.1, a defendant's offense level must be enhanced by 2 levels if:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

U.S.S.G. § 3C1.1 (bold in original). The Guidelines' commentary gives the following relevant example of obstruction of justice:

> (D)    destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so; however, if such conduct occurred contemporaneously with arrest (e.g., attempting to swallow or throw away a controlled substance), it shall not, standing alone, be sufficient to warrant an adjustment for obstruction unless it resulted in a material hindrance to the official investigation or prosecution of the instant offense or the sentencing of the offender.

U.S.S.G. § 3C1.1 Application Note 4(D).  See United States v. Fleming, 667 F.3d 1098, 1109 (10th Cir. 2011)("Section 3C1.1 expressly applies to attempts by defendants to directly or *indirectly* threaten, intimidate, or influence a potential witness.")(emphasis in original).  The enhancement applies even for attempted obstruction of justice if the United States demonstrates that the defendant intended to obstruct justice and that the defendant committed an act that constitutes a substantial step toward the obstruction of justice.  See United States v. Fleming, 667 F.3d at 1107.

J. Gallegos and A. Gallegos' reliance on United States v. Baggett for the proposition that obstructive conduct must occur during the investigation is misplaced.  Whereas United States v. Baggett applies an earlier version of § 3C1.1 which so required, the current Guidelines do not require obstructive conduct to occur during an investigation.  The version of § 3C1.1 that United States v. Baggett applies provides:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by 2 levels.

United States v. Baggett, 342 F.3d at 541 (emphasis omitted)(quoting U.S.S.G. § 3C1.1).  Effective November 1, 2006, this language was revised to the current language, which notably replaces the phrase "during the course of" with "with respect to."  U.S.S.G. § 3C1.1.  This temporal distinction makes the difference.

The fact that J. Gallegos and A. Gallegos burned Burns' body and car before the investigation began is immaterial.  The Guidelines Commentary provides that "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may

be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1 Application Note 1. Although J. Gallegos and A. Gallegos burned Burns' body and car before the murder investigation began, A. Gallegos' actions were designed to thwart the investigation. The current Guidelines merely require that "the defendant willfully obstructed or impeded . . . with respect to the investigation, prosecution, or sentencing." U.S.S.G. § 3C1.1 (emphasis added). This broad language encompasses J. Gallegos' and A. Gallegos' actions in burning Burns' body and car, as such actions hindered officials' ability to gather fingerprints and forensic evidence. See May 10 Tr. 17:1-2 (Castellano). J. Gallegos' and A. Gallegos' actions thus "obstructed or impeded . . . the administration of justice . . . with respect to the investigation." U.S.S.G. § 3C1.1.

The Court concludes that the act of burning Burns' body and A. Sutton's car is a willful impediment to the investigation of Burns' murder and squarely falls within § 3C1.1's purview. Burning the victim's body and his car was a "necessarily willful impediment to the investigation of Burns' murder," and the Court infers "that such burning was done to destroy the evidence." June 11 Tr. at 24:18-21 (Court). According to B. Cordova's testimony,[9] A. Gallegos said that he and his brother shot Burns, bound him, and burned him. See Cordova Tr. at 58:5-13 (Castellano, B. Cordova). The Guidelines Commentary provides that "destroying or concealing . . . evidence that is material to an official investigation or judicial proceeding" is an example of the conduct to which § 3C1.1 applies. U.S.S.G. § 3C1.1 Application Note 4(D). Moreover, "material" evidence

---

[9]At the June 11, 2019, hearing, the Court noted that it cannot use B. Cordova's "testimony against Mr. J. Gallegos, [] because it's inadmissible nonhearsay evidence only to Andrew Gallegos." June 11 Tr. at 29:21-23 (Court). The Court nevertheless concludes that a preponderance of the evidence supports the conclusion that J. Gallegos incinerated Burns' body and car to impede law enforcement.

is "evidence . . . that, if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 Application Note 6. B. Cordova testified that A. Gallegos told him that law enforcement found Burns burned in the bosque and did not have any evidence as a result of the fire. See Cordova Tr. at 58:14-19 (Castellano, Cordova). The Court concludes by a preponderance of the evidence that, by destroying material evidence, J. Gallegos' and A. Gallegos' actions were designed to obstruct and impede the investigation. Accordingly, the Court overrules J. Gallegos and A. Gallegos' objection, and will apply the obstruction-of-justice adjustment to their sentences for Count 4.

## II.     THE COURT OVERRULES J. GALLEGOS' OBJECTION TO THE J. GALLEGOS PSR'S VULNERABLE-VICTIM ADJUSTMENT UNDER U.S.S.G. § 3A1.1(b).

J. Gallegos objects to the vulnerable-victim adjustment in the J. Gallegos PSR ¶ 42, at 13, because, he argues, "[t]here is no credible testimony that [Castillo] was vulnerable," and because "[Castillo] was not 'locked' in his cell per testimony." J. Gallegos Objections ¶ 19, at 4 (quoting J. Gallegos PSR ¶ 42, at 13; citing United States v. Lambright, 320 F.3d 517). At the June 11, 2019, hearing, the Court noted that, based upon Lujan's testimony, "the SNM targeted Castillo to be killed because of his alleged cooperation with law enforcement." June 11 Tr. at 9:4-6 (Court). The Court added that the SNM ordered Castillo's murder by issuing a "green light . . . pursuant to the gang's prohibition of snitching," because Castillo had snitched on other SNM members. June 11 Tr. at 9:10-11 (Court). J. Gallegos argued, however, that nearly everyone "involved . . . in this trial had [] a green light on them." June 11 Tr. at 13:16-14:13 (Benjamin).

The United States asserts that the vulnerable-victim adjustment applies, because Castillo was incarcerated, and because J. Gallegos helped murder Castillo "immediately following [Castillo's] ingestion of heroin." United States' J. Gallegos Response at 5. According to the

United States, "Castillo was in a more difficult position to fight off his attackers while trapped in his own cell with three others and while under the influence of a narcotic drug." United States' J. Gallegos Response at 5. At the June 11, 2019, hearing, the United States averred that it agrees with the Court's vulnerable-victim analysis and that it "believe[s] that the enhancement applies." June 11 Tr. at 13:5-8 (Castellano). The USPO asserts that the adjustment is appropriate, because "[s]everal Circuits have found that the enhancement is warranted when there is an assault against incarcerated or detained individuals." J. Gallegos First Addendum at 3. The USPO also argues that the adjustment applies, because "it was well known that [Castillo], a member of the SNM gang, had a 'green light,' which meant he was to be killed." J. Gallegos Second Addendum at 3.

The vulnerable-victim adjustment, U.S.S.G. § 3A1.1(b), provides:

> (b)     (1)     If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels.
>
>         (2)     If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by **2** additional levels.

U.S.S.G. § 3A1.1(b)(1) (bold in original). Application Note 2 to U.S.S.G. § 3A1.1 explains:

> For purposes of subsection (b), "**vulnerable victim**" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.
>
> Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.
>
> Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline. For example, if the offense

guideline provides an enhancement for the age of the victim, this subsection would
not be applied unless the victim was unusually vulnerable for reasons unrelated to
age.

U.S.S.G. § 3A1.1 Application Note 2 (bold in original). "In order to classify a victim as 'vulnerable,' 'the sentencing court must make particularized findings of vulnerability.'" United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 834). "The focus of the inquiry must be on the 'victim's personal or individual vulnerability.'" United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 835). In addition, "the enhancement should apply when the victim is 'less able to resist than the typical victim.'" United States v. Scott, 529 F.3d at 1300 (quoting United States v. Castaneda, 239 F.3d at 980).

The vulnerable-victim adjustment "applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." U.S.S.G. § 3A1.1 Application Note 2 (emphasis added). For example, in United States v. Tapia, the Eleventh Circuit reviewed the district court's decision that an incarcerated government informant, whom other prisoners assaulted, was a vulnerable victim for U.S.S.G. § 3A1.1's purposes. See United States v. Tapia, 59 F.3d at 1143. The Eleventh Circuit found no error in the application of the adjustment to the appellants' convictions under 18 U.S.C. § 1513 (retaliating against a witness, victim, or informant), determining that the district court "correctly concluded that [the victim], as an individual, was particularly vulnerable by virtue of his incarceration with Appellants and his inability to escape, and that [the victim] was targeted because of this vulnerability." United States v. Tapia, 59 F.3d at 1143. In United States v. Lambright, the Fifth Circuit upheld U.S.S.G. § 3A1.1's application where a corrections officer killed an inmate. See United States v. Lambright, 320 F.3d at 518. The district court concluded that the inmate was a vulnerable victim, because "he was completely dependent upon the care of the correction officers,

. . . was locked in his cell prior to the assault, and . . . he could not protect himself from the assault."
20 F.3d at 518. Similarly, the Tenth Circuit underscores that the adjustment "is reserved for exceptional cases in which the victim is *unusually* vulnerable or *particularly susceptible* to the crime committed," where the victims "are unable to protect themselves." United States v. Proffit, 304 F.3d at 1007 (emphasis in original). There is no requirement, however, for the sentencing court to find "that the defendant intentionally targeted the victim because of the victim's vulnerability" to apply the adjustment. United States v. Checora, 175 F.3d at 789 n.4. Further, "[i]n assessing vulnerability, the sentencing court must make an individualized determination; it is not enough that a victim belongs to a class generally considered vulnerable." United States v. Scott, 529 F.3d at 1300-01 (citing United States v. Proffit, 304 F.3d at 1007; United States v. Hardesty, 105 F.3d at 560).

The Court concludes that Castillo qualifies as a vulnerable victim under U.S.S.G. § 3A1.1(b)(1), and thus the vulnerable-victim adjustment applies to J. Gallegos' Count 1 conviction. The SNM targeted Castillo to be killed, because of his alleged cooperation with law enforcement. See Transcript of Excerpt of Testimony of Leonard Lujan at 78:15 (taken April 23, 2018, and April 24, 2018)(Lujan), filed May 16, 2018 (Doc 2282)("Lujan Tr.")(stating that Castillo needed to be killed because "he was a rat"). The SNM issued a greenlight on Castillo requiring that he be killed pursuant to the gang's prohibition on snitching. See Lujan Tr. at 12:16-23 (Beck, Lujan)(stating that "the biggest" rule of the SNM is "don't snitch" and that those who do are "going to get stabbed or get killed"); id. at 73:10-12 (Beck, Lujan)(stating that being a rat results in "an automatic green light"); id. at 78:13-16 (Beck, Lujan)(discussing B. Garcia issuing a hit on Castillo, because he was a rat).

The Court concludes that the greenlight on Castillo made him particularly vulnerable to

being murdered.  Castillo's incarceration with other SNM members who knew of the greenlight and were ordered to act on it increased Castillo's vulnerability.  See, e.g., Lujan Tr. at 87:18-23 (stating that Lujan would follow an order from somebody who "had a push within the SNM"); Transcript of Excerpt of Testimony of Michael Jaramillo at 164:4-8 (taken May 13, 2018)(Cooper, Jaramillo), filed May 23, 2018 (Doc. 2316)("Jaramillo Tr.")(confirming that, when a member gets confirmation "that somebody has got to get hit, he needs to go forward with that and make sure those people get hit").  DeLeon, J. Gallegos, and Jaramillo targeted Castillo specifically because of the greenlight.  See Lujan Tr. at 83:21-84:4 (Lujan)(stating that Lujan told J. Gallegos that B. Garcia ordered Lujan to choose people to kill Castillo, and that Lujan chose DeLeon, J. Gallegos, and Jaramillo); Jaramillo Tr. at 14:20-22 (Jaramillo)(stating that J. Gallegos informed Jaramillo and DeLeon that they "were going to be taking out" Castillo); United States v. Pearce, 967 F.2d at 435 (stating that U.S.S.G. § 3A1.1(b)(1) is justified where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics").  In addition, DeLeon, J. Gallegos, and Jaramillo had easy access to Castillo, because they were housed together, and specifically attacked Castillo in his cell, where it would be harder for Castillo to escape.  See Jaramillo Tr. at 12:16-18 (Beck, Jaramillo)(providing that Jaramillo and Castillo were housed in the same unit); id. at 14:10-12 (Beck, Jaramillo)(providing that J. Gallegos occupied the room "next door" to Jaramillo's room); id. at 19:17-22 (Jaramillo)(stating that J. Gallegos, Jaramillo, and DeLeon entered Castillo's cell and strangled him "as soon as [Castillo] was done injecting [] heroin"); United States v. Tapia, 59 F.3d at 1143 (concluding that the victim  "was particularly vulnerable by virtue of his incarceration with [the defendants] and his inability to escape, and that [the victim] was targeted because of this vulnerability").  DeLeon, J. Gallegos, and Jaramillo outnumbered Castillo in his small cell, and waited to attack Castillo until Castillo had ingested

heroin, so they used Castillo's vulnerable, intoxicated state to their advantage.  See Jaramillo Tr. at 15:10-12 (Jaramillo)(stating that the murder plan was to enter Castillo's "room in the morning, give him a shot of heroin, and then strangle him"); id. at 19:20-22 (Jaramillo)(stating that, "as soon as [Castillo] was done injecting the heroin, Joe and Angel grabbed him, rolled him over onto his bed, and [Jaramillo] began to choke him out"); United States v. Checora, 175 F.3d at 788 (upholding U.S.S.G. § 3A1.1(b)(1)'s application where the victim was outnumbered, drunk and had little ability to defend himself).  Accordingly, the Court determines that credible testimony establishes that Castillo was a vulnerable victim, because: (i) the SNM placed a hit on Castillo; (ii) Castillo was incarcerated with other SNM members who were ordered to carry out the hit; (iii) DeLeon, J. Gallegos, and Jaramillo outnumbered Castillo when they attacked and killed Castillo; (iv) DeLeon, J. Gallegos, and Jaramillo attacked and killed Castillo while he was intoxicated from heroin; and (v) Castillo could not defend himself or escape from the surprise attack in his cell.  See Memorandum Opinion and Order at 105-08, 2019 WL 4891122, at *41, filed October 3, 2019 (Doc. 2899)(D.N.M.)(Browning, J.)(concluding that the same factors justify overruling Troup's objection to the vulnerable-victim adjustment for participating in Castillo's murder).  J. Gallegos knows or should have known of these particular vulnerabilities, so the Court applies the 2-level adjustment under U.S.S.G. § 3A1.1(b)(1) and overrules J. Gallegos' Objection to the adjustment.

## III.  THE COURT OVERRULES J. GALLEGOS' OBJECTION TO THE J. GALLEGOS PSR'S PHYSICAL-RESTRAINT ADJUSTMENT UNDER U.S.S.G. § 3A1.3.

J. Gallegos' PSR applies a physical-restraint adjustment to Count 1's violent crimes in aid of racketeering, and aiding and abetting, for Castillo's murder, because Castillo "was physically restrained in the course of the offense."  J. Gallegos PSR ¶ 41, at 13.  J. Gallegos objects to the

physical-restraint adjustment, because "[t]he facts used to assess this adjustment are inaccurate and not based on credible trial testimony." J. Gallegos Objections ¶ 18, at 4. J. Gallegos contends that physical-restraint adjustment involves "double counting," June 11 Tr. at 19:13 (Sindel), because the Court referred to Castillo's restraint as one reason for applying the vulnerable-victim adjustment, and J. Gallegos therefore argues that "there is an overlap" between the vulnerable-victim adjustment and the physical-restraint adjustment, June 11 Tr. at 19:21 (Sindel).

The USPO counters that the physical-restraint adjustment is appropriate, because accurate information supports the adjustment, and because the "victim's cell[] only [had] one entrance and exit"; "the victim was not able to fight off his assailants or escape while being held down and strangled by multiple individuals"; and "the attacks occurred behind closed doors out of the view of prison guards," J. Gallegos First Addendum at 3. The USPO adds that the Court determined that the adjustment applies for Castillo's murder during the sentencing hearing for Troup, who was also involved in Castillo's murder. See J. Gallegos Second Addendum at 3. Similarly, the United States argues that the physical-restraint adjustment applies, because J. Gallegos "physically restrained Frank Castillo while Jaramillo strangled him." United States' J. Gallegos Response at 5. The United States also notes that "strangulation, which include[s] restraint," is a "common means of killing people in the SNM." June 11 Tr. at 20:10-12 (Castellano).

At the June 11, 2019, hearing, the Court concluded that, according to Jaramillo's testimony, DeLeon and J. Gallegos held Castillo down while Jaramillo strangled him. See June 11 Tr. at 17:14-16 (Court). The Court noted that Jaramillo's exact words were that J. Gallegos participated by "helping hold down" Castillo. June 11 Tr. at 17:21-22 (Court). The Court said that Clark also testified that J. Gallegos held Castillo "down with the monkey grip or gorilla grip, something like that, and that it was easy." June 11 Tr. at 18:2-3 (Court). The Court noted that

applying the physical-restraint adjustment "does not involve impermissible double counting, because Mr. Castillo's physical restraint by Mr. DeLeon and Mr. Gallegos to make it easier for Mr. Jaramillo to strangle Mr. Castillo is not being used as [the] basis of a different adjustment." June 11 Tr. at 18:17-21 (Court)(citing United States v. Flinn, 18 F.3d 826, 829 (10th Cir. 1994)). The Court said that it finds Jaramillo's and Clark's testimonies to be credible, and thus overruled J. Gallegos' objection. See June 11 Tr. at 18:6-15 (Court); id. at 20:21-21:1 (Court).

U.S.S.G. § 3A1.3 states that, "[i]f a victim was physically restrained in the course of the offense, increase by **2** levels." U.S.S.G. § 3A1.3 (bold in original). The Guidelines define the term "physically restrained" as "the forcible restraint of the victim such as being tied, bound, or locked up." U.S.S.G. §1B1.1 Application Note 1(L). These examples "are merely illustrative and not exhaustive." United States v. Rodella, No. CR 14-2783, 2015 WL 711941, at *27 (citing United States v. Checora, 175 F.3d at 790). The physical-restraint adjustment applies where "there [is] a forcible restraint of a victim which occurs during commission of the offense." United States v. Checora, 175 F.3d at 790 (footnote omitted). There does not have to be "physical touching of the victim," because "[k]eeping someone from doing something is inherent within the concept of restraint." United States v. Fisher, 132 F.3d at 1329-30 (applying § 3A1.3 where a "coconspirator deliberately kept the security guard at bay by pointing a gun directly at his head"). Furthermore, the Tenth Circuit has held that the physical-restraint adjustment applied when two defendants tackled a victim to the ground to prevent the victim from escaping. See United States v. Checora, 175 F.3d at 790.

The Court concludes that, based on Jaramillo's and Clark's testimonies, the physical-restraint adjustment applies, because DeLeon and J. Gallegos held Castillo down while Jaramillo strangled him to death. See Jaramillo Tr. at 21:2-13 (Beck, Jaramillo)(stating that "Joe

and Angel grabbed [Castillo] by his arms and rolled him over onto his bed"); id. at 174:2-6 (Beck, Jaramillo)(stating that J. Gallegos participated in Castillo's murder by "help[ing] hold down" Castillo); Transcript of Excerpt of Testimony of Benjamin Clark at 66:21-24 (taken May 4, 2018)(Clark)(stating that J. Gallegos described DeLeon holding Castillo "down with the monkey grip or gorilla grip, something like that, and that it was easy; that Angel held him so tight that it was easy for him to kill" Castillo)("Clark Tr."). The Court determines that Jaramillo's and Clark's testimonies are credible. J. Gallegos' grabbing of Castillo, which occurred during commission of the offense, was clearly forcible and made it easier for Jaramillo to strangle Castillo. See Clark Tr. at 66:21-24 (Clark); United States v. Ivory, 532 F.3d at 1106; United States v. Checora, 175 F.3d at 791. Thus, the physical-restraint adjustment applies to J. Gallegos' conduct.

The Court also concludes that applying the physical-restraint adjustment does not constitute impermissible double counting, because J. Gallegos' restraint of Castillo does not form the basis of another adjustment. In United States v. Flinn, the Tenth Circuit stated that "[i]mpermissible double counting or impermissible cumulative sentencing occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes." 18 F.3d at 829 (citing United States v. Lowder, 5 F.3d 467, 472 (10th Cir. 1993)). Moreover, an "upward departure cannot be based upon conduct included within [the] base offense level." United States v. Flinn, 18 F.3d at 829 (citing United States v. Werlinger, 894 F.2d 1015, 1017 (8th Cir. 1990)). As discussed above, the Court determines that the vulnerable-victim adjustment applies to Castillo's murder, because: (i) the SNM placed a hit on Castillo; (ii) Castillo was incarcerated with other SNM members who were ordered to carry out the hit; (iii) DeLeon, J. Gallegos, and Jaramillo outnumbered Castillo when they attacked and killed Castillo; (iv) DeLeon, J. Gallegos,

and Jaramillo attacked and killed Castillo while he was intoxicated from heroin; and (v) Castillo could not defend himself or escape from the surprise attack in his cell. In contrast, the Court determines that the physical-restraint adjustment applies, because DeLeon and J. Gallegos held down Castillo's arms to make it easier for Jaramillo to strangle Castillo. Holding down Castillo's arms is not conduct that justifies the vulnerable-victim adjustment's application. See Clark Tr. at 66:21-24 (Clark). The Court disagrees that the bases for the vulnerable-victim adjustment and the physical-restraint adjustment "overlap." June 11 Tr. at 19:21 (Sindel). See United States v. Flinn, 18 F.3d at 829. Accordingly, the Court concludes that Castillo was physically restrained during his murder, so the 2-level adjustment under U.S.S.G. § 3A1.3 applies, and the Court overrules J. Gallegos' objection.

## IV. THE COURT SUSTAINS J. GALLEGOS' AND A. GALLEGOS' OBJECTIONS TO THE RESTITUTION REQUEST.

The J. Gallegos PSR and the A. Gallegos PSR provide that "[t]he provisions of the Mandatory Victim Restitution Act of 1996 apply to these Title 18 offenses" and states that A. Sutton submitted a request for restitution. J. Gallegos PSR ¶ 28, at 12; A. Gallegos PSR ¶ 22, at 9. A. Sutton requests $21,000.00 for her 2012 Mitsubishi Gallant, which was burned along with Burns' body; $7,200.00 for lost income or wages, calculated at $15.00 per hour at forty hours per week; and $280.00 for transportation, for a total of $28,480.00. See J. Gallegos PSR ¶ 29, at 12; A. Gallegos PSR ¶ 22, at 9. J. Gallegos objects to the J. Gallegos PSR's restitution calculations, and he argues that the J. Gallegos PSR's "figures should be offset by funds 'the girlfriend' and insurance received from State or Federal sources." J. Gallegos Objections ¶ 16, at 3 (quoting J. Gallegos PSR ¶ 29, at 11). A. Gallegos incorporates J. Gallegos' objection and additionally

argues that he "does not believe he owes restitution as he did not set the vehicle on fire and there was no trial evidence that he incinerated the Mitsubishi." A. Gallegos Objections ¶ 7, at 2.

In the A. Gallegos First Addendum, the USPO maintains that A. Gallegos "was found guilty of Violent Crimes in Aid of Racketeering (Conspiracy to Murder) and (Murder); therefore, the Mandatory Victim Restitution Act of 1996 applies to these offenses." A. Gallegos First Addendum at 2. The United States asserts in the United States' A. Gallegos Response that it agrees with the USPO that A. Gallegos is required to pay restitution. See United States' A. Gallegos Response at 2. In the J. Gallegos Second Addendum, however, the USPO concedes that, based on the Court's conclusions at the May 10, 2019, hearing, restitution is not authorized for A. Sutton. See J. Gallegos Second Addendum at 2.

The MVRA requires a court to order a defendant convicted of certain offenses to "make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate." 18 U.S.C. § 3663A(a)(1). The MVRA defines the term "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). The MVRA provides that it applies "in all sentencing proceedings for convictions of . . . any offense . . . that is . . . a crime of violence, as defined in section 16[,] . . . and . . . in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1). Moreover, 18 U.S.C. § 16 defines the term "crime of violence" as:

> (a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 16. Further, the MVRA outlines four categories of losses which the defendant must cover by paying restitution: (i) damage to, or loss or destruction of, property, see 18 U.S.C. § 3663A(b)(1); (ii) bodily injury, including the cost of medical care, psychiatric and psychological care, physical and occupational rehabilitation, and the victim's lost income, see 18 U.S.C. § 3663A(b)(2); (iii) if the bodily injury results in death, the cost of funeral and related services, see 18 U.S.C. § 3663A(b)(3); and (iv) the victim's expenses incurred during participation in the investigation or prosecution of the offense, including child care expenses and transportation costs, see 18 U.S.C. § 3663A(b)(4).

The MVRA applies in Counts 4 and 5, because murder and conspiracy to murder are "crime[s] of violence" for MVRA purposes. 18 U.S.C. § 16. See United States v. Visinaiz, 428 F.3d at 1305 (upholding order of restitution for defendant convicted of second-degree murder); United States v. Juvenile Male, 923 F.2d at 620 (concluding that "conspiracy to travel in interstate commerce to commit murder" is a "crime of violence as contemplated by section[] 16(b)," because it "creates a substantial risk that physical force may be used"); United States v. Cruz, 805 F.2d 1464, 1474 n.11 (11th Cir. 1986)(writing in dicta that conspiracies to commit a crime of violence create a substantial risk of violence, such that § 16 encompasses these offenses). Given that Burns is a murder victim, restitution is mandatory for his losses.

The question remaining is whether A. Sutton, the murder victim's girlfriend, is properly considered "a victim of the offense" such that she may receive restitution under the MVRA for the destruction of her car, loss of income or wages, and transportation costs. 18 U.S.C. § 3663A(b)(1). Neither the United States nor the USPO makes a serious attempt to argue that A. Sutton qualifies as a victim of A. Gallegos' actions under the MVRA. See United States v. Kieffer, 681 F.3d at 1171 ("[T]he Government makes no serious attempt to establish that it met its burden of proving

any of the individuals the court deemed entitled to restitution were 'victims' of Defendant's 'criminal conduct' within the meaning of the MVRA. Accordingly, the district court's order of restitution fails for lack of proof.")(quoting 18 U.S.C. § 3663A(a)(2)); United States v. Speakman, 594 F.3d 1165, 1172-73, 1173 n.5 (10th Cir. 2010)(stating that the United States bears the burden of establishing who is a victim of the offense for MVRA purposes). The United States argues that the Mitsubishi was "burned as part of [the] offense conduct," and therefore, the vehicle was "sufficiently close and related to the crime" such that the vehicle's destruction should warrant restitution for A. Sutton. May 10 Tr. at 17:1-7 (Castellano). Moreover, although the USPO adequately demonstrates that murder is indeed a "crime of violence" within the MVRA's purview, the USPO and the United States do not demonstrate how the MVRA may be construed in a way that requires J. Gallegos and A. Gallegos to pay restitution to A. Sutton. Third Addendum at 1.

A. Sutton does not qualify as a "victim" under the MVRA, because she was not "directly and proximately harmed" by the offense. 18 U.S.C. § 3663A(a)(2). See June 11 Tr. at 34:1-3 (Court). The offense here is Burns' murder. Burns' body was found severely burnt and left on the ground about six feet from the trunk of the burnt 2012 Mitsubishi Gallant, registered to A. Sutton. See J. Gallegos PSR ¶ 20, at 11; A. Gallegos PSR ¶ 14, at 8. The autopsy reveals that a gunshot to Burns' head caused his death. See J. Gallegos PSR ¶ 22, at 11; A. Gallegos PSR ¶ 16, at 9. According to B. Cordova's testimony, A. Gallegos said that he and his brother shot Burns, bound him, and burned him. See Cordova Tr. at 58:5-13 (Castellano, B. Cordova). The question is not whether A. Sutton is a victim of J. Gallegos' and A. Gallegos' actions in burning her car, but rather, whether she is a victim of Burns' murder. The burning of the car is separate conduct from the act of murdering Burns; therefore, A. Sutton's loss of her car is not the "direct[] and proximate[]" result of "the commission of" the murder. 18 U.S.C. § 3663A(a)(2). See June 11

Tr. at 34:23-35:1 (Court). Accordingly, A. Sutton is not properly considered a victim of Burns' murder, and the Court will not award her restitution for her destroyed car.

The MVRA provides two avenues for an order of restitution for loss of income. The first is "in the case of an offense resulting in bodily injury to a victim[,]" in which the Court shall order that the defendant

> (A) pay an amount equal to the cost of necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care, including nonmedical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment;

> (B) pay an amount equal to the cost of necessary physical and occupational therapy and rehabilitation; and

> (C) reimburse the victim for income lost by such victim as a result of such offense.

18 U.S.C. § 3663A(b)(2). This provision is inapplicable to Sutton, because it applies to a victim who suffered physical injury as a result of the offense, and Burns' murder did not result in bodily injury to Sutton. See United States v. Oslund, 453 F.3d 1048, 1062 (8th Cir. 2006)("When an offense causes bodily harm to a victim, restitution must be ordered for medical or psychological treatment, costs of therapy and rehabilitation, and 'income lost by such victim as a result of such offense.'" (quoting 18 U.S.C. § 3663A(b)(2)).

Second, the defendant must, "in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). Again, this provision is inapplicable to A. Sutton, as her lost wages or income is not a result of her "participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). The same reasoning

applies to A. Sutton's requests for restitution to cover transportation costs.[10]  Accordingly, the

Court will not order restitution for A. Sutton's lost wages or income or for her transportation costs.

Neither the United States nor the USPO provides facts so that the Court may determine restitution

amounts that are appropriate to cover "the cost of necessary funeral and related services," and so

the Court will not order restitution under the MVRA for Burns' funeral costs.  18 U.S.C.

§ 3663A(b)(3).

## V.    THE COURT WILL NOT DEPART DOWNWARD, AND WILL SENTENCE A. GALLEGOS TO TWO CONCURRENT SENTENCES FOR COUNTS 4 AND 5.

The advisory Guidelines' sentences for A. Gallegos' convictions are 120 months

imprisonment for Count 4 and life imprisonment  for Count 5.  See A. Gallegos PSR ¶¶ 98-99,

at 25; May 10 Tr. 18:15-20 (Court).  A. Gallegos requests "a sentence of 15 years, or alternatively,

a sentence which would allow the possibility of parole."  Sentencing Memo. at 1.  A. Gallegos

contends that the Guidelines are "advisory instead of mandatory," Sentencing Memo. at 4, and that

the Court may instead give a sentence in accordance with the factors which 18 U.S.C. § 3553(a)

outlines, see Sentencing Memo. at 5-6.  The United States argues that, under 18 U.S.C.

§ 1959(a)(1), the Court must impose a life sentence for murder in Count 5.  See Tr. 4:14-5:1

(Castellano).  The probation officer agrees.  See Tr. 5:14-19 (Court, Cordova).

The Court agrees that it cannot consider the § 3553(a) factors to depart below the statutory

minimum.  "As a matter of law, the district court [is] not authorized [] to consider factors other

---

[10]The Court cannot determine with accuracy or by a preponderance of the evidence from what the claim for transportation costs arises, as A. Sutton's Victim Impact Statement (dated January 7, 2019), filed March 28, 2019 (Doc. 2599-3), provides only that she is seeking restitution for "train & bus," Sutton's Victim Impact Statement at 7.  The Court assumes that these costs were because of A.S. having to use alternate transportation after the loss of the car, which is why it does not award restitution for these costs.

than substantial assistance in sentencing below the statutory minimum." United States v. A.B., 529 F.3d 1275, 1280 (10th Cir. 2008). A. Gallegos has not offered substantial assistance to the United States. There is no statutory authority for the Court to depart below the mandatory life sentences in this case. See United States v. Campbell, 995 F.2d 173, 175 (10th Cir. 1993)("When a sentence is fixed by statute, any exception to the statutory directive must also be given by statute."). Furthermore, parole has been replaced by supervised release in the federal system, making the possibility of parole not an option. See United States v. Haymond, 139 S. Ct. 2369, 2382 (2019)("[In 1984], Congress overhauled federal sentencing procedures to make prison terms more determinate and abolish the practice of parole. . . . In parole's place, Congress established the system of supervised release."); Bledsoe v. United States, 384 F.3d 1232, 1233 (10th Cir. 2004)("Under the [Sentencing Reform Act], parole was to be abolished, the Parole Commission was to be phased out, and prisoners were to serve uniform sentences under sentencing guidelines."). The Court therefore sentences A. Gallegos to Congress' requirement of life imprisonment for his Count 5 conviction, which will run concurrently with the sentence for his Count 4 conviction.

With U.S.S.G. § 3C1.1's application, A. Gallegos' total offense level is 43. A. Gallegos does not object to the PSR's calculated criminal history score of 13 and criminal history category of VI. See A. Gallegos PSR ¶¶ 49-50, at 16; Objections ¶¶ 1-8, at 1-3. With a criminal history category of VI and a total offense level of 43, the Guideline imprisonment range is life, which is the same as the A. Gallegos PSR's Guideline imprisonment range. See PSR ¶ 99, at 25. The Court could depart from the Guidelines sentence, and still sentence at the statutory sentence of life. That exercise would be academic and theoretical, but possible and permissible. The Court expressly concludes, however, that the Guidelines sentence is appropriate as to both Counts 4 and 5. The

seriousness of the crime that the jury found A. Gallegos committed, the need for deterrence both at a specific and general level, the need for a just sentence, and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct all outweigh any factors that put downward pressure on the sentence.

**IT IS ORDERED** that: (i) the Defendant's Objections to the Presentence Report (PSR), filed April 11, 2019 (Doc. 2614), are overruled as to Defendant Joe Lawrence Gallegos' objections to the obstruction-of-justice adjustment, the vulnerable-victim adjustment, and the physical-restraint adjustment, and sustained as to J. Gallegos' objection to the restitution request; and (ii) the Defendant's Objections to the Presentence Report (PSR), filed April 18, 2019 (Doc. 2617), are overruled as to Defendant Andrew Gallegos' objection to the obstruction-of-justice adjustment and his request for a downward departure, and sustained as to A. Gallegos' objection to the restitution request.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
   Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Susan M. Porter
Albuquerque, New Mexico

--and--

Sarah M. Gorman
Albuquerque, New Mexico

     *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

     *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

    *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

    *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

    *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

    *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

--and--

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

     *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

     *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

    *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

    *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

> *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

> *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

> *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

> *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

> *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

*Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

*Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

*Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

*Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

*Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*